**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE SAVANNA GROUP, INC. | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 10-cv-7995 |
| v. | ) | |
| | ) | |
| TRYNEX, INC. and JAMES TRUAN, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Before the Court is Plaintiff The Savanna Group Inc.'s Second Amended Motion for

Class Certification pursuant to Federal Rule of Civil Procedure 23. For the following reasons,

the Court enters and continues the Motion subject to the submission of additional information by

the parties as discussed in detail below.

**BACKGROUND**

Plaintiff The Savanna Group, Inc. ("Savanna Group") is a "design/build landscape

contracting firm." (R. 145-3, Defs.' Resp., Timothy Caldwell Dep. Tr. 11:24). Defendant

Trynex, Inc. ("Trynex") manufactures snow and ice control equipment, including salt

"spreaders." (R. 137, Pl.'s Mem. Law, Ex. C, Dep. Tr. Barry Truan; Compl. ¶ 10.) Defendant

James Truan is the Vice-President and a shareholder of Trynex. (Pl.'s Mem. Law, Ex. D, James

Truan Dep. Tr. 7: 14-17.) Trynex paid B2B to send "SnowEx Alert" faxes to a list of recipients

advertising the sale of an extended warranty on Trynex's salt spreaders. (Pl.'s Mem. Law, Ex.

C, Barry Truan Dep. Tr. 43-45.)  "Business to Business," or "B2B" was an operation run by

Caroline Abraham that sent "blast" fax advertising to various recipients from 2005 to 2007.

(Pl.'s Mem. Law, Ex. B., June 12, 2011 C. Abraham Dep. Tr. 9-12; 13: 10-15.)  B2B purchased

lists of recipients from InfoUSA.  (Pl.'s Mem. Law, Ex. E, C. Abraham Decl. ¶ 6. (Dec. 28,

2010).)

Plaintiff alleges that it is part of a class of intended recipients to which Trynex sent faxes

advertising the extended warranty on Trynex's salt spreaders without invitation or permission in

violation of the Telephone Consumer Protection Act ("TCPA").  (Compl. ¶¶ 4,11,15.)  The

TCPA prohibits the "use [of] any telephone facsimile machine, computer, or other device to

send, to a telephone facsimile machine, an unsolicited advertisement," unless, among other

conditions, the "unsolicited advertisement is from a sender with an established business

relationship with the recipient."  47 U.S.C. §§ 227(b)(1)(C), (b)(1)(C)(i).  Plaintiff also alleges

that Trynex violated 64 C.F.R. 1200 by failing to display a proper opt-out notice in its faxes.

(Compl. ¶ 26.)  Plaintiff moves to certify the class and to appoint Savanna Group as the class

representative and Plaintiff's Counsel as class counsel.  (Pl.'s Mem. Law 1.)

## LEGAL STANDARD

Federal Rule of Civil Procedure Rule 23(a) contains four prerequisites for class

certification: numerosity, commonality, typicality, and adequacy.  *See* Fed. R. Civ. P. 23(a);

*Wal-Mart Stores, Inc. v. Dukes*, __U.S.__, 131 S. Ct. 2541, 2550, 180 L. Ed. 2d 374 (2011).  In

addition to satisfying the Rule 23(a) requirements, plaintiffs must show that the proposed class

satisfies one of the three requirements set forth in Rule 23(b).  *See Amchem Prods., Inc. v.*

*Windsor*, 521 U.S. 591, 614, 117 S. Ct. 2231, 138 L. Ed. 3d 689 (1997); *Oshana v. Coca-Cola*

*Co.*, 472 F.3d 506, 513 (7th Cir. 2006). Where, as here, the named Plaintiff seeks certification pursuant to Rule 23(b)(3), it must show that "questions of law and fact common to members of the class predominate over questions affecting only individual members of the class" and that the "class action device is superior to other available methods for fairly and efficiently resolving the dispute in question." *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 808, 814 n.5 (7th Cir. 2012); *see also* Fed. R. Civ. P. 23(b)(3). In order to grant class certification under Rule 23, the Court must be "satisfied, after a rigorous analysis" that the Rule's requirements are met. *Dukes*, 131 S. Ct. at 2551 (citation omitted). Because "'[t]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action,'" the court's rigorous analysis frequently "entail[s] some overlap with the merits of the plaintiff's underlying claim." *Id.* at 2551-52 (quoting *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)). Plaintiff bears the burden of proving each disputed requirement by a preponderance of the evidence. *Messner*, 669 F.3d at 811. District courts have broad discretion in determining motions for class certification. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 345, 99 S. Ct. 2326, 60 L. Ed. 2d 931 (1979); *Messner*, 669 F.3d at 811.

To be entitled to class certification, a plaintiff must satisfy each requirement of Rule 23(a)--numerosity, commonality, typicality, and adequacy of representation--and one subsection of Rule 23(b). *See Harper v. Sheriff of Cook Co.*, 581 F.3d 511, 513 (7th Cir. 2009); *Oshana*, 472 F.3d at 513. "'Failure to meet any of the Rule's requirements precludes class certification.'" *Harper*, 581 F.3d at 513 (quoting *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008). Satisfaction of these requirements, on the other hand, categorically entitles a plaintiff to pursue

her claim as a class action. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins.*, 130 S. Ct. 1431, 1437, 176 L. Ed. 2d 311(2009). In certifying a class, a court "should endeavor to select the most appropriate subsection [of Rule 23(b)], not just the first linguistically applicable one in the list." *Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 898 (7th Cir. 1999). In analyzing class certification, the Court "should make whatever factual and legal inquiries are necessary under Rule 23." *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001).

## ANALYSIS

### I.     Class Definition Issues

#### A.     Differing Class Definitions Do Not Preclude Certification

As an initial matter, Plaintiff proffers a different proposed class definition in its Second Amended Class Certification Motion than in its Complaint. (R. 138, Pl.'s Second Am. Mot. Class. Cert. 1; R. 1-1, Compl. ¶ 18.) Defendants argue that Plaintiff has "improperly attempted to change the [class] definition," and in the alternative, that neither proposed class definition meets the certification requirements. (R. 145, Defs.' Resp. 24.)

In its Complaint, Plaintiff defines the class as follows:

All persons who (1) one or after four years prior to the filing of this action, (2) were sent telephone facsimile messages of material advertising the commercial availability of any property, good, or services by or on behalf of Defendants, (3) with respect to whom Defendants cannot provide evidence of prior express permission or invitation for the sending of such faxes, (4) with whom Defendants did not have an established business relationship, and (5) which did not display the proper opt out notice. (Compl. ¶ 18.)

In its Second Amended Class Certification Motion, Plaintiff defines the class differently:

All persons who were successfully sent a facsimile on December 19, 2006 or December 20, 2006, from "SnowEx . . . Leaders in Ice Control" promoting the "best built . . . best backed" salt spreaders, offering "50% off on extended warranty for all of our spreaders purchased in December, 2006 and January, 2007," and instructing interested recipients to

4

"Call 1-800-Salters for more information."
(Pl.'s Second Am. Mot. Class. Cert 1.)

Under Federal Rule of Civil Procedure 23, "[a]n order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel." Fed. R. Civ. P. 23. District courts typically, though not invariably, hold a plaintiff seeking class certification to the definition espoused in the relevant complaint. *Compare, e.g., Clarke v. Baptist Mem'l Healthcare Corp.*, 264 F.R.D. 375, 381 (W.D. Tenn. 2009) ("To accommodate a new proposed class definition, plaintiffs will need to amend the complaint."); *Costelo v. Chertoff*, 258 F.R.D. 600, 604-05 (C.D. Cal. 2009) ("The Court is bound to class definitions provided in the complaint and, absent an amended complaint, will not consider certification beyond it."); *id.* at 604-05 n. 6 (collecting cases); *Heastie v. Cmty. Bank of Greater Peoria*, 125 F.R.D. 669, 672 n. 3, 680 n. 10 (N.D. Ill.1989) ("As this Court observed earlier, the class definitions proposed in [plaintiff's] motion for class certification differs from that set forth in her complaint. The Court has certified the class as originally proposed, but [plaintiff] may file an appropriate motion to amend both her complaint and the class definitions we have set forth here . . . ."), *with Pop's Pancakes, Inc. v. NuCO2, Inc.*, 251 F.R.D. 677, 680 n. 1 (S.D. Fla. 2008) (limiting its analysis to the class definition set forth in the plaintiff's motion, rather than the different definition articulated in the complaint). The Seventh Circuit has not addressed the scope of the district court's discretion to modify the class definition at the class certification stage. *See Schorsh v. Hewlett-Packard*, 417 F.3d 748 (7th Cir. 2005) (noting that "[l]itigants and judges regularly modify class definitions" but in the context of deciding whether an amendment expanding the class definition commences a new action for purposes of the Class Action Fairness Act).

5

In *Bridgeview Health Care Ctr. Ltd. v. Clark*, 09 C 5601, 2011 WL 4628744 (N.D. Ill. Sept. 30, 2011), another TCPA case, the court rejected essentially the same argument as Defendants make here. In *Bridgeview,* the plaintiff sought to change the class definition from all those individuals who were sent faxes without consent and during a certain time period to persons who were sent a particular fax. 2011 WL 4628744, at *2 n.2. The court reasoned that the cases cited by the defendant emphasizing that a motion for class certification "does not operate as a de facto amendment of a party's complaint" did not suggest that differing class definitions precluded certification. *Id.* at *2 (citing *Heastie* and *Ridings v. Canadian Imperial Bank*, 94 F.R.D. 147 (N.D. Ill. 1982)). To the contrary, in those cases the court certified the class and invited plaintiffs to amend their complaint to reflect the new class definition. *Id.* at 2; *Heastie*, 125 F.R.D. at 672 n.3 (treating complaint as controlling and allowing leave to amend even where the differences were "more significant" than in *Ridings*).

The Court finds the reasoning of *Bridgeview* persuasive. This approach is also consistent with Rule 23, which contemplates the amendment of a class certification order prior to judgment. Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment"); *Gates v. City of Chicago*, 04 C 2155, 2011 WL 1811187, at *2 (N.D. Ill. May 12, 2011) (noting the same). Accordingly, the Plaintiff's change of class definition will not forestall the Court's class certification inquiry.[1] In addition, Defendant is not

---

[1] Defendants do not argue that Plaintiff has failed to satisfy the "ascertainability" requirement of the class certification inquiry, which often arises in connection with class definition issues. *See Oshana v. Coca-Cola Bottling Co.*, 472 F.3d 506 (7th Cir. 2006) (noting in addition to the Rule 23(a) and Rule 23(b) requirements, "a plaintiff must also show . . . that the class is indeed identifiable as a class"); *Oshana v. Coca-Cola Bottling Co.*, 225 F.R.D. 575, 580 (N.D. Ill. 2005), *aff'd sub nom.*, *Oshana v. Coca-Cola Bottling Co.*, 472 F.3d 506 (7th Cir. 2006) ("Courts have implied two prerequisites to class certification that must be satisfied prior to

prejudiced by the timing of the change here and has had ample time to respond to the modified

proposed class.  As in *Heastie*, Plaintiff may amend its Complaint.  Moreover, under either class

definition, Defendants' arguments that the class definition is improper based upon

"consent/existing business relationship" issues fail.

### B. Defendants' Consent-Based Objections to the Class Definitions

Under the Complaint's class definition, Defendants argue that *GM Sign, Inc. v. Brink's

Mfg. Co.*, No. 09 C 5528, 2011 WL 248511 (N.D. Ill. Jan. 25, 2011), forecloses class

certification.  (Defs.' Resp. 24.)  Defendants' reliance on *Brink's*, however, is misplaced.  In

*Brink's,* another putative TCPA class action, the Court held that the plaintiff had failed to satisfy

the predominance requirement because the class definition required plaintiff to show lack of

consent or an established business relationship, and the defendant had presented substantial

evidence of consent with respect to individual fax recipients.  *Brink's*, 2011 WL 248511, at *8.

In *Brink's*, the court reasoned that in light of the defendant's evidence, it would have to "engage

in a class-member-specific inquiry to determine whether each recipient did indeed give

permission or have an established business relationship with Defendant at the pertinent time."

*Id.* at *8-9 (noting the defendant did not make "vague assertions about the nature of prior

_____

addressing the requirements of Rule 23(a): (1) the class must be sufficiently defined so that the
class is identifiable; and (2) the named representative must fall within the proposed class.").
Here, both requirements are satisfied.  The report of Mr. Biggerstaff, Plaintiff's expert, identifies
13,946 unique fax numbers to which B2B sent the Trynex fax.  (Biggerstaff Decl. ¶ 7 (May 16,
2011).)   Mr. Biggerstaff's report also identifies Plaintiff's numbers among those listed in the fax
transmission logs.  (Biggerstaff Decl. ¶ 7.  (May 16, 2011.); Defs.' Resp., Ex. B, Timothy
Caldwell Dep. Tr. 36:21-22.)  Thus, Plaintiff has sufficiently demonstrated both that the class
refers to a defined group of individuals and that the group included Plaintiff.

business relationships and consent" but presented "specific evidence of the same." (internal quotation marks omitted)). Of particular relevance here, the Court in *Brink's* noted that "[t]here is no evidence that Defendant engaged a third party to distribute faxes." *Id.* at *10. Here, not only have Defendants failed to offer specific evidence of consent or a prior business relationship between Trynex and the intended fax recipients like the kind in *Brink's*, but it is undisputed that Trynex engaged a third-party, B2B, to send faxes. *See id.* (noting evidence that the defendant "created an electronic database . . . which included contact information for the company's actual and prospective customers" and gathered fax numbers by calling prospective customers); (Pl.'s Mem. Law, Ex. C, Barry Truan Dep. Tr. 43-45.) Thus, the Court rejects Defendants' argument against the Complaint class definition.

Unlike the class definition in the Plaintiff's Complaint, the class definition in Plaintiff's Second Amended Class Certification Motion does not expressly require lack of consent or lack of an established business relationship. (Pl.'s Second Am. Mot. Class Cert. 1.). Rather, it defines the class as all persons who were faxed a particular extended warranty advertisement. (*Id.* at 1.) Defendants challenge this definition on the ground that it "ignores the consent/existing business relationship entirely." (Defs.' Resp. 25.) Like its argument against the Complaint definition, however, Defendants provide no evidence akin to that in *Brink's* showing that individual questions of consent may predominate over common ones.

Thus, the Court will determine whether Plaintiff has satisfied Rule 23 with respect to the definition in the Second Amended Class Certification Motion.

II.     **Numerosity**

Rule 23 requires that a class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  A class of forty generally satisfies the numerosity requirement.  *See, e.g., McCabe v. Crawford & Co.*, 210 F.R.D. 631, 643-44 (N.D. Ill. 2002); *cf. Pruitt v. City of Chicago*, 472 F.3d 925, 926 (7th Cir. 2006).

To satisfy numerosity, Plaintiff relies upon a report and declaration by its expert, Mr. Robert Biggerstaff.  (R. 137-6, Pl.'s Mem. Law, Ex. F, G)  Mr. Biggerstaff bases his report upon fax transmission logs obtained from the hard-drive of a B2B computer.  (Biggerstaff Report 1 (Dec. 20, 2010.).  Caroline Abraham, the founder of B2B, ran B2B's fax operation with a network of computers from her home with assistance from Macaw SRL, a Romanian-based company.  (C. Abraham Dep. 9-10, 20)  During discovery in *CY's Crabhouse*, another TCPA case involving B2B and Plaintiff's Counsel, Caroline Abraham's son, Joel Abraham, conveyed the hard drive along with back-up disks of information on the B2B network computers to Plaintiff's Counsel.[2]  ( Pl.'s Mem. Law, Ex. Q, J. Abraham Dep. Tr. 17-18; C. Abraham Decl. ¶ 2 (Dec. 28, 2010).).  In his report, Mr. Biggerstaff[3] states that he found "several references to

---

[2] Joel Abraham testified in his deposition that he brought the back-up CDs with him to the deposition.  (Pl.'s Mem., Ex. Q, J. Abraham Dep. Tr. 22:18-23:4-5.) As for the hard-drive, whether Plaintiff's Counsel received the B2B hard-drive directly from Joel Abraham or via Joel Abraham's attorney at the time, Mr. Eric Rubin, remains unclear.  In his deposition in *Creative Montessori Learning Ctr. v. Ashford Gear*, Mr. Rubin could not clearly recall either way, but acknowledged it was possible that Joel produced the records directly to one of Plaintiff's Counsel of record, Mr. Ryan Kelly.  (R. 145-13, Eric Rubin Dep. Tr. 164:14.)  Emails exchanged between Mr. Ryan Kelly and Mr. Eric Rubin on this subject are also ambiguous.  (R. 137-4, Pl.'s Mem. Law.)

[3] Defendants do not challenge Mr. Biggerstaff's report under *Daubert v. Merrell Dow Pharm., Inc.*, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) or Federal Rule of Evidence 702.

'HylaFAX,'" a "computer-based fax broadcasting application." (Biggerstaff Report 2 (Dec. 20,

2010).) In addition, Mr. Biggerstaff states that he found "a standard HylaFAX fax log" that

showed "5,783 records of attempted facsimile transmissions" and that "3,895 transmissions were

successful and error-free transmissions of a 3-page fax." (*Id.* at 2.) In his declaration subsequent

to the report, Mr. Biggerstaff revised his conclusion as to the number of transmissions after

reviewing the hard-drive in conjunction with Ms. Abraham's March 11, 2011 declaration and

accompanying documents, which appear to include screenshots from B2B's computer files

related to faxing, copies of faxes, and emails from "fax 5" and "fax 2" servers to Caroline

Abraham summarizing fax transmissions. (Biggerstaff Decl. ¶¶ 9, 10 (Jan. 10, 2012).)

Specifically, Mr. Biggerstaff concluded that B2B's "Fax Upload" directory contained the list of

fax numbers and fax images for each broadcast (*Id.* at ¶ 4.), including three files related to the

Trynex broadcast: (1) T120701_SnowexTheirs Combo061219a-barry.tif; (2) Barry.csv; and (3)

T120701_ExtraFaxNumbers061219a.csv. (*Id.* at ¶ 5.) Mr. Biggerstaff opines that "Barry.csv,"

is a "list of 14,442 fax numbers (13,946 unique) that would be consistent with the source list

numbers for use by B2B to conduct the fax broadcasting of the image 'T120701_SnowexTheirs

Combo061219a-barry.tif,'" after accounting for B2B's "scrubbing and deduping" of the list

against its "do-not-fax list." (*Id.* at ¶¶ 4, 7.) The documents provided by Ms. Abraham also

"identify the source MySQL database for the Trynex fax broadcast as 'NumereBarry20061219.'"

(*Id.* ¶ 14.) (C. Abraham Decl. (Mar. 11, 2011).) Mr. Biggerstaff states that he retrieved this file

from the hard-drive and pulled from within in it 12,163 fax numbers, which he attaches as an

exhibit to his report. (*Id.* at ¶14.) Thus, Mr. Biggerstaff concludes that "[e]ach of these 12,163

fax numbers were sent the Trynex fax, and 8,199 were successful error-free received fax

10

transmissions."  (*Id.* at 14.)

Defendants argue that Plaintiff has failed to satisfy numerosity on two grounds: (1) the TCPA requires proof that the faxes were not only sent, but received; (2) Mr. Biggerstaff's report is based upon evidence lacking proper authentication.  The Court rejects both of Defendants' arguments.

**A.  TCPA Distinction Between "Sent" and "Received" Faxes**

Defendants' attempt to defeat numerosity based upon the TCPA's alleged distinction between "sent" and "received" faxes is unpersuasive.  Specifically, Defendants contend that "numerosity is contingent on receipt of [a] [f]ax," and thus because Plaintiff has failed to produce a fax "actually received" by any potential class member or itself, Plaintiff has failed to establish numerosity.  (Defs.' Resp. 7.)  The TCPA provides that "[i]t shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States . . . to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement," unless the sender obtained the fax numbers through certain voluntary means or the unsolicited fax advertisement contains a specific notice.  *See* 47 U.S.C. § 227(b)(1)(C).  Even assuming the TCPA requires proof of receipt as opposed to merely transmission, Defendants fail to support the argument that a plaintiff may only establish receipt by producing the actual fax itself.  Indeed, Plaintiff has produced circumstantial evidence of receipt through the fax logs.  *See CE Design Ltd. v. CY's Crabhouse N., Inc.*, 259 F.R.D. 135, 142 (N.D. Ill. 2009) (noting defendant's argument that TCPA requires proof of receipt did not defeat predominance when plaintiff had "provided circumstantial proof of receipt by all of the numbers to which the fax logs indicate faxes were

successfully sent on behalf of Cy's Crabhouse.").

Moreover, Defendants do not take issue with Mr. Biggerstaff's conclusion that the fax transmission logs show that B2B sent out faxes advertising the Trynex extended warranty to thousands of different fax numbers. Nor do Defendants provide any evidence showing that Mr. Biggerstaff's number is vastly over-inclusive, which, according to Defendants, it must be, if there is any dispute as to whether the class clears the commonly-accepted threshold of forty members. *See Szabo*, 249 F.3d at 676 (noting numerosity "would be plain enough if, for example, the plaintiff alleged that the class had 10,000 members, making it too numerous to allow joinder, while the defendant insisted that the class contained only 10 members" (citation omitted).)

### B. Admissibility and Authentication of the Biggerstaff Report

Next, Defendants challenge numerosity on the ground that the evidence forming the basis of Mr. Biggerstaff's report is inadmissible and not properly authenticated. Mr. Biggerstaff's expert report is based upon fax transmission logs he obtained by examining the B2B hard-drive conveyed by Joel Abraham to Ryan Kelly. (Biggerstaff Report 2.) Defendants argue that the hard-drive lacks proper authentication because Mr. Kelly has failed to provide "a declaration or affidavit as to how he obtained the hard drive, who else handled the drive in question or how the hard drive was extracted from whatever computer system it was removed from." (Defs.' Resp. 8.) Although Ms. Abraham attests to such information, (C. Abraham Decl. ¶¶ 4-5 (Dec. 28, 2010)), Defendants contend that this evidence is insufficient because Ms. Abraham's son, Joel Abraham, and not Ms. Abraham, actually removed the hard-drive from the computer. (Defs.' Resp. 8.) Thus, according to Defendants, Ms. Abraham lacks personal knowledge of the transfer

and removal of the hard-drive.  (*Id.* at 8.)

> ### i.   Admissibility

Federal Rule of Evidence 803(6) provides that records of "a regularly conducted activity"

may be admissible if (1) "the record was made at or near the time by--or from information

transmitted by--someone with knowledge"; (2) "the record was kept in the course of a regularly

conducted activity of a business, organization, occupation, or calling, whether or not for profit";

(3) "making the record was a regular practice of that activity"; (4) the testimony of a custodian,

another qualified witness, or where applicable a certification shows the above conditions are

satisfied; and (5) "neither the source of information nor the method or circumstances of

preparation indicate a lack of trustworthiness."  Fed. R. Evid. 803(6)(A)-(E).  "[C]omputer data

compilations are admissible as business records under Fed. R. Evid. 803(6) if a proper

foundation as to the reliability of the records is established."  *United States v. Jackson*, 208 F.3d

633, 638 (7th Cir. 2000) (quoting *United States v. Briscoe*, 896 F.2d 1476, 1494 (7th Cir. 1990)).

In addition, to authenticate an item of evidence under Rule 901, the "proponent must produce

evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R.

Evid. 901(a).  The proponent may do so through such methods as the "testimony of a witness

with knowledge."  Fed. R. Evid. 901(b)(1).  Generally, at the summary judgment stage, an

affidavit from a qualified individual can establish the admissibility and authenticity of business

records.  *See Thanonsingh v. Bd. of Educ.*, 462 F.3d 762, 778 (7th Cir. 2006).

Here, Plaintiff has provided sufficient evidence to establish the admissibility of the fax

transmission logs extracted from the hard-drive under Rule 803(6).  "A party establishes a

foundation for admission of business records when it demonstrates through the testimony of a

qualified witness that the records were kept in the course of a regularly conducted business activity and that it was the regular practice of that business to make such records." *U.S. v. Reese*, 666 F.3d 1007, 1017 (7th Cir. 2012) (citations omitted). In a March 11, 2011 declaration, Ms. Abraham states that with respect to "a number of B2B's electronically stored and computer generated documents related to a fax campaign on behalf of Trynex, Inc," that all such "data, documents and records . . . were made or stored at or near the time of the occurrence of the matters related to B2B business, were kept in the regular course of regularly conducted business activities of B2B; and were made or stored by regularly conducted activities as a regular practice of B2B." (Pl.'s Mem. Ex. A, C. Abraham Decl. 3-4 (Mar. 11, 2011).) The March 2011 Declaration in turn incorporates a December 28, 2010 Declaration by Ms. Abraham. (C. Abraham Decl. 2.) Together, these declarations and Ms. Abraham's deposition testimony amply demonstrate that Ms. Abraham is "someone with knowledge" of B2B's business. (Pl.'s Mem. Law, Ex. B, C. Abraham Dep. Tr. 10-11; C. Abraham Decl. ¶ 3,6 (Dec. 28, 2010).) Thus, the contents of the hard-drive are admissible under Rule 803(6).

### ii. Authentication

Defendants also argue that the fax transmission logs extracted from the B2B hard-drive lack proper authentication. Specifically, Defendants contend that the fax logs are unreliable because Plaintiff seeks to authenticate them "through an individual [sic] that has no personal knowledge of any aspect of the removal and transfer of the hard drive at issue" and "fail[s] to provide the Court with any information as to how the hard drive was removed from the computer at issue, who handled the hard drive prior to its delivery to Biggerstaff and whether the hard drive was altered in any manner prior to Biggerstaff's review." (Defs.' Resp. 8.)

14

To authenticate evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Federal Rule of Evidence 803(6) provides that a "custodian of the record" or any "other qualified witness" may authenticate a business record. *Thanongsinh*, 462 F.3d at 777 (quoting Fed. R. Evid. 803(6)). The custodian or qualified witness may authenticate the record in two ways: (1) testifying in court that "it was the regular practice' of the business to make and keep the record"; (2) certifying in compliance with Rule 902(11) or 902(12) that the document meets the requirements of Rule 803(6)(A)-(C), which are the following: (a) "the record was made at or near the time by--or from information transmitted by--someone with knowledge" (b) "the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit"; (c) "making the record was a regular practice of that activity." *Thanongsinh*, 462 F.3d at 777; Fed. R. Evid. 803(6)(A)-(C). The custodian "need not be in control of or have individual knowledge of the particular corporate record[]," but must "be familiar with the company's recordkeeping practices." *Thanongsinh*, 462 F.3d at 777. By the same reasoning, "[a] qualified witness need not be the author of the document but must have personal knowledge of the procedure used to create and maintain the document." *Reese*, 666 F.3d at 1017. To satisfy these authentication requirements, "the party seeking admission . . . need not have secured already the deposition testimony of these witnesses. Instead, he only need establish that the document has 'sufficient indicia of trustworthiness to be considered reliable.'" *Thanongsinh*, 462 F.3d at 777 (quoting *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000)).

15

Plaintiff has presented sufficient evidence that the fax transmission logs are properly authenticated. First, as noted above, Plaintiff has demonstrated that Caroline Abraham qualifies as a custodian or other qualified witness because she is "familiar with the company's record-keeping practices" with respect to fax transmission logs. Caroline Abraham testified in her deposition that in operating B2B she "participat[ed]" in the fax broadcasting by "telling the [IT] guys [at Macaw] exactly [when each] campaign is ready to go." (C. Abraham Dep. Tr. 40,41:2-6). The Macaw IT staff would then initiate the fax transmission from Romania over Ms. Abraham's phone lines. (C. Abraham Dep. Tr. 90:20.) Ms. Abraham also maintained the database with customer information and saved copies of customer faxes and communications. (C. Abraham Dep. Tr. 12:16, 11:16-17, 19:4-20) (June 12, 2011)). She stored this information on the B2B computers in her home. (C. Abraham Dep. Tr. 20 (June 12, 2011).).

Second, Ms. Abraham has sufficient knowledge to authenticate the fax transmission logs by either testifying that they were made or kept in the "regular practice" of B2B's business or certifying that the logs satisfy the conditions of 803(6)(A)-(C). *See* C. Abraham Dep. Tr. 20 (June 12, 2011). In her March 11, 2011 declaration, Ms. Abraham testified with respect to the documents upon which Mr. Biggerstaff based his January 10, 2012 report that they "were made or stored at or near the time of the occurrence of the matters related to the B2B business; were kept in the regular course of regularly conducted business activities of B2B; and were made or stored by regularly conducted activities as a regular practice of B2B." (C. Abraham Decl. (March 11, 2011)). Ms. Abraham clarified in her deposition that the phrase "were made or stored at or near the time of the occurrence of the matters related to B2B business," meant that "everything was done as the business was being done. If faxes came in from a customer they

16

were stored when they came in." (C. Abraham Dep. Tr. 20). Ms. Abraham also stated that

storing such documents was a "part of [B2B's] activities also." (C. Abraham Dep. Tr. 24 (June

12, 2011).)

Defendant's speculation as to chain of custody problems is insufficient to defeat proper

authentication under the business records exception. *See DirecTV, Inc. v. Reyes*, 03 C 8056,

2006 WL 533364, at *6 (N.D. Ill. Mar. 1, 2006) ("[I]f the document has been properly

authenticated, there is no chain of custody requirement for the business records exception.").

Defendant has not presented any evidence of alteration or interference with the hard-drive.

Moreover, any such issues go to the weight, rather than the admissibility of the evidence. *Cf.*

*U.S. v. Prieto*, 549 F.3d 513, 524-25 (7th Cir. 2008) (noting in a criminal case that "gaps in the

chain [of custody] go to the weight of the evidence, not its admissibility"); *see DirecTV*, 2006

WL 533364, at*6 (N.D. Ill. Mar. 1, 2006); *Holtzman v. Turza*, 08 C 2014, 2009 WL 3334909

(N.D. Ill. Oct. 14, 2009) (noting this proposition in the context of a TCPA case in which

defendant offered no reason to believe that the fax logs had been falsified).

Thus, Plaintiff has satisfied the numerosity requirement.

## III.    Commonality

Rule 23(a)(2) requires that "questions of law or fact common to the class" exist. *Keele v.*

*Wexler*, 149 F.3d 589, 594 (7th Cir. 1998) (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018

(7th Cir. 1992)). "A common nucleus of operative fact is usually enough to satisfy" this

requirement. *Keele*, 149 F.3d at 594 (quoting *Rosario*, 963 F.2d at 1018); *see also Kaufman v.*

*Am. Express Travel Related Servs. Co.*, 264 F.R.D. 438, 442 (N.D. Ill. 2009) ("The commonality

requirement does not necessitate every class member's factual or legal situation to be a carbon

17

copy of those of the named plaintiffs, so the low commonality hurdle is easily surmounted.")
(internal quotation marks omitted).  "Common nuclei of fact are typically manifest where . . . the
defendants have engaged in standardized conduct towards members of the proposed class."
*Keele*, 149 F.3d at 594.  "The fact that there is some factual variation among the class grievances
will not defeat a class action."  *Rosario*, 963 F.2d at 1017; *see also Chandler*, 162 F.R.D. at
307-08 ("It is well established . . . that the presence of some individualized issues does not
overshadow the common nucleus of operative fact presented when the defendant is engaged in
standardized conduct toward the class.").

Plaintiff argues that Defendants' hiring of B2B to send the same fax to a list of numbers
that B2B compiled from a database obtained from InfoUSA without the intended recipients'
prior express invitation or permission constitutes "standardized conduct involving a common
nucleus of operative facts" sufficient to establish commonality.  (Pl.'s Second Am. Mot. Class
Cert. 2.)  Plaintiff also identifies the following issues of law and fact common to the class: (1)
"[w]hether Defendants' fax is an advertisement;" (2) "[w]hether Defendants violated the TCPA
by sending an advertisement by fax without first obtaining express invitation or permission to do
so;" (3) "whether Plaintiff and other class members are entitled to statutory damages"; and (4)
"whether Defendants sent the fax advertisements knowingly or willfully and, if so, whether the
Court should treble the statutory damages."  (*Id.* at 9.)

In response, Defendants raise two arguments as to why Plaintiff has not satisfied the
commonality requirement.  First, Defendants argue that the consent issues in this case make
class-wide disposition inappropriate.  Specifically, Defendants contend that individualized
inquiry is necessary for each putative class plaintiff because (1) the fax at issue, as "an

advertisement for the extension of customer warranties for products," was "intended for existing customers"; and (2) some of the alleged fax recipients, according to Defendants, consented to the Trynex fax by "voluntarily" publishing their fax numbers. (Defs.' Resp. 10-11.)   As the Court has already discussed, although specific evidence of consent may prove a hurdle to other elements of class certification, *see, e.g.*, *Brink's,* 2011 WL 248511, at *1 (holding "multiple affidavits" showing defendant's collection of "information regarding the company's existing customers during the course of the relevant business relationships" defeated predominance); *CE Design Limited*, 637 F.3d at 727 (holding "doubts about [the] truthfulness" of class representative's president regarding consent issues defeated adequacy of proposed class representative), "vague allegations" of class member consent do not defeat commonality.  *See, e.g., GM Sign, Inc. v. Group C Cmcn's,* No. 08 C 4521, 2010 WL 744262, at *3 (N.D. Ill. Feb. 25, 2010) ("[Defendant's] unsupported speculation that some of the proposed class members may have independently consented does not warrant denial of class certification."); *Green v. Serv. Master on Location Servs. Corp.*, 07 C 4705, 2009 WL 1810769, at *2 (N.D. Ill. June 22, 2009) ("[I]n the context of certification of a TCPA class-action complaint . . . the possibility that some class members may have consented is not sufficient to defeat class certification.").

Here, Defendants have provided no specific allegations or supporting evidence that individual putative class plaintiffs consented to the receipt of the Trynex fax.  Rather, Defendants rely on the proposition that because Defendants intended the fax for existing customers, B2B must have only sent the fax to existing customers, and thus the Court must resolve consent issues on an individualized basis.  (Defs.' Resp. 10.,  Ex. C, B. Truan Dep. Tr. 12, 15-16, 35-37, 44-45.)   In his deposition testimony, Barry Truan, a Trynex customer-service

representative, indicated that the fax at issue was only intended for "registered users and existing dealers and distributors." (B. Truan Dep. Tr. 7:17-19, 47:17:24.). Mr. Truan, however, provided no specific information as to how this intention was communicated to B2B or reflected in the faxes B2B actually sent. While Mr. Truan indicated that B2B received the numbers in the blast fax at issue from Trynex, and those numbers were for customers or registered users only (except for a small list of Trynex sales representatives included as common practice), Mr. Truan could not recall who from Trynex provided him or B2B with the list. (B. Truan Dep. Tr. 37-38, 47-48.) This is particularly problematic, given that Plaintiff has offered a confirmation addressed to "Barry," and apparently sent from B2B to Mr. Truan, which specified that "[y]our price is only $508 for us transmitting . . . ads to all the fax numbers we have for snow removal and landscaping companies." (C. Abraham Decl. (Mar. 11, 2011), # B2B000012.)[4]

Defendants' argument against commonality based on "voluntary publication" similarly fails. Defendants' reliance on *Saf-T-Gard Int'l Inc. v. Wagener Equities, Inc.*, 251 F.R.D. 312 (N.D. Ill. 2008) in support of this argument is misplaced. In *Saf-T-Gard*, the district court denied certification not on the basis of consent, but because it lacked "information sufficient to identify the recipients of the disputed fax." 251 F.R.D. at 315 ("[In] the absence of some

---

[4] To clarify, the confirmation is from "Kevin Wilson" and bears the return address heading of "The Marketing Research Center." In her deposition, Ms. Abraham specified that the "The Marketing Research Center" is another name for B2B, and Kevin Wilson was a sales agent for Macaw SRL. (C. Abraham Dep. Tr. 26:4-7, 78:22; 27, 28.) The confirmation also bears the date March 2, 2011, even though the alleged faxing took place in December 2006. (C. Abraham Decl., #B2B000012, (March 11, 2011); *Id.* at #B2B000004.) Ms. Abraham clarified that the discrepancy was due to the fact that the document contains "a special word field" that pulls the current date. Thus, according to Ms. Abraham, because she printed the document around the time of the signing of her March 11, 2011 declaration, the document bears the date of March 2, 2011. (C. Abraham Dep. 103.)

realistic means of identifying potential class members, class certification is inappropriate.")

Indeed, before denying certification on the basis of class indefiniteness, the district court rejected

the same argument Defendants make here, noting that it was "undisputed that some number of

faxes were sent on defendant's behalf (with or without defendant's explicit authorization),

potentially to thousands of recipients unknown to defendant" and that such conduct reflects

"precisely the type of 'organized program' that lends itself to a common adjudication of the

consent issue." *Saf-T-Gard Int'l Inc.*, 251 F.R.D. at 315. While Defendants claim in their briefs

to have presented the Court with evidence that "at least 3,451 of the alleged 8,199 received faxes

were sent to voluntarily published fax numbers," Defendants fail to cite any support for this

assertion. (Defs.' Resp. 10.)

Second, Defendants argue that individualized inquiry is also necessary to determine

whether B2B sent the faxes (1) "over a regular telephone line, "and not a "T1" line or internet

connection; and (2) "to a "telephone facsimile machine" and not a computer or other device, as

allegedly required by the TCPA. (Defs.' Resp. 12.) In support of their arguments, Defendants

rely on the expert report of Mr. Ray Horak. (R-145-23, Defs.' Resp., Ex. U., Horak Report.)

Like Defendants' consent-based arguments, this attempt to defeat commonality rests not

on specific evidence, but the mere possibility that some putative class members received the fax

over a particular kind of fax line or through a particular kind of machine. In his report, Mr.

Horak opines that the "uncertain nature of the networks used by Macaw," gives rise to the

possibility that B2B sent the Trynex faxes over Vonage lines. (Horak Report 38.). Additionally,

Mr. Horak states that because fax transmission logs do not "provide the actual codes, if any,

received by the modems or other hardware" or a "trace log, which would detail the dialogue

between the transmitting and receiving modems and, thereby, substantiate the HylaFAX interpretation of the results of the attempted transitions," false-positive transmissions are possible. (Horak Report 37.) Ultimately, these generalizations, while suggesting potential factual variation among putative class members' cases, are insufficient alone to show the absence of a "common nuclei of operative fact." *See CE Design Ltd.*, 271 F.R.D. at 601-02 (N.D. Ill. 2010) (reviewing district court cases rejecting similar commonality challenges in TCPA cases based upon testimony of Mr. Ray Horak).

## IV.     Typicality

Typicality is closely related to commonality. *See Keele*, 149 F.3d at 594. As the Supreme Court has noted, the commonality and typicality requirements "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *General Tel.*, 457 U.S. at 158 n. 13; *see also Mace*, 109 F.3d at 341 ("The typicality and commonality requirements of the Federal Rules ensure that only those plaintiffs or defendants who can advance the same factual and legal arguments may be grouped together as a class."). The typicality element broadly requires "that the claims or defenses of the representative party be typical of the claims or defenses of the class." *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009) (quoting *Williams v. Chartwell Fin. Servs., Ltd.*, 204 F.3d 748, 760 (7th Cir. 2000)). "A claim is typical if it 'arises from the same event or practice or course of conduct that gives rise to the claims of other class members and . . . [the] claims are based on the same legal theory.'" *Oshana*, 472 F.3d at 514 (quoting *Rosario*, 963 F.2d at 1018). "Although

'the typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members,' the requirement 'primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large.'" *Muro*, 580 F.3d at 492 (quoting *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)). Plaintiff argues that typicality is satisfied because the "class member claims' arise from the same transaction or occurrence," namely, the alleged unauthorized faxing by Defendants through B2B. (Pl.'s Mem. Law Class Cert. 9.)

Here, Plaintiff has provided evidence that Defendant Trynex made a single payment to B2B to send out Trynex's extended warranty fax, and B2B sent the fax to thousands of different fax numbers. (B. Truan Dep. Tr. 35-36, 45; Biggerstaff Decl. 14. (Jan. 10, 2012).) The putative class members' claims also arise from the same legal theory--that Defendants violated the TCPA by sending faxes without the express consent or permission of the intended recipients.

Defendants argue that Savanna Group's claim is not typical of the class because "it stands to reason" that Savanna Group either had a business relationship with Trynex or consented to receive Trynex's faxes because Trynex only sent its SnowEx Alerts to "distributors, dealers, suppliers and equipment owners," and Savanna Group received Trynex's SnowEx Alert. (Defs.' Resp. 13.) Like its challenges to commonality, however, Defendants provide insufficient information to support these assumptions. Indeed, Barry Truan's testimony--one of the few sources of evidence Defendants offer to corroborate the existence of a business relationship--simultaneously undercuts it, as Barry Truan testified that he "did not recall if [Trynex] did business with the Savanna Group in particular" because "they buy through one of

23

[Trynex's] dealers and distributors." (B. Truan Dep. Tr. 53:7-9.) In addition, James Truan, vice-president of Trynex, testified that he was not familiar with the Savanna Group. (Pl.'s Mem. Law, Ex. D, J. Truan Dep Tr. 37:4-13.) Plaintiff has satisfied the typicality requirement.

## V. Adequacy of the Class Representative

Rule 23(a)(4) makes it a prerequisite of certification that "the representative parties will fairly and adequately protect the interests of the class." Fed. R.Civ. P. 23(a)(4). To satisfy Rule 23(a)(4), the class representative must "possess the same interest and suffer the same injury as the class members." *Uhl v. Thoroughbred Tech. & Telecmcn's, Inc.*, 309 F.3d 978, 984 (7th Cir. 2002). "A class is not fairly and adequately represented if class members have antagonistic or conflicting claims." *Rosario*, 963 F.2d at 1018. In determining adequacy, the district court must "ensure that there is no inconsistency between the named parties and the class they represent." *Uhl*, 309 F.3d at 978 (citing *Amchem*, 521 U.S. at 625).

In opposing the adequacy of Savanna Group as a class representative, Defendants repeat their unsupported argument that Savanna Group's claims are not typical of the class, which the Court has already rejected. Defendants also argue that Savanna Group has a different interest from the rest of the class because it received a letter from Plaintiff's Counsel stating that Savanna Group would receive compensation ranging from $500 to $1500 per unauthorized fax if the class action succeeds. (Defs.' Mem. Law, Ex. N.) Regardless of the propriety of class counsel sending such a letter, the letter's prediction of Savanna Group's compensation in the event of a successful suit alone is insufficient to place Savanna Group's interest in the litigation in conflict with those of other class members. Savanna Group, like the other putative class members, seeks damages for the injury of being sent unwanted faxes. (Compl. ¶ 42.) Therefore,

the named plaintiff is adequate to represent the interests of the class.

## VI.    Adequacy of Class Counsel

Rule 23 also requires the adequacy of class counsel.  *See* Fed. R. Civ. P. 23(g)(2); *Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir. 2002) ("For purposes of determining whether the class representative is an adequate representative of the members of the class, the performance of the class lawyer is inseparable from that of the class representative.").  Under Federal Rule of Civil Procedure 23(g)(4), class counsel must "fairly and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(4).  Courts must consider the following in appointing class counsel: (1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (3) "counsel's knowledge of the applicable law;" (4) "the resources that counsel will commit to representing the class."  Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).  In addition, courts may also "consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(1)(B).

Class counsel acts as a fiduciary of the class.  *See Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 917 (7th Cir. 2011); *Culver*, 277 F.3d at 913.  As such, class counsel must show the district court that "they would prosecute the case in the interest of the class . . . rather than just in their interests as lawyers who if successful will obtain a share of any judgment or settlement as compensation for their efforts."  *Creative Montessori*, 662 F.3d at 917 (citations omitted).  "If, therefore, the lawyer, through breach of his fiduciary obligations to the class, or otherwise, demonstrates that he is not an adequate representative of the interests of the

class as a whole, realism requires that certification be denied." *Culver*, 277 F.3d at 913 (citations omitted).

In determining adequacy, courts should consider class counsel's integrity and capacity to act as "conscientious fiduciaries of the class." *Creative Montessori*, 662 F.3d at 918. Class counsel need not commit "egregious misconduct" to qualify as inadequate. Rather, courts must deny certification if "[m]isconduct by class counsel . . . creates a serious doubt that counsel will represent the class loyally." 662 F.3d at 918. The rationale for holding class counsel to a higher standard than merely avoiding "egregious misconduct" is to deter unethical behavior. *Creative Montessori*, 662 F.3d at 918.

Defendants argue that class counsel is inadequate based upon the following allegations: (1) Plaintiff's Counsel breached a confidentiality agreement with Caroline Abraham regarding information on a B2B hard drive and backup disks; (2) Plaintiff's Counsel misrepresented the nature of the class action in a solicitation letter to Plaintiff; and (3) Plaintiff's Counsel acted improperly in sending a $5,000 check to Mr. Eric Rubin, Caroline Abraham's attorney, allegedly to induce Ms. Abraham to continue to supply information from the B2B hard drive on various intended targets of B2B's mass faxing operation. (Defs.' Mem. Law 15-20.) Because Plaintiff failed to provide sufficient information on the third allegation, the Court will delay consideration on the other allegations until Plaintiff has provided such information.

In early August of 2009, Mr. Brian Wanca, one of Plaintiff's counsel of record, sent Caroline Abraham's attorney, Mr. Eric Rubin, a $5,000 check made out personally to Mr. Rubin with a notation in the memo line, "document retrieval." (R. 145-13, Defs.' Resp., Ex. K, Rubin Dep. Tr. 52: 14-20.) Mr. Rubin testified that he regarded the payment as an attempt "of

26

questionable propriety" to pay Ms. Abraham for her "cooperation and providing information." (Rubin Dep. Tr. 55:2-5.) Defendants contend that the payment was a bribe intended to induce Ms. Abraham to continue supplying information to Plaintiff's Counsel about B2B's broadcast faxing operation, including the numbers and identities of fax recipients. (Defs.' Resp. 19.). In particular, Defendants take issue with the manner of payment, which consisted of a "$5,000 check in a Ramada Inn envelope without a cover letter made personally to Rubin without any explanation." (Defs.' Resp. 19.)

Plaintiff's Counsel does not dispute the fact or manner of the attempted payment. Instead, Plaintiff refers generally to the decisions of other district courts that have concluded that Plaintiff's conduct, though questionable, is insufficient to render class counsel inadequate. *Creative Montessori Learning Ctrs. v. Ashford Gear, LLC*, No. 09 C 3963, 2012 WL 3961307, at*3 (N.D. Ill. Sept. 10, 2012) (*Creative Montessori II*) (collecting district court cases finding adequacy of Plaintiff's Counsel post-*Creative Montessori*); *Reliable Money Order, Inc. v. McKnight Sales Co.*, 281 F.R.D. 327, 336 (E.D. Wis. 2012) ("Whatever this court's opinion of counsel's behavior might be, such behavior does not create a serious doubt that class counsel will represent the class loyally."). Plaintiff's reliance on other district court cases to rebut Defendants' allegations concerning the payment to Caroline Abraham, however, does not satisfy its obligation. Under Rule 23, Plaintiff bears the burden of demonstrating the adequacy of Plaintiff's Counsel. Accordingly, Rule 23 permits district courts in appointing class counsel to "order potential class counsel to provide information on any subject pertinent to the appointment." Fed. R. Civ. P. 23(g)(1)(C). Moreover, the Seventh Circuit has made clear that in the class certification inquiry courts "should make whatever factual and legal inquiries are

necessary under Rule 23." *Szabo*, 249 F.3d 672, 676 (7th Cir. 2001) ("[A]n order certifying a class usually is the district judge's last word on the subject; there is no later test of the decision's factual premises."). Plaintiff's invitation to rely solely on the findings of other district courts to resolve the adequacy issue does not provide the Court with sufficient information to make an individualized determination in this case.

Even if the Court adopted the findings of these decisions, they do not fully resolve the adequacy questions in this case with respect to the attempted payment to Caroline Abraham. The post-*Creative Montessori* cases Plaintiff relies upon to establish adequacy rely heavily upon *CE Design Ltd. v. CY's Crabhouse N., Inc.*, 07 C 5456, 2010 WL 3327876 (N.D. Ill. Aug. 23, 2010). *See, e.g., Reliable Money Order*, 281 F.R.D. at 335; *Am. Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.*, No. 9 C 1162, 2012 WL 3027953, at *7 (N.D. Ill. July 24, 2012). In *CY's Crabhouse*, however, the district court only accepted Plaintiff's explanation that the $5,000 payment was for reimbursement of Abraham's discovery compliance expenses and the purchase of the B2B computer after requiring Brian Wanca and Ryan Kelly--two of the same attorneys in this case--to submit a "sworn explanation describing any past, current, or proposed financial arrangement between plaintiff's counsel and the Abrahams, B2B, or their counsel." *CY's Crabhouse* at *6. Moreover, *CY's Crabhouse* preceded *Creative Montessori*, which clarified that the *Culver* standard was the correct one for assessing the adequacy of counsel. Similarly, the district court on remand in *Creative Montessori*, although applying the "serious doubt" standard, found adequacy after "review[ing] hundreds of pages of supplemental submissions" on remand. *Creative Montessori II*, 2012 WL 3961307, at *1.

Here, although Defendants raised the propriety of the payment in their response brief, (Defs.' Resp. 19.), Plaintiff failed to direct the court to any arguments or supporting evidence addressing this allegation, beside the expert reports of Professor Richard W. Painter, a "leading ethicist." (Pl.'s Mem. Law 21, Pl.'s Mem. Law Ex. II, JJ). With respect to this allegation, Professor Painter's reports mostly repeat the arguments that Plaintiff made in defense of the payment in *CY's Crabhouse*. (Painter Report 10.) Therefore, Plaintiff's insistence that "district court after district court has reached exactly the same conclusion" on this issue is insufficient to establish the adequacy of Plaintiff's Counsel here. (Pl.'s Reply 17.)

Given that Plaintiff bears the burden of proving the Rule 23 elements, the Court will take the "adequacy of counsel" element under advisement until Plaintiff provides additional information. Specifically, Plaintiff must provide on or before January 14, 2013 and for each counsel of record a (1) detailed affidavit with appropriate support explaining the $5,000 attempted payment to Caroline Abraham; and (2) a detailed affidavit describing any past, present, or proposed financial arrangements with Caroline Abraham, Joel Abraham, or their counsel, or any attempts to establish such relationships. Defendants may respond by January 21, 2013.

## VII. Predominance

Plaintiff seeks certification under Rule 23(b)(3). Accordingly, Plaintiff must demonstrate that "questions of law and fact common to members of the class predominate over questions affecting only individual members of the class." *Messner*, 669 F.3d at 808; *see also* Fed. R. Civ. P. 23(b)(3). Predominance is satisfied where common evidence may prove the class member's claims. *Messner*, 669 F.3d at 815 ("If, to make a prima facie showing on a given question, the

members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question."). The "mere existence," however, of individual issues is insufficient to defeat predominance. *See Messner*, 669 F.3d at 815 (noting that to satisfy predominance "[i]ndividual questions need not be absent").

Defendants argue that Plaintiff fails to establish predominance because "there is no generalized proof by which Plaintiff can prove its case." (Defs.' Resp. 22.) Specifically, Defendants contend that because Plaintiff received Defendant Trynex's SnowEx Alert in the past, which is an "advertisement extending a warranty to customers [who] already owned Trynex's products," any liability determination with respect to the specific SnowEx Alert fax at issue here would require an individualized inquiry into the merits of each putative class member's claim. (Defs.' Resp. 22.) These arguments, however, confuse the issue of consent with the question of whether there is generalized proof to resolve it. Defendants do not dispute that Trynex paid B2B to send the extended warranty fax to some group of recipients. Defendants also provide no specific evidence that Plaintiff consented to the fax or that Plaintiff had a pre-existing business relationship with Defendant Trynex, beyond Plaintiff's past receipt of the SnowEx Alert fax. Rather, Defendants rely solely on the logic that because the extended warranty fax was intended for customers, Plaintiff must be a customer, and therefore individual questions of consent and pre-existing business relationships predominate.

This argument fails to establish the predominance of individual over common issues. Plaintiff has presented evidence that B2B sent the faxes in one single distribution without distinguishing between customer and non-customers. Defendants have neither argued nor

provided any evidence to the contrary. Indeed, the record at this stage suggests nothing other than that a limited number of sources of evidence can resolve this issue.[5]

Moreover, courts in this district have agreed that the presence of some limited issues requiring individual inquiry do not defeat predominance. *See, e.g., CE Design Ltd.*, 271 F.R.D. at 630 (finding predominance notwithstanding defendant's argument that "some of the contacts designated as prospects have separately consented to receiving the advertisements"); *G.M. Sign, Inc. v. Franklin Bank, S.S.B.*, 06 C 949, 2008 WL 3889950, at *6 (N.D. Ill. Aug. 20, 2008) ("Though some of the issues Franklin Bank identifies have the potential to require individual resolution, there can be no question that the common issues identified above will be a main focus of this case going forward.").

Defendants' reliance on *Brink's* and *Forman v. Data Transfer, Inc.*, 164 F.R.D. 400 (E.D. Pa. 1995) is also misplaced. In *Brink's*, another putative TCPA class action, the Court found that the named plaintiff had failed to satisfy predominance where the defendant presented evidence that it had "obtained the consent of Plaintiff and the other non-pre-existing-customer recipients of the faxes before sending them" and that "the other recipients of the faxes were pre-existing customers." *Brink's*, at *8 (noting the defendant "does not make 'vague assertions' about the

---

[5] While the evidence in the record bearing on consent may conflict, it suggests only few sources of evidence for resolving that conflict. In his deposition, Barry Truan testified that Trynex provided two lists of fax numbers to B2B: (1) a list of "registered dealers and users"; and (2) a handwritten list of Trynex's sales representatives' numbers, who typically were included on customer service communications. (Barry Truan Dep. Tr. 43:17, 28: 23-25) Mr. Truan, however, could not provide any details as to how the transfer of the first list occurred. (Pl.'s Mem., Ex B, C. Abraham Dep. Tr. 168 (June 12, 2011)). Thus, the record suggests that the fax numbers at issue did not come from a multitude of sources, a fact that might otherwise complicate the consent inquiry.

nature of prior business relationships and consent, but has offered specific evidence of the same.")  Moreover, in *Brink's*, the Court specifically noted the absence of any evidence that "Defendant engaged a third party to distribute faxes."  *Brink's*, 2011 WL 248511, at *10.  Here, the very opposite is true, because neither party disputes that Defendant Trynex hired B2B to send faxes in a manner that was common to all or a majority of the fax recipients.  *Forman*, a case from the Eastern District of Pennsylvania is similarly unhelpful, as district courts in this District have "widely criticized [its] logic," instead affirming the proposition that "the question of consent may rightly be understood as a common question."  *Green*, 2009 WL 1810769, at *2.

## VIII.   Superiority

To satisfy superiority, Plaintiff must demonstrate "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The following factors are relevant: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3)(A)-(D).

In light of these factors, the Court finds a class action is superior to other methods of adjudicating the putative class members' TCPA claims.  Given the large number of plaintiffs in this suit and the similarity of their claims, disposition by class action is an efficient use of judicial resources.  *See Hinman*, 545 F. Supp. 2d at 807.  Moreover, the small potential recovery in individual actions–the greater of $500 or "actual monetary loss" from the violation– and reduced likelihood that plaintiffs will bring them also weighs in favor of class-wide resolution.

*See* 47 U.S.C. § 227 (b)(3)(B); *Pastor v. State Farm Mut. Auto. Ins. Co.*, 487 F.3d 1042, 1047

(7th Cir. 2007) ("The policy at the very core of the class action mechanism is to overcome the

problem that small recoveries do not provide the incentive for any individual to bring a solo

action prosecuting his or her rights."); *G.M. Sign, Inc. v. Finish Thompson*, No. 07 C 5953, 2009

WL 2581324, at *7 (Aug. 20, 2009) ("Rule 23(b)(3) was designed for situations . . . in which the

potential recovery is too slight to support individual suits, but injury is substantial in the

aggregate") (citing *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 953 (7th Cir. 2006)).

Defendants offer two arguments against superiority: (1) the "class action resulted from

Plaintiff's counsel creating it out of whole cloth from a database it obtained in another unrelated

matter pursuant to a confidentiality agreement"; and (2) Plaintiff's Counsel-and not the putative

class members are the real "beneficiaries" of the litigation, which is contrary to the terms of the

TCPA and *Creative Montessori*.   As both of these arguments go to the "adequacy" rather than

the "superiority" requirement of Rule 23, the Court will not address them again here.  Moreover,

the superiority determination is not inextricably tied to the adequacy of the class counsel or the

class representative.  Class counsel may be inadequate, and the claims still appropriate for

class-wide resolution.  *See CE Design Ltd.*, 637 F.3d at 728 ("Should the court decide that CE is

not a proper class representative, that would not conclude the question whether the suit should be

allowed to proceed as a class action."); *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 96 (7th Cir.

1977) ("In lieu of a change in counsel which might result in a certification of the class actions,

plaintiffs are not barred from continuing the lawsuits on their own behalf.").

**CONCLUSION**

Because Plaintiff has failed to meet its burden of establishing the adequacy of class counsel, the Court enters and continues Plaintiff's motion subject to the submission of additional information.  Accordingly, the Court orders Plaintiff to submit on or before January 14 and for each counsel of record: a (1) detailed affidavit with appropriate support explaining the $5,000 attempted payment to Caroline Abraham; and (2) a detailed affidavit describing any past, present, or proposed financial arrangements with Caroline Abraham, Joel Abraham, or their counsel, or any attempts to establish such relationships.  Defendants may respond by January 21, 2013.   Plaintiff may amend its Complaint to reflect the class definition in its Second Amended Class Certification Motion by January 18, 2013.

**Date:** January 4, 2013

**ENTERED**

_____
AMY J. STEEVE
United States District Court Judge