IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THE SAVANNA GROUP, INC.     )
     )
     )
     Plaintiff,     )
     )     Case No. 10-cv-7995
     v.     )
     )
TRYNEX, INC. and JAMES TRUAN,     )
     )
     )
     Defendants.     )

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Before the Court is Plaintiff The Savanna Group Inc.'s Second Amended Motion for

Class Certification pursuant to Federal Rule of Civil Procedure 23. For the following reasons,

the Court enters and continues the Motion subject to the submission of additional information by

the parties as discussed in detail below.

### BACKGROUND

Plaintiff The Savanna Group, Inc. ("Savanna Group") is a "design/build landscape

contracting firm." (R. 145-3, Defs.' Resp., Timothy Caldwell Dep. Tr. 11:24). Defendant

Trynex, Inc. ("Trynex") manufactures snow and ice control equipment, including salt

"spreaders." (R. 137, Pl.'s Mem. Law, Ex. C, Dep. Tr. Barry Truan; Compl. ¶ 10.) Defendant

James Truan is the Vice-President and a shareholder of Trynex. (Pl.'s Mem. Law, Ex. D, James

Truan Dep. Tr. 7: 14-17.) Trynex paid B2B to send "SnowEx Alert" faxes to a list of recipients

advertising the sale of an extended warranty on Trynex's salt spreaders. (Pl.'s Mem. Law, Ex.

C, Barry Truan Dep. Tr. 43-45.) "Business to Business," or "B2B" was an operation run by Caroline Abraham that sent "blast" fax advertising to various recipients from 2005 to 2007. (Pl.'s Mem. Law, Ex. B., June 12, 2011 C. Abraham Dep. Tr. 9-12; 13: 10-15.) B2B purchased lists of recipients from InfoUSA. (Pl.'s Mem. Law, Ex. E, C. Abraham Decl. ¶ 6. (Dec. 28, 2010).)

Plaintiff alleges that it is part of a class of intended recipients to which Trynex sent faxes advertising the extended warranty on Trynex's salt spreaders without invitation or permission in violation of the Telephone Consumer Protection Act ("TCPA"). (Compl. ¶¶ 4,11,15.) The TCPA prohibits the "use [of] any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement," unless, among other conditions, the "unsolicited advertisement is from a sender with an established business relationship with the recipient." 47 U.S.C. §§ 227(b)(1)(C), (b)(1)(C)(i). Plaintiff also alleges that Trynex violated 64 C.F.R. 1200 by failing to display a proper opt-out notice in its faxes. (Compl. ¶ 26.) Plaintiff moves to certify the class and to appoint Savanna Group as the class representative and Plaintiff's Counsel as class counsel. (Pl.'s Mem. Law 1.)

## LEGAL STANDARD

Federal Rule of Civil Procedure Rule 23(a) contains four prerequisites for class certification: numerosity, commonality, typicality, and adequacy. *See* Fed. R. Civ. P. 23(a); *Wal-Mart Stores, Inc. v. Dukes*, __U.S.__, 131 S. Ct. 2541, 2550, 180 L. Ed. 2d 374 (2011). In addition to satisfying the Rule 23(a) requirements, plaintiffs must show that the proposed class satisfies one of the three requirements set forth in Rule 23(b). *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117 S. Ct. 2231, 138 L. Ed. 3d 689 (1997); *Oshana v. Coca-Cola*

2

*Co.*, 472 F.3d 506, 513 (7th Cir. 2006). Where, as here, the named Plaintiff seeks certification

pursuant to Rule 23(b)(3), it must show that "questions of law and fact common to members of

the class predominate over questions affecting only individual members of the class" and that the

"class action device is superior to other available methods for fairly and efficiently resolving the

dispute in question." *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 808, 814 n.5 (7th

Cir. 2012); *see also* Fed. R. Civ. P. 23(b)(3). In order to grant class certification under Rule 23,

the Court must be "satisfied, after a rigorous analysis" that the Rule's requirements are met.

*Dukes*, 131 S. Ct. at 2551 (citation omitted). Because "'[t]he class determination generally

involves considerations that are enmeshed in the factual and legal issues comprising the

plaintiff's cause of action,'" the court's rigorous analysis frequently "entail[s] some overlap with

the merits of the plaintiff's underlying claim." *Id.* at 2551-52 (quoting *Gen. Tel. Co. of

Southwest v. Falcon*, 457 U.S. 147, 160, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)). Plaintiff

bears the burden of proving each disputed requirement by a preponderance of the evidence.

*Messner*, 669 F.3d at 811. District courts have broad discretion in determining motions for class

certification. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 345, 99 S. Ct. 2326, 60 L. Ed. 2d 931

(1979); *Messner*, 669 F.3d at 811.

     To be entitled to class certification, a plaintiff must satisfy each requirement of Rule

23(a)--numerosity, commonality, typicality, and adequacy of representation--and one subsection

of Rule 23(b). *See Harper v. Sheriff of Cook Co.*, 581 F.3d 511, 513 (7th Cir. 2009); *Oshana*,

472 F.3d at 513. "'Failure to meet any of the Rule's requirements precludes class certification.'"

*Harper*, 581 F.3d at 513 (quoting *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008)).

Satisfaction of these requirements, on the other hand, categorically entitles a plaintiff to pursue

3

her claim as a class action. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins.*, 130 S. Ct.

1431, 1437, 176 L. Ed. 2d 311(2009). In certifying a class, a court "should endeavor to select

the most appropriate subsection [of Rule 23(b)], not just the first linguistically applicable one in

the list." *Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 898 (7th Cir. 1999). In analyzing class

certification, the Court "should make whatever factual and legal inquiries are necessary under

Rule 23." *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001).

ANALYSIS

I.      **Class Definition Issues**

    A.      **Differing Class Definitions Do Not Preclude Certification**

As an initial matter, Plaintiff proffers a different proposed class definition in its Second

Amended Class Certification Motion than in its Complaint. (R. 138, Pl.'s Second Am. Mot.

Class. Cert. 1; R. 1-1, Compl. ¶ 18.) Defendants argue that Plaintiff has "improperly attempted

to change the [class] definition," and in the alternative, that neither proposed class definition

meets the certification requirements. (R. 145, Defs.' Resp. 24.)

In its Complaint, Plaintiff defines the class as follows:

> All persons who (1) one or after four years prior to the filing of this action, (2) were sent telephone facsimile messages of material advertising the commercial availability of any property, good, or services by or on behalf of Defendants, (3) with respect to whom Defendants cannot provide evidence of prior express permission or invitation for the sending of such faxes, (4) with whom Defendants did not have an established business relationship, and (5) which did not display the proper opt out notice. (Compl. ¶ 18.)

In its Second Amended Class Certification Motion, Plaintiff defines the class differently:

> All persons who were successfully sent a facsimile on December 19, 2006 or December 20, 2006, from "SnowEx . . . Leaders in Ice Control" promoting the "best built . . . best backed" salt spreaders, offering "50% off on extended warranty for all of our spreaders purchased in December, 2006 and January, 2007," and instructing interested recipients to

4

"Call 1-800-Salters for more information."
(Pl.'s Second Am. Mot. Class. Cert 1.)

Under Federal Rule of Civil Procedure 23, "[a]n order that certifies a class action must

define the class and the class claims, issues, or defenses, and must appoint class counsel." Fed.

R. Civ. P. 23. District courts typically, though not invariably, hold a plaintiff seeking class

certification to the definition espoused in the relevant complaint. *Compare, e.g., Clarke v.*

*Baptist Mem'l Healthcare Corp.*, 264 F.R.D. 375, 381 (W.D. Tenn. 2009) ("To accommodate a

new proposed class definition, plaintiffs will need to amend the complaint."); *Costelo v.*

*Chertoff,* 258 F.R.D. 600, 604-05 (C.D. Cal. 2009) ("The Court is bound to class definitions

provided in the complaint and, absent an amended complaint, will not consider certification

beyond it."); *id.* at 604-05 n. 6 (collecting cases); *Heastie v. Cmty. Bank of Greater Peoria*, 125

F.R.D. 669, 672 n. 3, 680 n. 10 (N.D. Ill.1989) ("As this Court observed earlier, the class

definitions proposed in [plaintiff's] motion for class certification differs from that set forth in her

complaint. The Court has certified the class as originally proposed, but [plaintiff] may file an

appropriate motion to amend both her complaint and the class definitions we have set forth here .

. . ."), *with Pop's Pancakes, Inc. v. NuCO2, Inc.,* 251 F.R.D. 677, 680 n. 1 (S.D. Fla. 2008)

(limiting its analysis to the class definition set forth in the plaintiff's motion, rather than the

different definition articulated in the complaint). The Seventh Circuit has not addressed the

scope of the district court's discretion to modify the class definition at the class certification

stage. *See Schorsh v. Hewlett-Packard,* 417 F.3d 748 (7th Cir. 2005) (noting that "[l]itigants and

judges regularly modify class definitions" but in the context of deciding whether an amendment

expanding the class definition commences a new action for purposes of the Class Action

Fairness Act).

5

In *Bridgeview Health Care Ctr. Ltd. v. Clark*, 09 C 5601, 2011 WL 4628744 (N.D. Ill.
Sept. 30, 2011), another TCPA case, the court rejected essentially the same argument as
Defendants make here. In *Bridgeview*, the plaintiff sought to change the class definition from all
those individuals who were sent faxes without consent and during a certain time period to
persons who were sent a particular fax. 2011 WL 4628744, at *2 n.2. The court reasoned that
the cases cited by the defendant emphasizing that a motion for class certification "does not
operate as a de facto amendment of a party's complaint" did not suggest that differing class
definitions precluded certification. *Id.* at *2 (citing *Heastie* and *Ridings v. Canadian Imperial
Bank*, 94 F.R.D. 147 (N.D. Ill. 1982)). To the contrary, in those cases the court certified the
class and invited plaintiffs to amend their complaint to reflect the new class definition. *Id.* at 2;
*Heastie*, 125 F.R.D. at 672 n.3 (treating complaint as controlling and allowing leave to amend
even where the differences were "more significant" than in *Ridings*).

The Court finds the reasoning of *Bridgeview* persuasive. This approach is also consistent
with Rule 23, which contemplates the amendment of a class certification order prior to judgment.
Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or
amended before final judgment"); *Gates v. City of Chicago*, 04 C 2155, 2011 WL 1811187, at
*2 (N.D. Ill. May 12, 2011) (noting the same). Accordingly, the Plaintiff's change of class
definition will not forestall the Court's class certification inquiry.[1] In addition, Defendant is not

---

[1] Defendants do not argue that Plaintiff has failed to satisfy the "ascertainability"
requirement of the class certification inquiry, which often arises in connection with class
definition issues. *See Oshana v. Coca-Cola Bottling Co.*, 472 F.3d 506 (7th Cir. 2006) (noting in
addition to the Rule 23(a) and Rule 23(b) requirements, "a plaintiff must also show . . . that the
class is indeed identifiable as a class"); *Oshana v. Coca-Cola Bottling Co.*, 225 F.R.D. 575, 580
(N.D. Ill. 2005), *aff'd sub nom.*, *Oshana v. Coca-Cola Bottling Co.*, 472 F.3d 506 (7th Cir. 2006)
("Courts have implied two prerequisites to class certification that must be satisfied prior to

6

prejudiced by the timing of the change here and has had ample time to respond to the modified

proposed class. As in *Heastie*, Plaintiff may amend its Complaint. Moreover, under either class

definition, Defendants' arguments that the class definition is improper based upon

"consent/existing business relationship" issues fail.

### B.    Defendants' Consent-Based Objections to the Class Definitions

Under the Complaint's class definition, Defendants argue that *GM Sign, Inc. v. Brink's*

*Mfg. Co.*, No. 09 C 5528, 2011 WL 248511 (N.D. Ill. Jan. 25, 2011), forecloses class

certification. (Defs.' Resp. 24.) Defendants' reliance on *Brink's*, however, is misplaced. In

*Brink's*, another putative TCPA class action, the Court held that the plaintiff had failed to satisfy

the predominance requirement because the class definition required plaintiff to show lack of

consent or an established business relationship, and the defendant had presented substantial

evidence of consent with respect to individual fax recipients. *Brink's*, 2011 WL 248511, at *8.

In *Brink's*, the court reasoned that in light of the defendant's evidence, it would have to "engage

in a class-member-specific inquiry to determine whether each recipient did indeed give

permission or have an established business relationship with Defendant at the pertinent time."

*Id.* at *8-9 (noting the defendant did not make "vague assertions about the nature of prior

---

addressing the requirements of Rule 23(a): (1) the class must be sufficiently defined so that the
class is identifiable; and (2) the named representative must fall within the proposed class."].
Here, both requirements are satisfied. The report of Mr. Biggerstaff, Plaintiff's expert, identifies
13,946 unique fax numbers to which B2B sent the Trynex fax. (Biggerstaff Decl. ¶ 7 (May 16,
2011).) Mr. Biggerstaff's report also identifies Plaintiff's numbers among those listed in the fax
transmission logs. (Biggerstaff Decl. ¶ 7. (May 16, 2011.); Defs.' Resp., Ex. B, Timothy
Caldwell Dep. Tr. 36:21-22.) Thus, Plaintiff has sufficiently demonstrated both that the class
refers to a defined group of individuals and that the group included Plaintiff.

business relationships and consent" but presented "specific evidence of the same." (internal

quotation marks omitted)). Of particular relevance here, the Court in *Brink's* noted that "[t]here

is no evidence that Defendant engaged a third party to distribute faxes." *Id.* at *10. Here, not

only have Defendants failed to offer specific evidence of consent or a prior business relationship

between Trynex and the intended fax recipients like the kind in *Brink's*, but it is undisputed that

Trynex engaged a third-party, B2B, to send faxes. *See id.* (noting evidence that the defendant

"created an electronic database . . . which included contact information for the company's actual

and prospective customers" and gathered fax numbers by calling prospective customers); (Pl.'s

Mem. Law, Ex. C, Barry Truan Dep. Tr. 43-45.) Thus, the Court rejects Defendants' argument

against the Complaint class definition.

Unlike the class definition in the Plaintiff's Complaint, the class definition in Plaintiff's

Second Amended Class Certification Motion does not expressly require lack of consent or lack

of an established business relationship. (Pl.'s Second Am. Mot. Class Cert. 1.). Rather, it

defines the class as all persons who were faxed a particular extended warranty advertisement.

(*Id.* at 1.) Defendants challenge this definition on the ground that it "ignores the consent/existing

business relationship entirely." (Defs.' Resp. 25.) Like its argument against the Complaint

definition, however, Defendants provide no evidence akin to that in *Brink's* showing that

individual questions of consent may predominate over common ones.

Thus, the Court will determine whether Plaintiff has satisfied Rule 23 with respect to the

definition in the Second Amended Class Certification Motion.

8

## II.     Numerosity

Rule 23 requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). A class of forty generally satisfies the numerosity requirement. *See, e.g., McCabe v. Crawford & Co.*, 210 F.R.D. 631, 643-44 (N.D. Ill. 2002); *cf. Pruitt v. City of Chicago*, 472 F.3d 925, 926 (7th Cir. 2006).

To satisfy numerosity, Plaintiff relies upon a report and declaration by its expert, Mr. Robert Biggerstaff. (R. 137-6, Pl.'s Mem. Law, Ex. F, G) Mr. Biggerstaff bases his report upon fax transmission logs obtained from the hard-drive of a B2B computer. (Biggerstaff Report 1 (Dec. 20, 2010).). Caroline Abraham, the founder of B2B, ran B2B's fax operation with a network of computers from her home with assistance from Macaw SRL, a Romanian-based company. (C. Abraham Dep. 9-10, 20) During discovery in *CY's Crabhouse*, another TCPA case involving B2B and Plaintiff's Counsel, Caroline Abraham's son, Joel Abraham, conveyed the hard drive along with back-up disks of information on the B2B network computers to Plaintiff's Counsel.[2] ( Pl.'s Mem. Law, Ex. Q, J. Abraham Dep. Tr. 17-18; C. Abraham Decl. ¶ 2 (Dec. 28, 2010).). In his report, Mr. Biggerstaff[3] states that he found "several references to

---

[2] Joel Abraham testified in his deposition that he brought the back-up CDs with him to the deposition. (Pl.'s Mem., Ex. Q, J. Abraham Dep. Tr. 22:18-23:4-5.) As for the hard-drive, whether Plaintiff's Counsel received the B2B hard-drive directly from Joel Abraham or via Joel Abraham's attorney at the time, Mr. Eric Rubin, remains unclear. In his deposition in *Creative Montessori Learning Ctr. v. Ashford Gear*, Mr. Rubin could not clearly recall either way, but acknowledged it was possible that Joel produced the records directly to one of Plaintiff's Counsel of record, Mr. Ryan Kelly. (R. 145-13, Eric Rubin Dep. Tr. 164:14.) Emails exchanged between Mr. Ryan Kelly and Mr. Eric Rubin on this subject are also ambiguous. (R. 137-4, Pl.'s Mem. Law.)

[3] Defendants do not challenge Mr. Biggerstaff's report under *Daubert v. Merrell Dow Pharm., Inc.*, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) or Federal Rule of Evidence 702.

'HylaFAX,'" a "computer-based fax broadcasting application." (Biggerstaff Report 2 (Dec. 20, 2010).) In addition, Mr. Biggerstaff states that he found "a standard HylaFAX fax log" that showed "5,783 records of attempted facsimile transmissions" and that "3,895 transmissions were successful and error-free transmissions of a 3-page fax." (*Id.* at 2.) In his declaration subsequent to the report, Mr. Biggerstaff revised his conclusion as to the number of transmissions after reviewing the hard-drive in conjunction with Ms. Abraham's March 11, 2011 declaration and accompanying documents, which appear to include screenshots from B2B's computer files related to faxing, copies of faxes, and emails from "fax 5" and "fax 2" servers to Caroline Abraham summarizing fax transmissions. (Biggerstaff Decl. ¶¶ 9, 10 (Jan. 10, 2012).) Specifically, Mr. Biggerstaff concluded that B2B's "Fax Upload" directory contained the list of fax numbers and fax images for each broadcast (*Id.* at ¶ 4.), including three files related to the Trynex broadcast: (1) T120701_SnowexTheirs Combo061219a-barry.tif; (2) Barry.csv; and (3) T120701_ExtraFaxNumbers061219a.csv. (*Id.* at ¶ 5.) Mr. Biggerstaff opines that "Barry.csv," is a "list of 14,442 fax numbers (13,946 unique) that would be consistent with the source list numbers for use by B2B to conduct the fax broadcasting of the image 'T120701_SnowexTheirs Combo061219a-barry.tif,'" after accounting for B2B's "scrubbing and deduping" of the list against its "do-not-fax list." (*Id.* at ¶¶ 4, 7.) The documents provided by Ms. Abraham also "identify the source MySQL database for the Trynex fax broadcast as 'NumereBarry20061219.'" (*Id.* ¶ 14.) (C. Abraham Decl. (Mar. 11, 2011).) Mr. Biggerstaff states that he retrieved this file from the hard-drive and pulled from within it 12,163 fax numbers, which he attaches as an exhibit to his report. (*Id.* at ¶14.) Thus, Mr. Biggerstaff concludes that "[e]ach of these 12,163 fax numbers were sent the Trynex fax, and 8,199 were successful error-free received fax

10

transmissions." (*Id.* at 14.)

Defendants argue that Plaintiff has failed to satisfy numerosity on two grounds: (1) the TCPA requires proof that the faxes were not only sent, but received; (2) Mr. Biggerstaff's report is based upon evidence lacking proper authentication. The Court rejects both of Defendants' arguments.

## A.  TCPA Distinction Between "Sent" and "Received" Faxes

Defendants' attempt to defeat numerosity based upon the TCPA's alleged distinction between "sent" and "received" faxes is unpersuasive. Specifically, Defendants contend that "numerosity is contingent on receipt of [a] [f]ax," and thus because Plaintiff has failed to produce a fax "actually received" by any potential class member or itself, Plaintiff has failed to establish numerosity. (Defs.' Resp. 7.) The TCPA provides that "[i]t shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States . . . to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement," unless the sender obtained the fax numbers through certain voluntary means or the unsolicited fax advertisement contains a specific notice. *See* 47 U.S.C. § 227(b)(1)(C). Even assuming the TCPA requires proof of receipt as opposed to merely transmission, Defendants fail to support the argument that a plaintiff may only establish receipt by producing the actual fax itself. Indeed, Plaintiff has produced circumstantial evidence of receipt through the fax logs. *See CE Design Ltd. v. CY's Crabhouse N., Inc.*, 259 F.R.D. 135, 142 (N.D. Ill. 2009) (noting defendant's argument that TCPA requires proof of receipt did not defeat predominance when plaintiff had "provided circumstantial proof of receipt by all of the numbers to which the fax logs indicate faxes were

11

successfully sent on behalf of Cy's Crabhouse.").

Moreover, Defendants do not take issue with Mr. Biggerstaff's conclusion that the fax transmission logs show that B2B sent out faxes advertising the Trynex extended warranty to thousands of different fax numbers. Nor do Defendants provide any evidence showing that Mr. Biggerstaff's number is vastly over-inclusive, which, according to Defendants, it must be, if there is any dispute as to whether the class clears the commonly-accepted threshold of forty members. *See Szabo*, 249 F.3d at 676 (noting numerosity "would be plain enough if, for example, the plaintiff alleged that the class had 10,000 members, making it too numerous to allow joinder, while the defendant insisted that the class contained only 10 members" (citation omitted).)

**B.    Admissibility and Authentication of the Biggerstaff Report**

Next, Defendants challenge numerosity on the ground that the evidence forming the basis of Mr. Biggerstaff's report is inadmissible and not properly authenticated. Mr. Biggerstaff's expert report is based upon fax transmission logs he obtained by examining the B2B hard-drive conveyed by Joel Abraham to Ryan Kelly. (Biggerstaff Report 2.) Defendants argue that the hard-drive lacks proper authentication because Mr. Kelly has failed to provide "a declaration or affidavit as to how he obtained the hard drive, who else handled the drive in question or how the hard drive was extracted from whatever computer system it was removed from." (Defs.' Resp. 8.) Although Ms. Abraham attests to such information, (C. Abraham Decl. ¶¶ 4-5 (Dec. 28, 2010)), Defendants contend that this evidence is insufficient because Ms. Abraham's son, Joel Abraham, and not Ms. Abraham, actually removed the hard-drive from the computer. (Defs.' Resp. 8.) Thus, according to Defendants, Ms. Abraham lacks personal knowledge of the transfer

12

and removal of the hard-drive. (*Id.* at 8.)

      i.    **Admissibility**

     Federal Rule of Evidence 803(6) provides that records of "a regularly conducted activity"

may be admissible if (1) "the record was made at or near the time by--or from information

transmitted by--someone with knowledge"; (2) "the record was kept in the course of a regularly

conducted activity of a business, organization, occupation, or calling, whether or not for profit";

(3) "making the record was a regular practice of that activity"; (4) the testimony of a custodian,

another qualified witness, or where applicable a certification shows the above conditions are

satisfied; and (5) "neither the source of information nor the method or circumstances of

preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6)(A)-(E). "[C]omputer data

compilations are admissible as business records under Fed. R. Evid. 803(6) if a proper

foundation as to the reliability of the records is established." *United States v. Jackson*, 208 F.3d

633, 638 (7th Cir. 2000) (quoting *United States v. Briscoe*, 896 F.2d 1476, 1494 (7th Cir. 1990)).

In addition, to authenticate an item of evidence under Rule 901, the "proponent must produce

evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R.

Evid. 901(a). The proponent may do so through such methods as the "testimony of a witness

with knowledge." Fed. R. Evid. 901(b)(1). Generally, at the summary judgment stage, an

affidavit from a qualified individual can establish the admissibility and authenticity of business

records. *See Thanonsingh v. Bd. of Educ.*, 462 F.3d 762, 778 (7th Cir. 2006).

     Here, Plaintiff has provided sufficient evidence to establish the admissibility of the fax

transmission logs extracted from the hard-drive under Rule 803(6). "A party establishes a

foundation for admission of business records when it demonstrates through the testimony of a

13

qualified witness that the records were kept in the course of a regularly conducted business activity and that it was the regular practice of that business to make such records." *U.S. v. Reese*, 666 F.3d 1007, 1017 (7th Cir. 2012) (citations omitted). In a March 11, 2011 declaration, Ms. Abraham states that with respect to "a number of B2B's electronically stored and computer generated documents related to a fax campaign on behalf of Trynex, Inc," that all such "data, documents and records . . . were made or stored at or near the time of the occurrence of the matters related to B2B business, were kept in the regular course of regularly conducted business activities of B2B; and were made or stored by regularly conducted activities as a regular practice of B2B." (Pl.'s Mem. Ex. A, C. Abraham Decl. 3-4 (Mar. 11, 2011).) The March 2011 Declaration in turn incorporates a December 28, 2010 Declaration by Ms. Abraham. (C. Abraham Decl. 2.) Together, these declarations and Ms. Abraham's deposition testimony amply demonstrate that Ms. Abraham is "someone with knowledge" of B2B's business. (Pl.'s Mem. Law, Ex. B, C. Abraham Dep. Tr. 10-11; C. Abraham Decl. ¶ 3,6 (Dec. 28, 2010).) Thus, the contents of the hard-drive are admissible under Rule 803(6).

### ii. Authentication

Defendants also argue that the fax transmission logs extracted from the B2B hard-drive lack proper authentication. Specifically, Defendants contend that the fax logs are unreliable because Plaintiff seeks to authenticate them "through an individual [sic] that has no personal knowledge of any aspect of the removal and transfer of the hard drive at issue" and "fail[s] to provide the Court with any information as to how the hard drive was removed from the computer at issue, who handled the hard drive prior to its delivery to Biggerstaff and whether the hard drive was altered in any manner prior to Biggerstaff's review." (Defs.' Resp. 8.)

14

To authenticate evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Federal Rule of Evidence 803(6) provides that a "custodian of the record" or any "other qualified witness" may authenticate a business record. *Thanongsinh*, 462 F.3d at 777 (quoting Fed. R. Evid. 803(6)). The custodian or qualified witness may authenticate the record in two ways: (1) testifying in court that "it was the regular practice' of the business to make and keep the record"; (2) certifying in compliance with Rule 902(11) or 902(12) that the document meets the requirements of Rule 803(6)(A)-(C), which are the following: (a) "the record was made at or near the time by--or from information transmitted by--someone with knowledge" (b) "the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit"; (c) "making the record was a regular practice of that activity." *Thanongsinh*, 462 F.3d at 777; Fed. R. Evid. 803(6)(A)-(C). The custodian "need not be in control of or have individual knowledge of the particular corporate record[]," but must "be familiar with the company's recordkeeping practices." *Thanongsinh*, 462 F.3d at 777. By the same reasoning, "[a] qualified witness need not be the author of the document but must have personal knowledge of the procedure used to create and maintain the document." *Reese*, 666 F.3d at 1017. To satisfy these authentication requirements, "the party seeking admission . . . need not have secured already the deposition testimony of these witnesses. Instead, he only need establish that the document has 'sufficient indicia of trustworthiness to be considered reliable.'" *Thanongsinh*, 462 F.3d at 777 (quoting *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000)).

15

Plaintiff has presented sufficient evidence that the fax transmission logs are properly authenticated. First, as noted above, Plaintiff has demonstrated that Caroline Abraham qualifies as a custodian or other qualified witness because she is "familiar with the company's record-keeping practices" with respect to fax transmission logs. Caroline Abraham testified in her deposition that in operating B2B she "participat[ed]" in the fax broadcasting by "telling the [IT] guys [at Macaw] exactly [when each] campaign is ready to go." (C. Abraham Dep. Tr. 40,41:2-6). The Macaw IT staff would then initiate the fax transmission from Romania over Ms. Abraham's phone lines. (C. Abraham Dep. Tr. 90:20.) Ms. Abraham also maintained the database with customer information and saved copies of customer faxes and communications. (C. Abraham Dep. Tr. 12:16, 11:16-17, 19:4-20) (June 12, 2011)). She stored this information on the B2B computers in her home. (C. Abraham Dep. Tr. 20 (June 12, 2011).).

Second, Ms. Abraham has sufficient knowledge to authenticate the fax transmission logs by either testifying that they were made or kept in the "regular practice" of B2B's business or certifying that the logs satisfy the conditions of 803(6)(A)-(C). *See* C. Abraham Dep. Tr. 20 (June 12, 2011). In her March 11, 2011 declaration, Ms. Abraham testified with respect to the documents upon which Mr. Biggerstaff based his January 10, 2012 report that they "were made or stored at or near the time of the occurrence of the matters related to the B2B business; were kept in the regular course of regularly conducted business activities of B2B; and were made or stored by regularly conducted activities as a regular practice of B2B." (C. Abraham Decl. (March 11, 2011)). Ms. Abraham clarified in her deposition that the phrase "were made or stored at or near the time of the occurrence of the matters related to B2B business," meant that "everything was done as the business was being done. If faxes came in from a customer they

16

were stored when they came in." (C. Abraham Dep. Tr. 20). Ms. Abraham also stated that storing such documents was a "part of [B2B's] activities also." (C. Abraham Dep. Tr. 24 (June 12, 2011).)

Defendant's speculation as to chain of custody problems is insufficient to defeat proper authentication under the business records exception. *See DirecTV, Inc. v. Reyes*, 03 C 8056, 2006 WL 533364, at *6 (N.D. Ill. Mar. 1, 2006) ("[I]f the document has been properly authenticated, there is no chain of custody requirement for the business records exception."). Defendant has not presented any evidence of alteration or interference with the hard-drive. Moreover, any such issues go to the weight, rather than the admissibility of the evidence. *Cf. U.S. v. Prieto*, 549 F.3d 513, 524-25 (7th Cir. 2008) (noting in a criminal case that "gaps in the chain [of custody] go to the weight of the evidence, not its admissibility"); *see DirecTV*, 2006 WL 533364, at*6 (N.D. Ill. Mar. 1, 2006); *Holtzman v. Turza*, 08 C 2014, 2009 WL 3334909 (N.D. Ill. Oct. 14, 2009) (noting this proposition in the context of a TCPA case in which defendant offered no reason to believe that the fax logs had been falsified).

Thus, Plaintiff has satisfied the numerosity requirement.

## III. Commonality

Rule 23(a)(2) requires that "questions of law or fact common to the class" exist. *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998) (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992)). "A common nucleus of operative fact is usually enough to satisfy" this requirement. *Keele*, 149 F.3d at 594 (quoting *Rosario*, 963 F.2d at 1018); *see also Kaufman v. Am. Express Travel Related Servs. Co.*, 264 F.R.D. 438, 442 (N.D. Ill. 2009) ("The commonality requirement does not necessitate every class member's factual or legal situation to be a carbon

17

copy of those of the named plaintiffs, so the low commonality hurdle is easily surmounted.") (internal quotation marks omitted). "Common nuclei of fact are typically manifest where . . . the defendants have engaged in standardized conduct towards members of the proposed class." *Keele*, 149 F.3d at 594. "The fact that there is some factual variation among the class grievances will not defeat a class action." *Rosario*, 963 F.2d at 1017; *see also Chandler*, 162 F.R.D. at 307-08 ("It is well established . . . that the presence of some individualized issues does not overshadow the common nucleus of operative fact presented when the defendant is engaged in standardized conduct toward the class.").

Plaintiff argues that Defendants' hiring of B2B to send the same fax to a list of numbers that B2B compiled from a database obtained from InfoUSA without the intended recipients' prior express invitation or permission constitutes "standardized conduct involving a common nucleus of operative facts" sufficient to establish commonality. (Pl.'s Second Am. Mot. Class Cert. 2.) Plaintiff also identifies the following issues of law and fact common to the class: (1) "[w]hether Defendants' fax is an advertisement;" (2) "[w]hether Defendants violated the TCPA by sending an advertisement by fax without first obtaining express invitation or permission to do so;" (3) "whether Plaintiff and other class members are entitled to statutory damages"; and (4) "whether Defendants sent the fax advertisements knowingly or willfully and, if so, whether the Court should treble the statutory damages." (*Id.* at 9.)

In response, Defendants raise two arguments as to why Plaintiff has not satisfied the commonality requirement. First, Defendants argue that the consent issues in this case make class-wide disposition inappropriate. Specifically, Defendants contend that individualized inquiry is necessary for each putative class plaintiff because (1) the fax at issue, as "an

18

advertisement for the extension of customer warranties for products," was "intended for existing customers"; and (2) some of the alleged fax recipients, according to Defendants, consented to the Trynex fax by "voluntarily" publishing their fax numbers. (Defs.' Resp. 10-11.) As the Court has already discussed, although specific evidence of consent may prove a hurdle to other elements of class certification, *see, e.g., Brink's,* 2011 WL 248511, at *1 (holding "multiple affidavits" showing defendant's collection of "information regarding the company's existing customers during the course of the relevant business relationships" defeated predominance); *CE Design Limited,* 637 F.3d at 727 (holding "doubts about [the] truthfulness" of class representative's president regarding consent issues defeated adequacy of proposed class representative), "vague allegations" of class member consent do not defeat commonality. *See, e.g., GM Sign, Inc. v. Group C Cmcn's,* No. 08 C 4521, 2010 WL 744262, at *3 (N.D. Ill. Feb. 25, 2010) ("[Defendant's] unsupported speculation that some of the proposed class members may have independently consented does not warrant denial of class certification."); *Green v. Serv. Master on Location Servs. Corp.,* 07 C 4705, 2009 WL 1810769, at *2 (N.D. Ill. June 22, 2009) ("[I]n the context of certification of a TCPA class-action complaint . . . the possibility that some class members may have consented is not sufficient to defeat class certification.").

Here, Defendants have provided no specific allegations or supporting evidence that individual putative class plaintiffs consented to the receipt of the Trynex fax. Rather, Defendants rely on the proposition that because Defendants intended the fax for existing customers, B2B must have only sent the fax to existing customers, and thus the Court must resolve consent issues on an individualized basis. (Defs.' Resp. 10., Ex. C, B. Truan Dep. Tr. 12, 15-16, 35-37, 44-45.) In his deposition testimony, Barry Truan, a Trynex customer-service

19

representative, indicated that the fax at issue was only intended for "registered users and existing dealers and distributors." (B. Truan Dep. Tr. 7:17-19, 47:17:24.). Mr. Truan, however, provided no specific information as to how this intention was communicated to B2B or reflected in the faxes B2B actually sent. While Mr. Truan indicated that B2B received the numbers in the blast fax at issue from Trynex, and those numbers were for customers or registered users only (except for a small list of Trynex sales representatives included as common practice), Mr. Truan could not recall who from Trynex provided him or B2B with the list. (B. Truan Dep. Tr. 37-38, 47-48.) This is particularly problematic, given that Plaintiff has offered a confirmation addressed to "Barry," and apparently sent from B2B to Mr. Truan, which specified that "[y]our price is only $508 for us transmitting . . . ads to all the fax numbers we have for snow removal and landscaping companies." (C. Abraham Decl. (Mar. 11, 2011), # B2B000012.)[4]

Defendants' argument against commonality based on "voluntary publication" similarly fails. Defendants' reliance on *Saf-T-Gard Int'l Inc. v. Wagener Equities, Inc.*, 251 F.R.D. 312 (N.D. Ill. 2008) in support of this argument is misplaced. In *Saf-T-Gard*, the district court denied certification not on the basis of consent, but because it lacked "information sufficient to identify the recipients of the disputed fax." 251 F.R.D. at 315 ("[In] the absence of some

---

[4] To clarify, the confirmation is from "Kevin Wilson" and bears the return address heading of "The Marketing Research Center." In her deposition, Ms. Abraham specified that the "The Marketing Research Center" is another name for B2B, and Kevin Wilson was a sales agent for Macaw SRL. (C. Abraham Dep. Tr. 26:4-7, 78:22; 27, 28.) The confirmation also bears the date March 2, 2011, even though the alleged faxing took place in December 2006. (C. Abraham Decl., #B2B000012, (March 11, 2011); *Id.* at #B2B000004.) Ms. Abraham clarified that the discrepancy was due to the fact that the document contains "a special word field" that pulls the current date. Thus, according to Ms. Abraham, because she printed the document around the time of the signing of her March 11, 2011 declaration, the document bears the date of March 2, 2011. (C. Abraham Dep. 103.)

APP00020

realistic means of identifying potential class members, class certification is inappropriate.") Indeed, before denying certification on the basis of class indefiniteness, the district court rejected the same argument Defendants make here, noting that it was "undisputed that some number of faxes were sent on defendant's behalf (with or without defendant's explicit authorization), potentially to thousands of recipients unknown to defendant" and that such conduct reflects "precisely the type of 'organized program' that lends itself to a common adjudication of the consent issue." *Saf-T-Gard Int'l Inc.*, 251 F.R.D. at 315. While Defendants claim in their briefs to have presented the Court with evidence that "at least 3,451 of the alleged 8,199 received faxes were sent to voluntarily published fax numbers," Defendants fail to cite any support for this assertion. (Defs.' Resp. 10.)

Second, Defendants argue that individualized inquiry is also necessary to determine whether B2B sent the faxes (1) "over a regular telephone line, "and not a "T1" line or internet connection; and (2) "to a "telephone facsimile machine" and not a computer or other device, as allegedly required by the TCPA. (Defs.' Resp. 12.) In support of their arguments, Defendants rely on the expert report of Mr. Ray Horak. (R-145-23, Defs.' Resp., Ex. U., Horak Report.)

Like Defendants' consent-based arguments, this attempt to defeat commonality rests not on specific evidence, but the mere possibility that some putative class members received the fax over a particular kind of fax line or through a particular kind of machine. In his report, Mr. Horak opines that the "uncertain nature of the networks used by Macaw," gives rise to the possibility that B2B sent the Trynex faxes over Vonage lines. (Horak Report 38.). Additionally, Mr. Horak states that because fax transmission logs do not "provide the actual codes, if any, received by the modems or other hardware" or a "trace log, which would detail the dialogue

between the transmitting and receiving modems and, thereby, substantiate the HylaFAX interpretation of the results of the attempted transitions," false-positive transmissions are possible. (Horak Report 37.) Ultimately, these generalizations, while suggesting potential factual variation among putative class members' cases, are insufficient alone to show the absence of a "common nuclei of operative fact." *See CE Design Ltd.*, 271 F.R.D. at 601-02 (N.D. Ill. 2010) (reviewing district court cases rejecting similar commonality challenges in TCPA cases based upon testimony of Mr. Ray Horak).

## IV. Typicality

Typicality is closely related to commonality. *See Keele*, 149 F.3d at 594. As the Supreme Court has noted, the commonality and typicality requirements "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *General Tel.*, 457 U.S. at 158 n. 13; *see also Mace*, 109 F.3d at 341 ("The typicality and commonality requirements of the Federal Rules ensure that only those plaintiffs or defendants who can advance the same factual and legal arguments may be grouped together as a class."). The typicality element broadly requires "that the claims or defenses of the representative party be typical of the claims or defenses of the class." *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009) (quoting *Williams v. Chartwell Fin. Servs., Ltd.*, 204 F.3d 748, 760 (7th Cir. 2000)). "A claim is typical if it 'arises from the same event or practice or course of conduct that gives rise to the claims of other class members and . . . [the] claims are based on the same legal theory.'" *Oshana*, 472 F.3d at 514 (quoting *Rosario*, 963 F.2d at 1018). "Although

22

'the typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members,' the requirement 'primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large.'" *Muro*, 580 F.3d at 492 (quoting *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)). Plaintiff argues that typicality is satisfied because the "class member claims' arise from the same transaction or occurrence," namely, the alleged unauthorized faxing by Defendants through B2B. (Pl.'s Mem. Law Class Cert. 9.)

Here, Plaintiff has provided evidence that Defendant Trynex made a single payment to B2B to send out Trynex's extended warranty fax, and B2B sent the fax to thousands of different fax numbers. (B. Truan Dep. Tr. 35-36, 45; Biggerstaff Decl. 14. (Jan. 10, 2012).) The putative class members' claims also arise from the same legal theory--that Defendants violated the TCPA by sending faxes without the express consent or permission of the intended recipients.

Defendants argue that Savanna Group's claim is not typical of the class because "it stands to reason" that Savanna Group either had a business relationship with Trynex or consented to receive Trynex's faxes because Trynex only sent its SnowEx Alerts to "distributors, dealers, suppliers and equipment owners," and Savanna Group received Trynex's SnowEx Alert. (Defs.' Resp. 13.) Like its challenges to commonality, however, Defendants provide insufficient information to support these assumptions. Indeed, Barry Truan's testimony--one of the few sources of evidence Defendants offer to corroborate the existence of a business relationship--simultaneously undercuts it, as Barry Truan testified that he "did not recall if [Trynex] did business with the Savanna Group in particular" because "they buy through one of

23

[Trynex's] dealers and distributors." (B. Truan Dep. Tr. 53:7-9.) In addition, James Truan, vice-president of Trynex, testified that he was not familiar with the Savanna Group. (Pl.'s Mem. Law, Ex. D, J. Truan Dep Tr. 37:4-13.) Plaintiff has satisfied the typicality requirement.

## V.    Adequacy of the Class Representative

Rule 23(a)(4) makes it a prerequisite of certification that "the representative parties will fairly and adequately protect the interests of the class." Fed. R.Civ. P. 23(a)(4). To satisfy Rule 23(a)(4), the class representative must "possess the same interest and suffer the same injury as the class members." *Uhl v. Thoroughbred Tech. & Telecmcn's, Inc.*, 309 F.3d 978, 984 (7th Cir. 2002). "A class is not fairly and adequately represented if class members have antagonistic or conflicting claims." *Rosario*, 963 F.2d at 1018. In determining adequacy, the district court must "ensure that there is no inconsistency between the named parties and the class they represent." *Uhl*, 309 F.3d at 978 (citing *Amchem*, 521 U.S. at 625).

In opposing the adequacy of Savanna Group as a class representative, Defendants repeat their unsupported argument that Savanna Group's claims are not typical of the class, which the Court has already rejected. Defendants also argue that Savanna Group has a different interest from the rest of the class because it received a letter from Plaintiff's Counsel stating that Savanna Group would receive compensation ranging from $500 to $1500 per unauthorized fax if the class action succeeds. (Defs.' Mem. Law, Ex. N.) Regardless of the propriety of class counsel sending such a letter, the letter's prediction of Savanna Group's compensation in the event of a successful suit alone is insufficient to place Savanna Group's interest in the litigation in conflict with those of other class members. Savanna Group, like the other putative class members, seeks damages for the injury of being sent unwanted faxes. (Compl. ¶ 42.) Therefore,

24

APP00024

the named plaintiff is adequate to represent the interests of the class.

## VI.    Adequacy of Class Counsel

Rule 23 also requires the adequacy of class counsel. *See* Fed. R. Civ. P. 23(g)(2); *Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir. 2002) ("For purposes of determining whether the class representative is an adequate representative of the members of the class, the performance of the class lawyer is inseparable from that of the class representative."). Under Federal Rule of Civil Procedure 23(g)(4), class counsel must "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4). Courts must consider the following in appointing class counsel: (1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (3) "counsel's knowledge of the applicable law;" (4) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).  In addition, courts may also "consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

Class counsel acts as a fiduciary of the class. *See Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 917 (7th Cir. 2011); *Culver*, 277 F.3d at 913.  As such, class counsel must show the district court that "they would prosecute the case in the interest of the class . . . rather than just in their interests as lawyers who if successful will obtain a share of any judgment or settlement as compensation for their efforts." *Creative Montessori*, 662 F.3d at 917 (citations omitted).  "If, therefore, the lawyer, through breach of his fiduciary obligations to the class, or otherwise, demonstrates that he is not an adequate representative of the interests of the

25

class as a whole, realism requires that certification be denied." *Culver*, 277 F.3d at 913 (citations omitted).

In determining adequacy, courts should consider class counsel's integrity and capacity to act as "conscientious fiduciaries of the class." *Creative Montessori*, 662 F.3d at 918. Class counsel need not commit "egregious misconduct" to qualify as inadequate. Rather, courts must deny certification if "[m]isconduct by class counsel . . . creates a serious doubt that counsel will represent the class loyally." 662 F.3d at 918. The rationale for holding class counsel to a higher standard than merely avoiding "egregious misconduct" is to deter unethical behavior. *Creative Montessori*, 662 F.3d at 918.

Defendants argue that class counsel is inadequate based upon the following allegations: (1) Plaintiff's Counsel breached a confidentiality agreement with Caroline Abraham regarding information on a B2B hard drive and backup disks; (2) Plaintiff's Counsel misrepresented the nature of the class action in a solicitation letter to Plaintiff; and (3) Plaintiff's Counsel acted improperly in sending a $5,000 check to Mr. Eric Rubin, Caroline Abraham's attorney, allegedly to induce Ms. Abraham to continue to supply information from the B2B hard drive on various intended targets of B2B's mass faxing operation. (Defs.' Mem. Law 15-20.) Because Plaintiff failed to provide sufficient information on the third allegation, the Court will delay consideration on the other allegations until Plaintiff has provided such information.

In early August of 2009, Mr. Brian Wanca, one of Plaintiff's counsel of record, sent Caroline Abraham's attorney, Mr. Eric Rubin, a $5,000 check made out personally to Mr. Rubin with a notation in the memo line, "document retrieval." (R. 145-13, Defs.' Resp., Ex. K, Rubin Dep. Tr. 52: 14-20.) Mr. Rubin testified that he regarded the payment as an attempt "of

26

questionable propriety" to pay Ms. Abraham for her "cooperation and providing information." (Rubin Dep. Tr. 55:2-5.) Defendants contend that the payment was a bribe intended to induce Ms. Abraham to continue supplying information to Plaintiff's Counsel about B2B's broadcast faxing operation, including the numbers and identities of fax recipients. (Defs.' Resp. 19.). In particular, Defendants take issue with the manner of payment, which consisted of a "$5,000 check in a Ramada Inn envelope without a cover letter made personally to Rubin without any explanation." (Defs.' Resp. 19.)

Plaintiff's Counsel does not dispute the fact or manner of the attempted payment. Instead, Plaintiff refers generally to the decisions of other district courts that have concluded that Plaintiff's conduct, though questionable, is insufficient to render class counsel inadequate. *Creative Montessori Learning Ctrs. v. Ashford Gear, LLC*, No. 09 C 3963, 2012 WL 3961307, at *3 (N.D. Ill. Sept. 10, 2012) (*Creative Montessori II*) (collecting district court cases finding adequacy of Plaintiff's Counsel post-*Creative Montessori*); *Reliable Money Order, Inc. v. McKnight Sales Co.*, 281 F.R.D. 327, 336 (E.D. Wis. 2012) ("Whatever this court's opinion of counsel's behavior might be, such behavior does not create a serious doubt that class counsel will represent the class loyally."). Plaintiff's reliance on other district court cases to rebut Defendants' allegations concerning the payment to Caroline Abraham, however, does not satisfy its obligation. Under Rule 23, Plaintiff bears the burden of demonstrating the adequacy of Plaintiff's Counsel. Accordingly, Rule 23 permits district courts in appointing class counsel to "order potential class counsel to provide information on any subject pertinent to the appointment." Fed. R. Civ. P. 23(g)(1)(C). Moreover, the Seventh Circuit has made clear that in the class certification inquiry courts "should make whatever factual and legal inquiries are

27

necessary under Rule 23." *Szabo*, 249 F.3d 672, 676 (7th Cir. 2001) ("[A]n order certifying a class usually is the district judge's last word on the subject; there is no later test of the decision's factual premises."). Plaintiff's invitation to rely solely on the findings of other district courts to resolve the adequacy issue does not provide the Court with sufficient information to make an individualized determination in this case.

Even if the Court adopted the findings of these decisions, they do not fully resolve the adequacy questions in this case with respect to the attempted payment to Caroline Abraham. The post-*Creative Montessori* cases Plaintiff relies upon to establish adequacy rely heavily upon *CE Design Ltd. v. CY's Crabhouse N., Inc.*, 07 C 5456, 2010 WL 3327876 (N.D. Ill. Aug. 23, 2010). *See, e.g., Reliable Money Order*, 281 F.R.D. at 335; *Am. Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.*, No. 9 C 1162, 2012 WL 3027953, at *7 (N.D. Ill. July 24, 2012). In *CY's Crabhouse*, however, the district court only accepted Plaintiff's explanation that the $5,000 payment was for reimbursement of Abraham's discovery compliance expenses and the purchase of the B2B computer after requiring Brian Wanca and Ryan Kelly--two of the same attorneys in this case--to submit a "sworn explanation describing any past, current, or proposed financial arrangement between plaintiff's counsel and the Abrahams, B2B, or their counsel." *CY's Crabhouse* at *6. Moreover, *CY's Crabhouse* preceded *Creative Montessori*, which clarified that the *Culver* standard was the correct one for assessing the adequacy of counsel. Similarly, the district court on remand in *Creative Montessori*, although applying the "serious doubt" standard, found adequacy after "review[ing] hundreds of pages of supplemental submissions" on remand. *Creative Montessori II*, 2012 WL 3961307, at *1.

28

Here, although Defendants raised the propriety of the payment in their response brief, (Defs.' Resp. 19.), Plaintiff failed to direct the court to any arguments or supporting evidence addressing this allegation, beside the expert reports of Professor Richard W. Painter, a "leading ethicist." (Pl.'s Mem. Law 21, Pl.'s Mem. Law Ex. II, JJ). With respect to this allegation, Professor Painter's reports mostly repeat the arguments that Plaintiff made in defense of the payment in *CY's Crabhouse*. (Painter Report 10.) Therefore, Plaintiff's insistence that "district court after district court has reached exactly the same conclusion" on this issue is insufficient to establish the adequacy of Plaintiff's Counsel here. (Pl.'s Reply 17.)

Given that Plaintiff bears the burden of proving the Rule 23 elements, the Court will take the "adequacy of counsel" element under advisement until Plaintiff provides additional information. Specifically, Plaintiff must provide on or before January 14, 2013 and for each counsel of record a (1) detailed affidavit with appropriate support explaining the $5,000 attempted payment to Caroline Abraham; and (2) a detailed affidavit describing any past, present, or proposed financial arrangements with Caroline Abraham, Joel Abraham, or their counsel, or any attempts to establish such relationships. Defendants may respond by January 21, 2013.

## VII. Predominance

Plaintiff seeks certification under Rule 23(b)(3). Accordingly, Plaintiff must demonstrate that "questions of law and fact common to members of the class predominate over questions affecting only individual members of the class." *Messner*, 669 F.3d at 808; *see also* Fed. R. Civ. P. 23(b)(3). Predominance is satisfied where common evidence may prove the class member's claims. *Messner*, 669 F.3d at 815 ("If, to make a prima facie showing on a given question, the

29

APP00029

members of a proposed class will need to present evidence that varies from member to member,
then it is an individual question. If the same evidence will suffice for each member to make a
prima facie showing, then it becomes a common question."). The "mere existence," however, of
individual issues is insufficient to defeat predominance. *See Messner*, 669 F.3d at 815 (noting
that to satisfy predominance "[i]ndividual questions need not be absent").

Defendants argue that Plaintiff fails to establish predominance because "there is no
generalized proof by which Plaintiff can prove its case." (Defs.' Resp. 22.) Specifically,
Defendants contend that because Plaintiff received Defendant Trynex's SnowEx Alert in the
past, which is an "advertisement extending a warranty to customers [who] already owned
Trynex's products," any liability determination with respect to the specific SnowEx Alert fax at
issue here would require an individualized inquiry into the merits of each putative class
member's claim. (Defs.' Resp. 22.) These arguments, however, confuse the issue of consent
with the question of whether there is generalized proof to resolve it. Defendants do not dispute
that Trynex paid B2B to send the extended warranty fax to some group of recipients. Defendants
also provide no specific evidence that Plaintiff consented to the fax or that Plaintiff had a
pre-existing business relationship with Defendant Trynex, beyond Plaintiff's past receipt of the
SnowEx Alert fax. Rather, Defendants rely solely on the logic that because the extended
warranty fax was intended for customers, Plaintiff must be a customer, and therefore individual
questions of consent and pre-existing business relationships predominate.

This argument fails to establish the predominance of individual over common issues.
Plaintiff has presented evidence that B2B sent the faxes in one single distribution without
distinguishing between customer and non-customers. Defendants have neither argued nor

APP00030

provided any evidence to the contrary. Indeed, the record at this stage suggests nothing other than that a limited number of sources of evidence can resolve this issue.[5]

Moreover, courts in this district have agreed that the presence of some limited issues requiring individual inquiry do not defeat predominance. *See, e.g., CE Design Ltd.*, 271 F.R.D. at 630 (finding predominance notwithstanding defendant's argument that "some of the contacts designated as prospects have separately consented to receiving the advertisements"); *G.M. Sign, Inc. v. Franklin Bank, S.S.B.*, 06 C 949, 2008 WL 3889950, at *6 (N.D. Ill. Aug. 20, 2008) ("Though some of the issues Franklin Bank identifies have the potential to require individual resolution, there can be no question that the common issues identified above will be a main focus of this case going forward.").

Defendants' reliance on *Brink's* and *Forman v. Data Transfer, Inc.*, 164 F.R.D. 400 (E.D. Pa. 1995) is also misplaced. In *Brink's*, another putative TCPA class action, the Court found that the named plaintiff had failed to satisfy predominance where the defendant presented evidence that it had "obtained the consent of Plaintiff and the other non-pre-existing-customer recipients of the faxes before sending them" and that "the other recipients of the faxes were pre-existing customers." *Brink's*, at *8 (noting the defendant "does not make 'vague assertions' about the

---

[5] While the evidence in the record bearing on consent may conflict, it suggests only few sources of evidence for resolving that conflict. In his deposition, Barry Truan testified that Trynex provided two lists of fax numbers to B2B: (1) a list of "registered dealers and users"; and (2) a handwritten list of Trynex's sales representatives' numbers, who typically were included on customer service communications. (Barry Truan Dep. Tr. 43:17, 28: 23-25) Mr. Truan, however, could not provide any details as to how the transfer of the first list occurred. (Pl.'s Mem., Ex B, C. Abraham Dep. Tr. 168 (June 12, 2011)). Thus, the record suggests that the fax numbers at issue did not come from a multitude of sources, a fact that might otherwise complicate the consent inquiry.

APP00031

nature of prior business relationships and consent, but has offered specific evidence of the same.") Moreover, in *Brink's*, the Court specifically noted the absence of any evidence that "Defendant engaged a third party to distribute faxes." *Brink's*, 2011 WL 248511, at *10. Here, the very opposite is true, because neither party disputes that Defendant Trynex hired B2B to send faxes in a manner that was common to all or a majority of the fax recipients. *Forman*, a case from the Eastern District of Pennsylvania is similarly unhelpful, as district courts in this District have "widely criticized [its] logic," instead affirming the proposition that "the question of consent may rightly be understood as a common question." *Green*, 2009 WL 1810769, at *2.

## VIII. Superiority

To satisfy superiority, Plaintiff must demonstrate "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The following factors are relevant: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D).

In light of these factors, the Court finds a class action is superior to other methods of adjudicating the putative class members' TCPA claims. Given the large number of plaintiffs in this suit and the similarity of their claims, disposition by class action is an efficient use of judicial resources. *See Hinman*, 545 F. Supp. 2d at 807. Moreover, the small potential recovery in individual actions–the greater of $500 or "actual monetary loss" from the violation– and reduced likelihood that plaintiffs will bring them also weighs in favor of class-wide resolution.

32

*See* 47 U.S.C. § 227 (b)(3)(B); *Pastor v. State Farm Mut. Auto. Ins. Co.*, 487 F.3d 1042, 1047 (7th Cir. 2007) ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights."); *G.M. Sign, Inc. v. Finish Thompson*, No. 07 C 5953, 2009 WL 2581324, at *7 (Aug. 20, 2009) ("Rule 23(b)(3) was designed for situations . . . in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate") (citing *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 953 (7th Cir. 2006)).

Defendants offer two arguments against superiority: (1) the "class action resulted from Plaintiff's counsel creating it out of whole cloth from a database it obtained in another unrelated matter pursuant to a confidentiality agreement"; and (2) Plaintiff's Counsel-and not the putative class members are the real "beneficiaries" of the litigation, which is contrary to the terms of the TCPA and *Creative Montessori*.  As both of these arguments go to the "adequacy" rather than the "superiority" requirement of Rule 23, the Court will not address them again here.  Moreover, the superiority determination is not inextricably tied to the adequacy of the class counsel or the class representative.  Class counsel may be inadequate, and the claims still appropriate for class-wide resolution.  *See CE Design Ltd.*, 637 F.3d at 728 ("Should the court decide that CE is not a proper class representative, that would not conclude the question whether the suit should be allowed to proceed as a class action."); *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 96 (7th Cir. 1977) ("In lieu of a change in counsel which might result in a certification of the class actions, plaintiffs are not barred from continuing the lawsuits on their own behalf.").

33

APP00033

## CONCLUSION

Because Plaintiff has failed to meet its burden of establishing the adequacy of class counsel, the Court enters and continues Plaintiff's motion subject to the submission of additional information. Accordingly, the Court orders Plaintiff to submit on or before January 14 and for each counsel of record: a (1) detailed affidavit with appropriate support explaining the $5,000 attempted payment to Caroline Abraham; and (2) a detailed affidavit describing any past, present, or proposed financial arrangements with Caroline Abraham, Joel Abraham, or their counsel, or any attempts to establish such relationships. Defendants may respond by January 21, 2013. Plaintiff may amend its Complaint to reflect the class definition in its Second Amended Class Certification Motion by January 18, 2013.

**Date:** January 4, 2013

ENTERED

AMY J. STUEVE
United States District Court Judge

34

APP00034

Order Form (01/2005)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 10 C 7995 | **DATE** | 2/19/2013 |
| **CASE TITLE** | | The Savanna Group, Inc vs. Truan | |

**DOCKET ENTRY TEXT**

The Court denies Defendants' Motion for Reconsideration [172].

■[ For further details see text below.]                                    Notices mailed by Judicial staff.

---

### STATEMENT

   Before the Court is Defendants' Motion to Reconsider the Court's January 4, 2013 Order continuing Plaintiff's Second Amended Motion for Class Certification. (R. 172; R. 156.) For the following reasons, the Court denies Defendants' Motion.

### BACKGROUND

   On September 21, 2012, Plaintiff Savanna Group Inc. filed a Second Amended Motion for Class Certification alleging violations of the Telephone Consumer Protection Act ("TCPA"). (R. 138.) In its Response to Motion, Defendants stated the following:

   Trynex has provided the Court with evidence that at least 3,451 of the alleged 8,199 received faxes were sent to voluntarily published fax numbers. As such, there needs to be an individual inquiry as to whether the putative class member by voluntarily publishing its fax number intended to give consent to receive fax advertisements.
   (R. 145, Defs.' Resp. 11.)

   In support of this proposition, Defendants cited only to *Saf-T-Gard Int'l, Inc. v. Wagener Equities, Inc.*, 251 F.R.D. 312 (N.D. Ill. 2008), not to exhibits to its briefs or the record. Accordingly, in assessing this proposition in its January 4, 2013 order, the Court stated the following: "While Defendants claim in their briefs to have presented the Court with evidence that 'at least 3,451 of the alleged 8,199 received faxes were sent to voluntarily published fax numbers,' Defendants fail to cite any support for this assertion." (Jan. 4, 2013 Order at 21.) On January 4, 2013, the Court continued Plaintiff Savanna Group's Second Amended Motion for Class Certification, pending additional submissions by the parties on the adequacy of class counsel. Defendants now move the Court to reconsider its January 4, 2013 order on the grounds that the Defendant had "provided support for its assertion in Exhibit F of its Motion to Strike Class Allegations," which Defendants filed on November 9, 2011. (R. 172, Mot. for Reconsideration at 1; R. 66, Mot. to Strike Class Allegations.)

| | Courtroom Deputy Initials: | KF |
|---|---|---|

APP00035

## LEGAL STANDARD

Federal Rule of Civil Procedure 54(b) permits the Court to exercise its inherent authority to reconsider its interlocutory orders. *See Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983) ("every order short of a final decree is subject to reopening at the discretion of the district judge"). Reconsideration motions under Rule 54(b) serve the limited function of correcting manifest errors of law or fact. *See Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir. 1987); *Zurich Capital Mkt., Inc. v. Coglianese*, 383 F. Supp. 2d 1041, 1045 (N.D. Ill. 2005). As the Seventh Circuit explains, "[i]t is well established that a motion to reconsider is only appropriate where a court has misunderstood a party, where the court has made a decision outside the adversarial issues presented to the court by the parties, where the court has made an error of apprehension (not of reasoning), where a significant change in the law has occurred, or where significant new facts have been discovered." *Broaddus v. Shields*, 665 F.3d 846, 860 (7th Cir. 2011) (citing *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990)). "Reconsideration is not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996). Whether to grant a motion for reconsideration is "entrusted to the sound judgment of the district court." *Matter of Prince*, 85 F.3d 314, 324 (7th Cir. 1996); *see also Damasco v. Clearwire*, 662 F.3d 891, 891 (7th Cir. 2011).

## ANALYSIS

Defendants have not demonstrated that reconsideration of any part of the Court's January 3, 2013 order is warranted. As the Court noted, Defendants did not cite to any support in their Response for the assertion that that they had provided the Court with evidence that the faxes were sent to voluntarily published fax numbers. Although Defendants subsequently argue that they had provided such information to their Court in their submissions on their prior Motion to Strike Class Allegations, Defendants failed to make that known to the Court or to provide such information in the relevant class certification briefing. Absent notice from the parties, the Court cannot be reasonably expected to scour briefs on past motions for evidence that might support a party's argument on a given motion. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.")

Moreover, Defendants fail to show that the Court made any "manifest errors of law or fact." *See Rothwell Cotton Co.*, 827 F.2d at 251. Defendants argue for reconsideration on the ground that the evidence offered in Defendants' Motion to Strike Class Allegations and *Saf-T-Guard* demonstrates that there is a "need for individual inquiry as to whether the putative class member by voluntarily publishing its fax number intended to give consent to receive fax advertisements." In its Order, however, the Court already discussed why *Saf-T-Guard* does not defeat commonality in these circumstances. In *Saf-T-Guard*, the Court denied certification not because consent issues defeated the commonality requirement, but because "there [was] simply no reasonable way of identifying potential class members in this case." *Saf-T-Gard*, 251 F.R.D. at 315 ("In the instant case, it is apparently undisputed that some number of faxes were sent on defendant's behalf . . . potentially to tens of thousands of recipients unknown to defendant. This reflects precisely the type of 'organized program' that lends itself to a common adjudication of the consent issue.").

Even if the Court were to consider Exhibit F in Defendant's Motion to Strike the Class Allegations, this would not change the conclusion that Plaintiff has satisfied the commonality requirement. Exhibit F consists of a number of printed pages presumably from the websites of intended fax recipients showing the businesses' contact information, including fax numbers. Courts have noted, however, that the mere publication of fax numbers is insufficient to establish a consent defense to a TCPA violation. *Cf. CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011) (noting an FCC regulation stating that "the fact that [a] facsimile number was made available in a directory, advertisement or website does not alone entitle a person to send a facsimile

10C7995 The Savanna Group, Inc vs. Truan                                    Page 2 of 3

APP00036

Case: 13-8004     Document: 1-2     Filed: 03/05/2013     Pages: 485

advertisement to that number"). Moreover, as the Court noted in its Order, Plaintiff has identified other common issues of law or fact, and any individualized consent issues do not predominate over those common questions. (R. 156, Order at 18,31.); *see Rosario v. Livaditis*, 963 F.2d 1013, 1017 ("The fact that there is some factual variation among the class grievances will not defeat a class action.") Thus, Defendants' motion for reconsideration is nothing more than an effort to "rehash[] previously rejected arguments or argu[e] matters that could have been heard during the pendency of the previous motion." *Caisse Nationale*, 90 F.3d at 1270.

## CONCLUSION

The Court denies Defendants' Motion for Reconsideration.

APP00037

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 10 C 7995 | **DATE** | 2/20/2013 |
| **CASE TITLE** | The Savanna Group vs. Truan | | |

**DOCKET ENTRY TEXT**

The Court grants Plaintiff's Second Amended Motion for Class Certification [138].

■[ For further details see text below.]        Notices mailed by Judicial staff.

---

### STATEMENT

Before the Court is Plaintiff Savanna Group Inc.'s Second Amended Motion for Class Certification. (R. 138.) After reviewing the parties' supplemental submissions, the Court grants the Motion.

### BACKGROUND

On September 21, 2012, Plaintiff moved to certify a class action based upon Defendants' alleged violations of the Telephone Consumer Protection Act ("TCPA"). Plaintiff alleges that Defendants violated the TCPA by hiring Business to Business Solutions ("B2B"), a "fax advertising business run by Caroline Abraham," to send unsolicited fax advertisements. (R. 138, Pl.'s Mem in Support of Certification 1-2) ("Pl.'s Cert. Mem.") On January 4, 2013, the Court entered and continued Plaintiff's Second Amended Motion for Class Certification. (R. 156, Jan. 4, 2013 Order.) The Court concluded that it lacked sufficient information to determine whether Plaintiff had satisfied its burden under Rule 23 of demonstrating the adequacy of class counsel. (*Id.* at 29.) Specifically, the Court lacked information regarding the circumstances of an attempted $5,000 payment from Mr. Brian Wanca, one of Plaintiff's Counsel, to Mr. Eric Rubin, Caroline Abraham's attorney at the time. (*Id.*) Accordingly, the Court ordered Plaintiff to submit the following for each counsel of record: a "(1) detailed affidavit with appropriate support explaining the $5,000 attempted payment to Caroline Abraham; and (2) a detailed affidavit describing any past, present, or proposed financial arrangements with Caroline Abraham, Joel Abraham, or their counsel, or any attempts to establish such relationships." (*Id.* at 28.) Pursuant to this order, on January 24, 2013, Plaintiff's Counsel filed the required affidavits for the following individuals: Brian J. Wanca, Ryan M. Kelly, Phillip A. Bock, James M. Smith, Phillip J. Bullimore, Jonathan B. Piper, and Todd Lewis. (R. 162, Pl.'s Supp. Mem.)

| | Courtroom Deputy Initials: | KF |
|---|---|---|

APP00038

**LEGAL STANDARD**

To be entitled to class certification, a plaintiff must satisfy each requirement of Rule 23(a)--numerosity, commonality, typicality, and adequacy of representation--and one subsection of Rule 23(b). *See Harper v. Sheriff of Cook Cty.*, 581 F.3d 511, 513 (7th Cir. 2009); *Oshana v. Coca-Cola Co.,* 472 F.3d 506, 513 (7th Cir. 2006). Rule 23 also requires the adequacy of class counsel. *See* Fed. R. Civ. P. 23(g)(2); *Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir. 2002) ("For purposes of determining whether the class representative is an adequate representative of the members of the class, the performance of the class lawyer is inseparable from that of the class representative."). Under Federal Rule of Civil Procedure 23(g)(4), class counsel must "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4). Courts must consider the following in appointing class counsel: (1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (3) "counsel's knowledge of the applicable law;" (4) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv). In addition, courts may also "consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

Class counsel acts as a fiduciary of the class. *See Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 917 (7th Cir. 2011); *Culver*, 277 F.3d at 913. As such, class counsel must show the district court that "they would prosecute the case in the interest of the class . . . rather than just in their interests as lawyers who if successful will obtain a share of any judgment or settlement as compensation for their efforts." *Creative Montessori*, 662 F.3d at 917 (citations omitted). "If, therefore, the lawyer, through breach of his fiduciary obligations to the class, or otherwise, demonstrates that he is not an adequate representative of the interests of the class as a whole, realism requires that certification be denied." *Culver*, 277 F.3d at 913 (citations omitted).

In determining adequacy, courts should consider class counsel's integrity and capacity to act as "conscientious fiduciaries of the class." *Creative Montessori*, 662 F.3d at 918. Class counsel need not commit "egregious misconduct" to qualify as inadequate. Rather, courts must deny certification if "[m]isconduct by class counsel . . . creates a serious doubt that counsel will represent the class loyally." 662 F.3d at 918. In clarifying the standard, the Seventh Circuit has noted that "[n]ot any ethical breach justifies the grave option of denying class certification." *Reliable Money Order, Inc. v. McKnight Sales Co., Inc.*, No. 12-2599, 2013 WL 85937, at *8-9 (7th Cir. Jan. 9, 2013) ("A 'slight' or 'harmless' breach of ethics will not impugn the adequacy of class counsel.") Nevertheless, "unethical conduct, not necessarily prejudicial to the class . . . raises a 'serious doubt' about the adequacy of class counsel when the misconduct jeopardizes the court's ability to reach a just and proper outcome in the case." *Id.* at *9.

**ANALYSIS**

In challenging the adequacy of Plaintiff's proposed Class Counsel under Rule 23, Defendants raise three allegations of misconduct: (1) Plaintiff's Counsel breached a confidentiality agreement with Caroline Abraham regarding information on a B2B hard drive and backup disks; (2) Plaintiff's Counsel misrepresented the nature of the class action in a solicitation letter to Plaintiff; and (3) Plaintiff's Counsel acted improperly in sending a $5,000 check to Mr. Rubin, Caroline Abraham's attorney at the time, allegedly to induce Ms. Abraham to provide further information about B2B's faxing operation. (R. 145, Defs.' Resp. Opposing Certification 15-20.) ("Defs.' Cert. Resp.") While considering the allegations as a whole to determine the adequacy of class counsel, the Court will detail each separately below.

APP00039

## I.      Alleged Breach of a Confidentiality Agreement

First, Defendant alleges that Plaintiff's counsel breached a confidentiality agreement with Caroline Abraham by using in subsequent TCPA litigation information on a B2B computer hard drive and DVDs that Caroline Abraham's son, Joel Abraham, had produced to Plaintiff's counsel on Caroline's behalf in February 2009. (Defs.' Cert. Resp. 18.) Beginning in July 2008, Mr. Ryan Kelly of Anderson + Wanca, requested various documents from Ms. Abraham in connection with four other TCPA cases in which Anderson + Wanca also served as counsel to TCPA plaintiffs. (Defs.' Cert. Resp., Ex. G. at 2.) Ms. Abraham claims that Plaintiff's Counsel represented to her during a December 14, 2008 conversation that "nobody would look at anything on these media not related to these four cases." (Defs.' Cert. Resp., Ex. G., Abraham Decl. 2-3.) In a December 16, 2008 email from Mr. Kelly to Ms. Abraham, Mr. Kelly attached a copy of an agreed protective order, which Mr. Kelly stated in the email would "prevent [him] from disclosing any of the back-up disks or hard drive to any third-party." (Defs.' Cert. Resp., Ex. 10.) In January 2009, Joel Abraham, acting at his mother's instruction, produced the hard drive and back up DVDs, (Defs.' Cert. Resp., Rubin Dep. Tr. 145-47), to Mr. Rubin, Joel and Caroline's attorney at the time, who then sent the materials on to Mr. Kelly in late February 2009. (Rubin Dep. Tr. 146:14-15.)

In response, Plaintiff argues that the hard drive "was not produced in response to [an] alleged promise of confidentiality." (Pl.'s Cert. Mem. Law 14.) Rather, after Caroline Abraham "repeatedly refused to cooperate," Anderson + Wanca obtained the hard drive from Mr. Rubin, Joel Abraham's attorney at the time, pursuant to a subpoena to Joel Abraham. (Id. at 16.) Plaintiff contends that neither Joel Abraham nor Mr. Rubin indicated at any time that Plaintiff should keep the materials confidential. (Id. at 16.)

In *Reliable Money Order*, No. 12-2599, 2013 WL 85937 (7th Cir. Jan. 9, 2013), the Seventh Circuit considered whether the district court had abused its discretion in refusing to deny certification based upon the same allegations against the same proposed class counsel as in this case. *Reliable Money Order*, 2013 WL 85937, at*10-11. With respect to the alleged breach of confidentiality with Caroline Abraham, the Seventh Circuit upheld the district court's conclusion that while the "conduct . . . certainly raises concerns about the professionalism of plaintiff's counsel, [it] does not raise serious doubts about their ability to represent the class faithfully." *Id.* at *10 (noting the conduct neither "prejudice[s] the class or create[s] a conflict of interest"). In limiting its holding, the Seventh Circuit noted that it "reflects only the judgment that actions such as occurred here . . . do not mandate disqualification of counsel." *Id.* Here, Defendants make substantially the same allegations and arguments with respect to this issue against the adequacy of class counsel as the defendant in *Reliable Money Order*. Moreover, Defendants have not presented any evidence showing that Plaintiff's Counsel's conduct, while less than transparent, will prejudice the class or rises to the level of "undermin[ing] the integrity of the proceedings." Accordingly, Plaintiff's Counsel's conduct with respect to Caroline Abraham on this issue does not render Plaintiff's Counsel inadequate.

## II.      Solicitation Letter

Next, Defendants argue that Plaintiff's Counsel's letter to Savanna Group demonstrates that Plaintiff's Counsel is not adequate to represent the class. Specifically, Defendants argue that the letter is "misleading" because it implies that Plaintiff is already a member of a certified class and improperly states the compensation Plaintiff would receive if Plaintiff's counsel prevailed in the suit. (Defs.' Cert. Resp. 16.)

The September 20, 2010 letter to Tim Caldwell of Savanna Group from Brian Wanca of Anderson + Wanca states the following, in relevant part:

During our investigation, we have determined that you are likely to be a class member in one or more of

APP00040

the cases we are pursuing. You might not remember receiving the junk faxes, but if the lawsuit were
successful, you would receive compensation (from $500 up to $1500) for each junk fax sent to you.

(Defs.' Cert. Resp., Ex. N.)

As with the alleged breach of confidentiality with Caroline Abraham, the Seventh Circuit in *Reliable
Money Order* concluded that the solicitation letter did not render class counsel inadequate. 2013 WL 85937, at
*11. Instead, the Seventh Circuit likened the solicitation letter to the "slight" ethical breaches in *Halverson v.
Convenient Food Mart*, 458 F.2d 927 (7th Cir. 1972), which involved an attorney's communication with potential
class members prior to the filing of the class action. 458 F.2d at 930. Moreover, as *Reliable Money Order* noted,
on remand from the Seventh Circuit in *Creative Montessori*, the district court concluded that the
"misrepresentation [in the solicitation letter] . . . is not so significant as to cast serious doubt on counsels' ability
to represent the class loyally." *Creative Montessori II*, No. 09 C 3969, 2012 WL 3961307, at *3 (N.D. Ill. Sept.
10, 2012). Here, too, the Court agrees that the conduct, while questionable, neither prejudices the class nor
compromises the "court's ability to reach a just and proper outcome in the case." *Reliable Money Order*, 2013
WL 85937, at *9.

### III.    $5,000 Attempted Payment to Caroline Abraham

In early August of 2009, Mr. Brian Wanca, one of Plaintiff's counsel of record, sent
Caroline Abraham's attorney, Mr. Rubin, a $5,000 check made out personally to Mr. Rubin
with a notation in the memo line, "document retrieval." (Defs.' Cert. Resp. 19.) The check was in a Ramada Inn
envelope and without a cover letter. (*Id.*) Defendants contend that the payment was in the least a "clear
demonstration of professional impropriety" and likely a "bribe for [Mr. Rubin] to get Ms. Abraham to cooperate
with Plaintiff's counsel in a scheme to file hundreds of TCPA lawsuits." (Defs.' Cert. Resp. 19.) In their
supplemental submissions, Defendants also argue that the $5,000 attempted payment from Mr. Wanca to Caroline
Abraham through Mr. Rubin constituted an improper inducement to Caroline Abraham in violation of Illinois
Rule of Professional Conduct 3.4. (Defs.' Supp. Mem. 9.)

Unlike the prior allegations, *Reliable Money Order* noted that the allegation of improper witness payments
against Plaintiff's Counsel, if proven, would render them inadequate as class counsel. *Reliable Money Order*,
2013 WL 85937, at *11 ("Thus, without a doubt, if Wanca sent Rub[i]n the check to influence Caroline
Abraham's testimony or made payment of expenses contingent upon the outcome of the case, Wanca would have
committed a serious breach of the ethical rules that would require denial of class certification.") Although the
issue of the $5,000 payment was not strictly before the Court in *Reliable Money Order*, the Seventh Circuit
nonetheless commented on its merits. The Seventh Circuit concluded that "determining the propriety of the
$5,000 check [would] require[] balancing the credibility of Rub[i]n's testimony against that of Wanca, who
denied the allegations." *Id.* at *11. Furthermore, the Court noted that the *Reliable Money Order* defendant had
not shown clear error in the *Cy's Crabhouse* court's factual findings that "no evidence existed to show improper
motive for the payment." *Id.* at *11.

Mr. Wanca avers in his affidavit that from July 10, 2008 to April 20, 2009, he "wrote checks to Caroline
Abraham and Joel Abraham to compensate them for their time and expense in retrieving documents and sitting
for depositions or sworn statements in 12 cases in which Business to Business Solutions acted as the fax
broadcaster." (Pl.'s Supp. Mem., Ex. A, B. Wanca Decl., Ex. 1, at 2 (June 25, 2010).) Specifically, with respect
to the $5,000 check, Mr. Wanca stated the following:

We anticipated seeking documents and testimony for more TCPA cases in the future and believed that it
would be best to take possession of the computer(s) to retrieve the data ourselves at our own time and

APP00041

expense. It was my understanding that the Abrahams sought to be compensated for turnover of the computer and loss of use of that computer. (In other words, they would need to buy a new computer and software.) Although I had no communications with Eric Rubin or the Abrahams, as those were handled by Ryan Kelly, while traveling with my family, in August of 2009, I sent a check in the amount of $5,000 . . . to Rubin for "document retrieval" to be used to reimburse Caroline or Joel for retrieving documents on cases that Kelly requested documents on, for sitting for future depositions/sworn statements, and for turnover of the computer and to compensate for loss of use of the computer.
(*Id.* ¶ 12.)

Mr. Wanca further asserted that "he believed this $5,000 amount to be reasonable because [he] believed Caroline and Joel had spent a considerable amount of time in responding to all previous requests" and he "anticipated that they would spend a considerable amount of time in the future responding to document requests and sitting for sworn statements/depositions." (*Id.* ¶ 13.) Mr. Wanca allegedly made the check payable to Mr. Rubin "to prevent Caroline and/or Joel from simply depositing the check and then disappearing." (*Id.* ¶ 13.) Mr. Rubin responded on August 12, 2009 with a letter to Mr. Wanca, in which he stated that he believed the check "to be of questionable propriety" and "an attempt to pay [his] client for their cooperation in providing [Plaintiff's Counsel] with information or documents identifying third parties that may have sent fax transmissions through Business to Business." (Defs.' Supp. Mem., Ex. I.) After Mr. Rubin returned the check, Mr. Wanca averred that he "sent [him] a handwritten note of apology for any misunderstanding." (B. Wanca Decl., Ex. 1, ¶ 13 (June 25, 2010).)

Mr. Kelly avers that he "had communication with Eric Rubin" and "discussed compensating Caroline for sitting for depositions/sworn statements . . . , and for turnover of the computer and to compensate for loss of use of the computer." (Pl.'s Supp. Mem., Ex. B, Kelly Decl., Ex. 1, ¶ 3.) Mr. Kelly also stated that he believed the $5,000 payment was reasonable because "it was anticipated that Caroline would spend a considerable amount of time in the future responding to document requests and sitting for sworn statements/depositions." (*Id.* ¶ 4.) According to Mr. Kelly, "Rubin stated that he would talk to Caroline about this matter and would let me know if Caroline would agree to provide additional documents and make herself available to provide sworn statements for the other TCPA cases." (*Id.*)

In their supplemental Memorandum accompanying the affidavits, Plaintiff's Counsel further argue that the $5,000 check was not improper on the grounds that (1) "Caroline Abraham had been deposed several times and there was no issue of influencing her testimony, which was essentially locked in" (Pl.'s Supp. Mem. 2); and (2) by August 2009, Anderson + Wanca "had already made payments totaling over $3,500 to Caroline Abraham and her son Joel to compensate their time and expenses for providing that information." (*Id.*)

Based upon its review of the supplemental submissions and consideration of Plaintiff's Counsel's actions as a whole, the Court finds that the conduct does not render Plaintiff's Counsel inadequate. Neither party disputes that Ms. Abraham had accepted reimbursement payment from Plaintiff's Counsel prior to the August 2009 incident. (Pl.'s Supp. Mem. 2; Defs.' Supp Mem. 2.) Although Plaintiff's explanation of the manner and amount of the payment leaves unanswered questions, the record before the Court does not demonstrate that Mr. Wanca or any other attorney of record for Plaintiff sent the payment with the motive to induce particular testimony from Caroline Abraham, especially because she had already testified several times on these issues. Nor does it demonstrate action on the part of Plaintiff's Counsel that would otherwise prejudice the class in whole or in part or undermine the integrity of the judicial proceeding. *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 960 (9th Cir. 2009) (disapproving of incentive agreements creating a "disconnect between the interests of the contracting representatives and class counsel, on the one hand, and members of the class on the other"); *Kaplan v. Pomerantz*, 132 F.R.D. 504, 511 (N.D. Ill. 1990) (decertifying class in part on grounds that "plaintiff's counsel was at least a silent accomplice in, and at most encouraged, plaintiff's false testimony"). Additionally, while not

APP00042

dispositive, the analyses of other district courts that have considered this allegation with respect to the adequacy of class counsel further support this conclusion.[1] *See CE Design Ltd. v. CY's Crabhouse N., Inc.*, 07 C 5456, 2010 WL 3327876, at *7 (N.D. Ill. Aug. 23, 2010) ("Though Abraham and Rubin may have viewed the larger $5,000 check as an attempt to induce her cooperation, that inference is not based on any communication from plaintiff's counsel."); *Am. Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.*, No. 09-CV-1162, 2012 WL 3027953, at *7 (W.D. Mich. July 24, 2012) ("This Court is in agreement with the district court in *CE Design* that no evidence suggests that Wanca or Kelly paid or attempted to pay Abraham or Joel Abraham contingent upon the *content* of their testimony or documents."). Thus, Plaintiff's Counsel's conduct, while questionable, does not rise to the level of prejudicing the class or compromising the "court's ability to reach a just and proper outcome in the case."[2] *Reliable Money Order*, 2013 WL 85937, at *9.

Moreover, as the *Reliable Money Order* court noted, in assessing the adequacy of class counsel, courts should also consider "counsel's work on the case to date, counsel's class action experience, counsel's knowledge of the applicable law, and the resources counsel will commit to the case." 2013 WL 85937, at *9. Defendants have not presented any evidence suggesting any deficiencies of Plaintiff's Counsel in this regard. *Id.* at *9 n.7 ("No one disputes the qualifications of plaintiff's counsel under [the other Rule 23] metrics.")

Plaintiff, therefore, has satisfied its burden under Rule 23 of demonstrating the adequacy of class counsel. Accordingly, the Court grants Plaintiff's Second Amended Motion for Class Certification and appoints Plaintiff's counsel of record as Class Counsel.

## CONCLUSION

The Court grants Plaintiff's Second Amended Motion for Class Certification. Pursuant to Rule 23(c), the Court appoints Plaintiff's Counsel of record as Class Counsel and certifies the following class: All persons who were successfully sent a facsimile on December 19, 2006 or December 20, 2006, from "SnowEx … Leaders in Ice Control" promoting the "best built … best backed" salt spreaders, offering "50% off on extended warranty for all of our spreaders purchased in December, 2006 and January, 2007," and instructing interested recipients to "Call 1-800-Salters for more information." (R. 161, Am. Compl. 3-4.)

---

[1] Although in *Reliable Money Order*, the Seventh Circuit assumed without deciding that evidence that Mr. Rubin perceived the check as pay-off was insufficient to establish that the payment "was contingent on the outcome of the case or the content of the testimony," this Court agrees with the district court in *Cy's Crabhouse* that such evidence, given the circumstances, is insufficient alone to establish an improper motive on the part of Mr. Wanca. *Reliable Money Order*, at *11.

[2] Defendants urge the Court to conclude that Plaintiff's Counsel's conduct violated Illinois Rule of Professional Conduct 3.4(b). The Rule provides that a "lawyer shall not . . . offer an inducement to a witness that is prohibited by law." Rule 3.4(b). The comments to the Rule further explain that a lawyer may "pay a witness or prospective witness the reasonable expenses incurred in providing evidence" and "reasonable charges for travel to the place of a deposition or hearing or to the place of consultation with the lawyer and for reasonable related out-of-pocket costs." Rule 3.4(b) cmt. Offers of payment or payment of expenses, however, "may not be contingent on the content of the testimony or the outcome of the litigation, or otherwise prohibited by law." Rule 3.4(b) cmt. As the issue of whether or not Plaintiff's Counsel violated the Rule is not dispositive of the adequacy of the class counsel, the Court will not reach this issue. *See Reliable Money Order*, 2013 WL 85937, at *9.

APP00043

**THE SAVANNA GROUP, INC v. TRYNEX, INC**

# TIMOTHY WAYNE CALDWELL

**Date:** May 16, 2011

## ORIGINAL

Amicus Court Reporters, Inc.
Phone:312/641-3500
Fax:312/641-3795
Email:info@amicusreporters.com



EXHIBIT
B

Page 1

# TIMOTHY WAYNE CALDWELL
# THE SAVANNA GROUP, INC v. TRYNEX, INC

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

THE SAVANNA GROUP, INC., an Illinois )
corporation, individually and as the )
representative of a class of )
similarly-situated persons, )
)
            Plaintiff, )
) No. 10 CV 7995
        vs. )
)
TRYNEX, INC., CHARLES TRUAN, JAMES )
TRUAN and PHIL TRUAN, )
)
          Defendants. )

    The deposition of TIMOTHY WAYNE CALDWELL,
called for examination pursuant to Notice and the Rules
of Civil Procedure for the United States District
Courts pertaining to the taking of depositions, taken
before DEBORAH T. BRAUER, a notary public within and
for the County of Lake, State of Illinois, at 3701
Algonquin Road, Rolling Meadows, Illinois, on the 16th
day of May, 2011, at the hour of 1:05 p.m.

# AMICUS COURT REPORTERS, INC.
## 888.641.3550

e973f225-05d6-40fb-a92a-b4147b4897d7

Case: 13-8004    Document: 1-2    Filed: 03/05/2013    Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 3 of 75 PageID #:9013

Page 2

TIMOTHY WAYNE  CALDWELL
THE SAVANNA GROUP, INC v. TRYNEX, INC



```
 1              PRESENT:

 2
           ANDERSON & WANCA
 3           BY:  MR. RYAN KELLY
                  MR. WALLACE SOLBERG
 4                3701 Algonquin Road
                  Suite 760
 5                Rolling Meadows, Illinois 60008
                  (847) 368-1500
 6
                       on behalf of the Plaintiff;
 7
           LITCHFIELD CAVO LLP
 8           BY:  MS. LAURA L. MILNICHUK
                  303 West Madison Street
 9                Suite 300
                  Chicago, Illinois  60606
10                (312) 781-6672
                  e-mail:  milnichuk@litchfieldcavo.com
11
                       on behalf of the Defendants.
12
13
14
15
16
17
18
19
20
21
22
23
24
```

AMICUS  COURT  REPORTERS,  INC.
888.641.3550

e973f225-05d6-40fb-a92a-b4147b4897d7

APP00046

TIMOTHY WAYNE   CALDWELL

THE SAVANNA GROUP, INC v. TRYNEX, INC

1
2                              I N D E X
3           DEPOSITION OF TIMOTHY WAYNE CALDWELL
                        MAY 16, 2011
4
5    EXAMINATION BY:                        PAGE
6        Ms. Milnichuk                        4
7

                          - - -

8
9                        E X H I B I T S
10                                         PAGE
     NUMBER                             REFERRED TO
11
     Deposition Exhibits
12
         1   (marked)                      25
13       2   (marked)                      42
         3   (marked)                      47
14       4   (marked)                      69
         5   (marked)                      82
15
16
17
18
19
20
21
22
23
24

AMICUS COURT REPORTERS, INC.
888.641.3550

e973f225-05d6-40fb-a92a-b4147b4897d7

# TIMOTHY WAYNE CALDWELL
## THE SAVANNA GROUP, INC v. TRYNEX, INC

1      (Witness sworn.)

2           TIMOTHY WAYNE CALDWELL,

3    called as a witness herein, having been first duly

4    sworn, was examined and testified as follows:

5                EXAMINATION

6    BY MS. MILNICHUK:

7         Q.   Hi, Mr. Caldwell.  My name is Laura Milnichuk

8    and I represent the defendants in this case.  What's

9    going to happen is I'm going to ask you a series of

10   questions and you need to give a series of answers.  I

11   ask that you always give a verbal answer, whatever your

12   response is, because the court reporter can't take down

13   a nod of the head or shaking.

14        A.   Okay.

15        Q.   And I'm going to assume you understood my

16   question unless you tell me to the contrary.

17        A.   Okay.

18        Q.   So if you don't understand, just say "I don't

19   understand" and I'll rephrase.

20        A.   Okay.

21        Q.   If at any point you need to take a break,

22   just let me know and we'll stop and go from there.

23        A.   Okay.

24        Q.   This deposition is being taken pursuant to

## AMICUS COURT REPORTERS, INC.
### 888.641.3550

e973f225-05d6-40fb-a92a-b4147b4897d7

TIMOTHY WAYNE   CALDWELL
THE SAVANNA GROUP, INC v. TRYNEX, INC

1    the Federal Rules of Civil Procedure, and the local

2    rules of the Northern District of Illinois.

3             Can you please state your name for the

4    record?

5        A.   Sure.  Timothy Wayne Caldwell.

6        Q.   And when were you born?

7        A.   April 22, 1967.

8        Q.   And where were you born?

9        A.   Sacramento, California.

10       Q.   What is your current address?

11       A.   202 April Lane, North Aurora, Illinois.  Do

12   you need the zip?

13       Q.   Sure.

14       A.   60542.

15       Q.   Are you married?

16       A.   Yes.

17       Q.   Do you have any kids?

18       A.   Yes.

19       Q.   How many?

20       A.   Two children.

21       Q.   Have you ever been deposed before?

22       A.   Define "deposed."

23       Q.   Sat in this same setting and taking your

24   deposition?

AMICUS COURT REPORTERS, INC.
888.641.3550

e973f225-05d6-40fb-a92a-b4147b4897d7

TIMOTHY WAYNE CALDWELL
THE SAVANNA GROUP, INC v. TRYNEX, INC

```
 1          A.   No.
 2          Q.   Have you ever been a party to a class action
 3     lawsuit before?
 4          A.   No.
 5          Q.   So you have never served as a class
 6     representative before?
 7          A.   Well, I think I get the credit card --
 8     sometimes they have those things, and I have been --
 9     they have sent me the stuff on that before, and I have
10     gotten that.  I don't know if that's the same thing or
11     not.
12          Q.   Okay.
13          MR. KELLY:  It just sounds like a class member.
14     BY MS. MILNICHUK:
15          Q.   So you have received some sort of
16     notification in the mail?
17          A.   Yes.
18          Q.   And did you choose to become a part of the
19     class?
20          A.   I never responded to them.
21          Q.   What is your highest level of education?
22          A.   I have a Bachelor's in Landscape Architecture
23     from Iowa State University.  Graduated in 1991.
24          Q.   Did you review any documents in preparation
```

Case: 13-8004    Document: 1-2    Filed: 03/05/2013    Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 8 of 75 PageID #:9018

Page 7

TIMOTHY WAYNE   CALDWELL
THE SAVANNA GROUP, INC v. TRYNEX, INC

1    for today's deposition?

2         A.   I reviewed from the past the fax record from

3    my fax machine.

4         Q.   And by "fax record" are you referring to the

5    fax itself or something else?

6         A.   I'm trying to remember.  Just the fax record.

7    My fax machine has a fax record.

8         Q.   Okay.  And when did you review that?

9         A.   I review it on a weekly basis.  The fax

10   machine I have produces a weekly fax report.  I don't

11   keep them so I don't have a file with every fax report.

12   It produces a weekly fax report.

13        Q.   Okay.  So you reviewed a weekly fax report at

14   some point --

15        A.   Every Friday.

16        Q.   Every Friday?

17        A.   Every single Friday.

18        Q.   For how long?

19        A.   13 years, since I have owned the business.

20        Q.   But you don't retain them, is that correct?

21        A.   No.

22        MR. KELLY:  Well, she said, is that correct, you

23   probably wanted to say "yes."

24        MS. MILNICHUK:  That's fine.

AMICUS  COURT  REPORTERS,  INC.
888.641.3550

e973f225-05d6-40fb-a92a-b4147b4897d7

APP00051

Case: 13-8004    Document: 1-2    Filed: 03/05/2013    Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 9 of 75 PageID #:9019

Page 8

## TIMOTHY WAYNE CALDWELL
### THE SAVANNA GROUP, INC v. TRYNEX, INC

1       MR. KELLY: Right?

2       THE WITNESS: Yes, I do not.

3  BY MS. MILNICHUK:

4       Q.   So it's correct that you do not retain them?

5       A.   Correct.

6       MR. KELLY: The reason I ask that is because in

7  conversation we kind of understand what the answers are

8  but when we read the transcript --

9       THE WITNESS: So it makes sense.

10       MR. KELLY: Yes.

11       THE WITNESS: Okay.

12  BY MS. MILNICHUK:

13       Q.   So you said 13 years since you formed the

14  company?

15       A.   Yes.

16       Q.   What company were you referring to?

17       A.   The Savanna Group.

18       Q.   And where is that located?

19       A.   202 April Lane, North Aurora.  Same address

20  as where I live.

21       Q.   So that was in 1998?

22       A.   '98, yes.

23       Q.   Do you remember approximately what month?

24       A.   I'm thinking it's November, December.  I

Case: 13-8004    Document: 1-2    Filed: 03/05/2013    Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 10 of 75 PageID #:9020

Page 9

TIMOTHY WAYNE   CALDWELL

THE SAVANNA GROUP, INC v. TRYNEX, INC

1  would have to look up the corporate papers and find out

2  when it was actually incorporated.

3      Q.  Are you the sole shareholder?

4      A.  No, I have a business partner.

5      Q.  Who is that?

6      A.  His name is Chris Molloy.

7      Q.  Can you spell Molloy?

8      A.  Sure, M-o-l-l-o-y.

9      Q.  And how long has he been your business

10  partner?

11     A.  13 years.

12     Q.  Do you know where he resides?

13     A.  In St. Charles.  I don't know the address off

14  the top of my head.  But he has nothing to do with the

15  office.  He's a production manager.  He's never in the

16  office.

17     Q.  What is your title?

18     A.  I am the President and Treasurer.

19     Q.  How would you define your job duties as

20  President and then as Treasurer?

21     A.  Okay.  As President I do all -- everything to

22  do with the corporate entity.  I file all the legal

23  papers on a yearly basis with the State of Illinois,

24  pay all the taxes, figure payroll, let's see, I do all

Case: 13-8004    Document: 1-2    Filed: 03/05/2013    Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 11 of 75 PageID #:9021

Page 10

TIMOTHY WAYNE   CALDWELL
THE SAVANNA GROUP, INC v. TRYNEX, INC

1    the -- as a landscape architect I do all drawings, the

2    estimating, the sales, collections, invoicing, billing,

3    anything to do with the corporate entity of working

4    with inside the office.  That's as President.

5         As Treasurer I collect any invoicing to the

6    company, pay all the bills, all the financial aspect.

7         Q.   What does Mr. Molloy do as production

8    manager?

9         A.   As production manager he basically starts the

10   crews in the morning, delivers whatever material they

11   need for the day, and takes care of any field

12   adjustments or anything.  Then at night he comes back,

13   makes sure all the trucks are unloaded and reloaded and

14   ready for the next day.

15        Q.   How many trucks do you have?

16        A.   Work trucks or total in fleet?

17        Q.   Both.

18        A.   Okay.  Work trucks would be three work

19   trucks, two trailers, four skids.  I don't know if you

20   need to know all that.  And then I have just a regular

21   like Tahoe is the vehicle I drive around in.

22        Q.   And so you said you have a degree in

23   Landscape Architecture?

24        A.   Uh-huh.

AMICUS COURT REPORTERS, INC.
888.641.3550

e973f225-05d6-40fb-a92a-b4147b4897d7

Case: 13-8004    Document: 1-2    Filed: 03/05/2013    Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 12 of 75 PageID #:9022

Page 11

## TIMOTHY WAYNE    CALDWELL
## THE SAVANNA GROUP, INC v. TRYNEX, INC

1      Q.  What primarily does The Savanna Group do?

2      A.  We're a design/build landscape contracting

3  firm, and we are primarily residentially based so we

4  deal with homeowners.

5      Q.  And what is the geographic reach of your

6  business?

7      A.  Far western suburbs.  I don't know, do you

8  need towns or just far western suburbs of Chicago?

9      Q.  What's the furthest western suburb?

10     A.  Dekalb.

11     Q.  Are you primarily landscaping lawns or

12  gardens?

13     A.  Mostly renovation of existing landscape,

14  paver patios, retaining walls, driveways, that kind of

15  stuff.

16     Q.  Do you do any work in the summertime?

17     A.  In the summertime, yes.  That's --

18     Q.  What about spring?

19     A.  Yes.

20     Q.  August, September, fall?

21     A.  Yes.

22     Q.  What about winter?

23     A.  Holiday decor.  We do some holiday decor in

24  the fall.  We start about in October hanging lights.

Case: 13-8004    Document: 1-2    Filed: 03/05/2013    Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 13 of 75 PageID #:9023

Page 12

## TIMOTHY WAYNE CALDWELL
## THE SAVANNA GROUP, INC v. TRYNEX, INC

1    And then in the winter I have a snow removal/snow

2    plowing division.

3        Q.    Did you say snow plowing and snow removal?

4        A.    Uh-huh.

5        Q.    Can you define for me exactly what you mean

6    by snow plowing and snow removal?

7        A.    What we do is we contract -- actually we're

8    used as a subcontractor most of the time for other

9    landscape contractors that hold the -- they're acting

10   as the general, we would be the sub.  And we will

11   actually plow the snow and apply de-icing agents to the

12   parking lots, sidewalks of the businesses that they

13   want us to.

14       Q.    Okay.  Do you work primarily in the snow

15   removal with residences?

16       A.    No.  We do no residential whatsoever in snow,

17   only industrial.

18       Q.    And where is the geographic reach of that

19   business, that aspect?

20       A.    Aurora, within five miles of the April Lane

21   address.

22       Q.    And correct me if I'm wrong, I believe you

23   said you receive the work from a general contractor and

24   you act as the sub?

Case: 13-8004    Document: 1-2    Filed: 03/05/2013    Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 14 of 75 PageID #:9024

Page 13

TIMOTHY WAYNE   CALDWELL
THE SAVANNA GROUP, INC v. TRYNEX, INC

1      A.   We act as a subcontractor.

2      Q.   Can you walk me through step by step, for

3  example, how you would receive a request to plow an

4  entity's lot?

5      A.   Sure.  It's all built on relationships.  I

6  have been in this industry for 25 years.  I have a lot

7  of contacts, professional relationships with people.

8  They will call me and say, Tim, I have a couple of

9  sites that I can't maintain, can you help us do that.

10  We'll then go out on the site, I'll meet with them on

11  the site, and we will physically measure up the areas,

12  and the scope of the work of what they want, like a

13  seasonal, a per push, how they want the contract.  I'll

14  then work up a contract and then send it to them and

15  then they will present it to their client.

16      Q.   By them who are you referring to?

17      A.   I will present the general contractor with my

18  cost, my bid, to maintain that property.  Then that

19  contractor will then submit it to the property managers

20  for approval.

21      Q.   And these general contractors, are they based

22  in Illinois?

23      A.   Some are national firms, some are local

24  firms.  It really depends.  And then I have a set

Case: 13-8004    Document: 1-2    Filed: 03/05/2013    Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 15 of 75 PageID #:9025

Page 14

TIMOTHY WAYNE   CALDWELL
THE SAVANNA GROUP, INC v.  TRYNEX, INC

1  amount of equipment, and when that equipment is booked

2  for the year I'm done.

3      Q.   Now, I believe you said for 25 years you have

4  been in the business --

5      A.   Uh-huh.

6      Q.   -- of snow removal, is that correct?

7      A.   I have been in the landscape industry.

8      Q.   And the landscape industry includes aspects

9  of snow removal and snow plowing?

10     A.   Yes.

11     Q.   What did you do before you formed The Savanna

12  Group?

13     A.   I worked for another landscape company called

14  Tandem Landscape Company out of West Chicago.  Before

15  that I worked for a John Aleck & Associates, a

16  landscaper contractor out of Frankfort, Illinois.

17     Q.   Can you spell Aleck?

18     A.   A-l-e-c-k.  He's no longer in business but

19  just in case.

20          The year before that I worked for Vande Hey

21  Landscape Company.

22     Q.   Can you spell that?

23     A.   V-a-n-d-e H-e-y out of Appleton, Wisconsin.

24  Prior to that I worked for a company called Clarence

TIMOTHY WAYNE CALDWELL
THE SAVANNA GROUP, INC v. TRYNEX, INC

1   Davids Incorporated.  Their corporate office I believe

2   is in Mattson, it used to be in Blue Island.

3       Q.   Illinois?

4       A.   Yes.

5            Prior to that I was at Iowa State University.

6   And during the time I was at Iowa State University I

7   worked for a company called Midwest Landscaping out of

8   Des Moines, Iowa and Walt Disney World out of Orlando,

9   Florida.  Those are the highlights anyway.  I'm sure I

10  worked for some small --

11      Q.   That had to have been fun.

12           And so the general contractors who reach out

13  to you, I believe you said in the fall or September or

14  around that time, how do they know you?

15      A.   I currently serve on the Illinois Landscape

16  Contractors' Association Board of Directors.  And I'm

17  currently also serving on their executive committee as

18  Secretary and Treasurer, and next month I will be

19  Vice-President, and next year President.  I also serve

20  on the Illinois Landscape Contractors' Certification

21  Committee.  I have served on that for 17 years.  I also

22  serve on PLANET which is the national organization for

23  landscape contractors.  And I serve on the

24  International Certification Council.  And what I do

e973f225-05d6-40fb-a92a-b4147b4897d7

## TIMOTHY WAYNE   CALDWELL
## THE SAVANNA GROUP, INC v. TRYNEX, INC

1   with that is they fly me all over the United States and

2   I monitor the national exam to make sure that there is

3   cohesiveness on that exam.

4        Q.   And are you listed somewhere in a database or

5   an index that people can look to to find snow removal?

6        A.   No.  The only way -- I think the only place

7   that we are listed for snow removal is through the

8   Illinois Landscape Contractors' Association, and that

9   association is made up of members of contractors within

10  the State of Illinois.  And all we do is list the

11  services that we may provide, that would be the only

12  database that we're in.

13       Q.   Are you listed as a contractor in that

14  database?

15       A.   A contractor, yes.

16       Q.   And just so it's clear on the record, when we

17  use the term "contractor" in terms of who reaches out

18  to you and then you subcontract, is that different from

19  who's listed in this database?

20       A.   Clarify that one more time.

21       Q.   Previously you said a contractor will call

22  you and then you will prepare a contract and send it

23  back to that contractor and then some contractor

24  essentially acts as middleman to procure the removal

## AMICUS  COURT  REPORTERS,  INC.
## 888.641.3550

Case: 13-8004    Document: 1-2    Filed: 03/05/2013    Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 18 of 75 PageID #:9028

Page 17

TIMOTHY WAYNE   CALDWELL
THE SAVANNA GROUP, INC v. TRYNEX, INC

1    process or business?

2        A.   Uh-huh.

3        Q.   You said you're also listed as a contractor

4    in the Illinois Landscaping Contractors' Association

5    database?

6        A.   Correct.

7        Q.   Is there a distinction between being a

8    contractor in that database versus how you used

9    contractor in the description of how you obtain

10   business?

11       A.   No.

12       Q.   Some people who act as contractors to procure

13   your business might also be listed in that database?

14       A.   Yes.  Yes, they are.

15       Q.   So is it fair to say that you work as a

16   contractor and a subcontractor in that sense?

17       A.   In some years, yes.  Some years we will hold

18   our own contracts, but most of the time, and what I

19   mean by most is 99.9 percent of the time, I act as a

20   subcontractor.

21       Q.   In what years did you hold your own

22   contracts?

23       A.   I can only think of one property, some very

24   small commercial property that I held a contract in 13

AMICUS  COURT  REPORTERS,  INC.
888.641.3550

e973f225-05d6-40fb-a92a-b4147b4897d7

Case: 13-8004    Document: 1-2    Filed: 03/05/2013    Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 19 of 75 PageID #:9029

Page 18

TIMOTHY WAYNE   CALDWELL
THE SAVANNA GROUP, INC v. TRYNEX, INC

```
1    years.
2        Q.    Where is that?
3        A.    In Naperville, Illinois.
4        Q.    Do you remember what year that was?
5        A.    That's been for the last I'd say five years.
6    Prior to that 100 percent -- we kind of fill a niche
7    for general contractors because we don't do any
8    maintenance, we don't cut any grass so we're not
9    considered competition for the other landscape
10   contractors.
11       Q.    Okay.  Who is in charge of purchasing the
12   equipment that's used, and I'm concerned with the snow
13   removal equipment, at Savanna?
14       A.    I do.
15       Q.    And in any given -- strike that.
16             What types of snow removal equipment do you
17   purchase?
18       A.    We purchase -- in the past we have purchased
19   pushers, they are attachments that go to a front-end
20   loader or a Skid Steer to pile snow.  It's new
21   technology for the industry in the last five years.
22   Also snow plows, salt spreaders in the past, but we
23   have recently gone to all liquid so we don't spread any
24   salt, have not spread any salt for the last five years.
```

e973f225-05d6-40fb-a92a-b4147b4897d7

APP00062

Case: 13-8004    Document: 1-2    Filed: 03/05/2013    Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 20 of 75 PageID #:9030

Page 19

## TIMOTHY WAYNE CALDWELL
## THE SAVANNA GROUP, INC v. TRYNEX, INC

1      Q.   So since 2006 you have not spread any salt?

2      A.   About 2005 I would say, '05, '06 season.

3      Q.   Where did you purchase this equipment from?

4      A.   Let's see.  The snow plows came with the

5  trucks.  They would be through Monroe who put the

6  trucks together originally.  So it's a Western plow, it

7  just comes with the truck.  The salt spreaders I

8  actually purchased from True Green Land Care at an

9  auction.

10     Q.   I'm sorry, you said that was the salt

11 spreaders?

12     A.   Yes.  The pushers we bought directly from --

13 I'm trying to remember the manufacturer name.  One is

14 called Monroe, it's called a snow bully.  And I'm

15 trying to remember the other name.  We bought directly

16 from the manufacturer.

17     Q.   With respect to the pushers?

18     A.   Yes.

19     Q.   Now did you purchase this equipment in 1998?

20     A.   Some of the -- no, no.  As equipment would

21 wear out we'd replace the equipment.

22     Q.   Is it the same three categories that would

23 have been replaced, meaning snow plows, salt spreaders,

24 and pushers?

Case: 13-8004    Document: 1-2    Filed: 03/05/2013    Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 21 of 75 PageID #:9031

Page 20

# TIMOTHY WAYNE CALDWELL
## THE SAVANNA GROUP, INC v. TRYNEX, INC

1    A.   Yes.

2    Q.   In preparation for the 2006 snow season,

3    2005-2006 snow season, did you replace any equipment?

4    A.   Not to my knowledge.  I don't remember that.

5    Q.   When was the equipment last replaced for the

6    2005-2006 season?

7    A.   I would have to look that up in records.  I

8    couldn't honestly tell you exactly when it would be.

9    Q.   Is that something you have a record of?

10   A.   I could find it, yes.  If nothing else it's

11   in the check registry as I paid for it.

12   Q.   So the information would be in the check

13   registry?

14   A.   Yes.

15   Q.   And you keep your check registries?

16   A.   Yes.

17   Q.   Do you have them all the way from when the

18   business started in 1998?

19   A.   Yes.  I started the business using

20   QuickBooks, so all the accounting is --

21   MS. MILNICHUK:  Off the record.

22                         (Discussion off the record.)

23   BY MS. MILNICHUK:

24   Q.   Do you have any other records that would

## AMICUS COURT REPORTERS, INC.
### 888.641.3550

e973f225-05d6-40fb-a92a-b4147b4897d7

Case: 13-8004    Document: 1-2    Filed: 03/05/2013    Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 22 of 75 PageID #:9032

Page 21

TIMOTHY WAYNE   CALDWELL
THE SAVANNA GROUP, INC v. TRYNEX, INC

1     corroborate or document the equipment replacement?

2         A.    That would be the only thing is just that,

3     when we purchased them.

4         Q.    Are there what you would categorize as a

5     primary group of contractors that provide you business

6     seasonally?

7         A.    Not in general, no.

8         Q.    So there is not one or two or three that

9     every year call you up and say, hey, Tim --

10        A.    No.

11        Q.    No?

12        A.    No.

13        Q.    So it changes every year?

14        A.    It changes, yes.

15        Q.    Do you remember who -- I'm going to go from

16    2004 to the end of the 2006 season.

17        A.    Okay.

18        Q.    Who would have been the contractors that gave

19    you business?

20        A.    Home and Garden is the primary one.  That's

21    Home and Garden Landscape Company if I remember

22    correctly.

23        Q.    Do you know where they're located?

24        A.    South side I believe.  It's around the

APP00065

Case: 13-8004  Document: 1-2  Filed: 03/05/2013  Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 23 of 75 PageID #:9033

Page 22

### TIMOTHY WAYNE CALDWELL
### THE SAVANNA GROUP, INC v. TRYNEX, INC

1    Flossmoor area. Tinley Park. Actually they're right

2    in Tinley Park. And then about that time also

3    Brickman.

4        Q.    Can you spell that?

5        A.    B-r-i-c-k-m-a-n, that was out of their

6    Naperville branch. And then also Balanced

7    Environmental, and that would be their Lombard office.

8        Q.    Are there any others?

9        A.    Not that I can think of.

10       Q.    Of those three can you allocate what

11   percentage of business they would have given you for

12   the 2004 through 2006 snow season?

13       A.    Home and Garden I believe was probably about

14   80 percent, and then 5 percent for Brickman, and then

15   the balance towards Balanced.

16       Q.    So 15 percent?

17       A.    15 percent, yes.

18       Q.    In a given year how much of your profits is

19   derived from the snow removal business aspect of the

20   business?

21       A.    Of the company as a whole?

22       Q.    Yes.

23       A.    Probably 40 percent. That's weird because

24   the season -- the snow plowing season goes from

e973f225-05d6-40fb-a92a-b4147b4897d7

Case: 13-8004    Document: 1-2    Filed: 03/05/2013    Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 24 of 75 PageID #:9034

Page 23

TIMOTHY WAYNE  CALDWELL
THE SAVANNA GROUP, INC v. TRYNEX, INC

1     November 1st to April 15th.  So a fiscal year it would

2     actually --

3          Q.   I see your point.

4               Okay.  If you want to change it for the --

5          A.   Fiscal year?

6          Q.   Yes.  What would be the percentage?

7          A.   I'd say it probably stays the same because

8     once you add November and December into the end of the

9     year and then January, February, March, it would

10    probably be in the same ballpark.

11         Q.   Now, are you or is Savanna a member of the

12    International Barter Association?

13         A.   Yes.

14         Q.   What is that?

15         A.   That is -- it's a barter association.

16         Q.   Can you give me a description?

17         A.   How do you describe that.  What we do is we

18    provide the same services, landscape services for a

19    client, and whatever we would normally get paid in cash

20    we get paid in charter or barter dollars.  Those barter

21    dollars go into an account, and then you can spend

22    those barter dollars the same as cash.

23         Q.   So where is the account based out of?

24         A.   Where is the corporate or international

AMICUS  COURT  REPORTERS,  INC.
888.641.3550

e973f225-05d6-40fb-a92a-b4147b4897d7

APP00067

Case: 13-8004    Document: 1-3    Filed: 03/05/2013    Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 25 of 75 PageID #:9035

Page 24

TIMOTHY WAYNE CALDWELL
THE SAVANNA GROUP, INC v. TRYNEX, INC

1  barter?

2      Q.   Sure.

3      A.   They were in Wauconda but I think they just

4  moved to a new location in Chicago.  Niles I believe is

5  their new location.

6      Q.   So are they in charge of maintaining the

7  accounts that hold your --

8      A.   Yes.

9      Q.   -- equipment dollars?

10     A.   Yes.  We get a monthly statement that shows

11 how much money is in each one of those accounts.

12     Q.   And is the statement -- does the statement

13 come from the International Barter Association or a

14 different entity?

15     A.   Yes, it comes from them directly, right from

16 their office.

17     Q.   What do you then do with the "barter

18 dollars"?

19     A.   If there is anything that we need as a

20 corporation to purchase, we'll purchase it through the

21 Barter Association.  If there are any services that we

22 may need we'll spend it -- it's basically equivalent to

23 cash.

24     Q.   What types of goods can you purchase through

AMICUS COURT REPORTERS, INC.
888.641.3550

e973f225-05d6-40fb-a92a-b4147b4897d7

APP00068

Case: 13-8004    Document: 1-2    Filed: 03/05/2013    Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 26 of 75 PageID #:9036

Page 25

TIMOTHY WAYNE   CALDWELL
THE SAVANNA GROUP, INC v. TRYNEX, INC

1    the association?

2        A.   It really depends on what is available

3    through the association.  Everyday it can change.  One

4    day it could be boxes and the next day it could be duct

5    tape and the next day it could be plants and the next

6    day it could be something else so you just never really

7    know.  There is nothing set that you definitely use.

8        Q.   Is there a set value on the types of goods

9    that can be purchased?

10       A.   Yes.  Usually the seller sets those values.

11       Q.   Is there a capacity or an amount that it

12   can't go over per product, for example?

13       A.   Not that I'm aware of.

14       Q.   How long has Savanna been a member of the

15   association?

16       A.   I believe 12 out of 13 years.  We joined very

17   soon after we formed the corporation.

18       Q.   Has Savanna ever purchased snow removal

19   equipment through the association?

20       A.   Not to my knowledge.  I don't believe so.

21                        (Deposition Exhibit No. 1 was

22                         marked for identification.)

23   BY MS. MILNICHUK:

24       Q.   I'm going to show you what's been marked as

AMICUS COURT REPORTERS, INC.
888.641.3550

e973f225-05d6-40fb-a92a-b4147b4897d7

TIMOTHY WAYNE   CALDWELL
THE SAVANNA GROUP, INC v. TRYNEX,   INC

1    Exhibit 1.  Take a minute to look at that and see if

2    you recognize it.

3        A.   Yes, that's a copy of my monthly statement

4    from the International Barter Association.

5        Q.   And just for the record this is Bates labeled

6    TSG3.

7        A.   Okay.

8        Q.   That's just for our purposes.  That's what

9    that means.

10        A.   I looking for it.  I didn't see it off the

11    top of my head.

12        Q.   In the upper right-hand corner, I'll direct

13    your attention there, it says International Monetary

14    Systems, do you know what that refers to?

15        A.   That refers to the Barter Association.

16        Q.   So the International Barter Association is

17    synonymous with International Monetary Systems?

18        A.   It actually started out as the

19    International --- I'm trying to remember the original

20    name.  It's been bought out by the IMS I believe three

21    or four years ago.  It used to be known as the Chicago

22    Barter Association I believe.  I don't remember the

23    name off the top of my head.  It's now known as IMS.

24        Q.   IMS standing for International Monetary

Case: 13-8004    Document: 1-2    Filed: 03/05/2013    Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 28 of 75 PageID #:9038

Page 27

TIMOTHY WAYNE   CALDWELL
THE SAVANNA GROUP, INC v. TRYNEX, INC

1    Systems?

2        A.   Correct.

3        Q.   Also in the right-hand portion, upper

4    right-hand portion it references Chris Katz.

5        A.   Uh-huh.

6        Q.   Who is Chris Katz?

7        A.   Chris Katz was our barter broker.  If I need

8    something I would contact the broker and say this is

9    what I'm looking for.

10       Q.   Now is Chris employed by IMS?

11       A.   Yes.

12       Q.   There is a 847-588-1818, extension 120

13   number; is that Chris' number?

14       A.   Yes.

15       Q.   And then just below that it says,

16   chris.katz@imsbarter.com, is that Chris' e-mail

17   address?

18       A.   Yes.

19       Q.   Do you know how long Chris has been a barter

20   broker?

21       A.   I have no clue.  I don't believe she's there

22   anymore.

23       Q.   How long has Chris been your broker?

24       A.   I believe she was our broker for about two

Case: 13-8004    Document: 1-2    Filed: 03/05/2013    Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 29 of 75 PageID #:9039

Page 28

TIMOTHY  WAYNE  CALDWELL
THE  SAVANNA  GROUP,  INC  v.  TRYNEX,  INC

1    years.

2        Q.    Two years from the date on this invoice which

3    is --

4        A.    Yes.

5        Q.    -- 11-30-2010?

6        A.    Yes.

7        Q.    So she was your barter broker from about

8    November 2008 to November 2010?

9        A.    Yes.

10       Q.    Who was your barter broker before Chris Katz?

11       A.    I cannot remember her name.  I cannot

12   remember her name right now.

13       Q.    It was a female?

14       A.    Yes.

15       Q.    How long approximately was she your broker

16   for?

17       A.    We have only had three brokers.  The first

18   one, the one I cannot remember -- uhm, Gabby.  I can't

19   remember her last name.  Gabby was our first broker.

20   She was our broker for probably ten years.  And then

21   Chris took over her position.  And I believe Chris just

22   left just recently, and there is a new contact, his

23   name is Dave.

24       Q.    Do you know where Gabby, Chris and Dave are

AMICUS  COURT  REPORTERS,  INC.
888.641.3550

e973f225-05d6-40fb-a92a-b4147b4897d7

Case: 13-8004    Document: 1-2    Filed: 03/05/2013    Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 30 of 75 PageID #:9040

Page 29

TIMOTHY WAYNE CALDWELL
THE SAVANNA GROUP, INC v. TRYNEX, INC

1   based out of?

2       A.   I assume it's Niles, whatever the address is

3   here.  I believe they're in their office --

4       Q.   And by address you mean the one you pointed

5   to on the letterhead?

6       A.   Yes.  7449 North Natches Avenue in Niles,

7   Illinois.

8       Q.   Directing your attention to I guess the

9   middle of the piece of paper now there is a sentence

10  that says, "Don't fight the crowded malls, go to

11  www.imsbarter.com; what's "imsbarter.com"?

12      A.   That is the their website.

13      Q.   Have you gone to that website and looked for

14  goods that you wanted to purchase for Savanna?

15      A.   I have gone on that website and just saw what

16  was available not searching out anything.

17      Q.   How long has that website retained that

18  address, meaning imsbarter.com?

19      A.   Quite honestly I don't know.  I would assume

20  since its existence.  I really don't know.

21      Q.   In 2006 would you have gone to that website

22  or maybe a different website to look for the goods that

23  were available?

24      A.   Yeah.  It wouldn't have been called IMS, it

Case: 13-8004    Document: 1-2    Filed: 03/05/2013    Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 31 of 75 PageID #:9041

Page 30

TIMOTHY WAYNE   CALDWELL
THE SAVANNA GROUP, INC v. TRYNEX, INC

1   would have been the parent company.

2       Q.   It indicates IMS relocated to their Illinois

3   office in Howard?

4       A.   No, in Niles.  Yeah, there is the new

5   address, 6201 West Howard in Niles.

6       Q.   Is that the current address?

7       A.   Yes.

8       Q.   Can you explain to me -- there appear to be

9   three entries in the body of this document all post --

10  it says, postdate of November 30, 2010; can you explain

11  to me what those are?

12      A.   Sure.  The interest is we have a line of

13  credit set up with the trade association just like a

14  cash line of credit.  And that was charges for -- to

15  cover that interest.  We do have a negative balance as

16  you can see in the lower right-hand corner.  The

17  service fee is a monthly fee that's paid in cash to be

18  a member, the $19.50.  And the late charge on an unpaid

19  fee is a balance that had not been paid so they charge

20  us a $15 fee.

21      Q.   And when you said that there was a minus

22  balance, what number were you referring to?

23      A.   Negative balance, lower right-hand corner it

24  says, trade balance $729.81 with a minus back behind

AMICUS COURT REPORTERS, INC.
888.641.3550

e973f225-05d6-40fb-a92a-b4147b4897d7

Case: 13-8004    Document: 1-2    Filed: 03/05/2013    Pages: 185

## TIMOTHY WAYNE  CALDWELL
## THE SAVANNA GROUP, INC v. TRYNEX, INC

1   it. It just means I owe on my line of credit, $729.81.

2       Q.   And then just below that there is -- it looks

3   like a cash activity section?

4       A.   Uh-huh.

5       Q.  What does the total number of cash fees due

6   refer to?

7       A.   Every purchase that you make through the

8   association you pay a 10 percent commission, and that's

9   what that represents.

10       Q.  Is Savanna a member of the ITEX Trade

11   Association?

12       A.  Yes, it is.

13       Q.  And what is the ITEX Trade Association?

14       A.  It's the exact time same thing as IMS only it

15   has other barter members. So something that you find

16   on barter and IMS you may not be able to find it

17   through ITEX.

18       Q.  And why is it that you would be able to find

19   more on the ITEX or with the ITEX Trade Association?

20       A.  It may not necessarily be more. It may be a

21   geographic location. IMS is based in the northern

22   suburbs. ITEX is based more in the central or the

23   western suburbs, so there is usually more chances that

24   we're going to find someone to barter in the ITEX.

e973f225-05d6-40fb-a92a-b4147b4897d7

Case: 13-8004    Document: 1-2    Filed: 03/05/2013    Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 33 of 75 PageID #:9043

Page 32

TIMOTHY WAYNE   CALDWELL
THE SAVANNA GROUP, INC v. TRYNEX, INC

1    Q.   And when you say "something to barter with,"

2  are you referring to the purchase of goods, can you

3  describe --

4    A.   It could be.  It's services.  If I need my

5  drycleaning done, I'll take my drycleaning and it won't

6  cost me cash, I can do it in trade.  If I need my house

7  cleaned, I can set up a weekly cleaning service, the

8  office, whatever that would be.

9    Q.   We need one of these in the legal profession.

10  I don't know if we have one of these.

11    A.   And really with the Barter Association you

12  never know what's available.  So some months is very

13  different than others, you know, I can get Sox tickets,

14  I can get Cubs tickets at the drop of a hat, usually

15  not well in advance but the day of.

16    Q.   Is the membership in either of the

17  International Barter Association or the ITEX Trade

18  Association limited to landscaping businesses?

19    A.   No.

20    Q.   So it could be --

21    A.   It covers everything.

22    Q.   Any business?

23    A.   Any business.

24    Q.   Were you bartering or trading with ITEX Trade

Case: 13-8004    Document: 1-2    Filed: 03/05/2013    Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 34 of 75 PageID #:9044

Page 33

TIMOTHY WAYNE    CALDWELL
THE SAVANNA GROUP, INC v. TRYNEX, INC

1    Association in 2006?

2        A.   No.

3        Q.   When did you start bartering with them?

4        A.   2010.

5        Q.   Is that the year you became a member?

6        A.   Yes.

7        Q.   Does that also have monthly membership fees

8    or dues?

9        A.   Yes.

10       Q.   Are you still a member?

11       A.   Yes.

12       Q.   Do you have your monthly statements from the

13   IMS, or if it was International Barter Association at

14   that time, dating back to 2006 or 2005 or even 2004?

15       A.   I would have to check with my accountant and

16   see if those records were destroyed or not because we

17   just keep them for the set allotted time that the

18   accountant recommends.  And I don't remember off the

19   top of my head what that time is but they would be

20   archived if we had them.

21       Q.   Do you provide all of your documents to your

22   accountant or what types of documents does he receive?

23       A.   He has full access to QuickBooks so he

24   doesn't necessarily see each individual piece of paper

AMICUS COURT REPORTERS, INC.
888.641.3550

e973f225-05d6-40fb-a92a-b4147b4897d7

Case: 13-8004    Document: 1-2    Filed: 03/05/2013    Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 35 of 75 PageID #:9045

Page 34

TIMOTHY WAYNE   CALDWELL
THE SAVANNA GROUP, INC v. TRYNEX, INC

1    but everything is categorized especially when it comes

2    to purchases.

3        Q.    What about invoices received, for example,

4    from IMS or International Barter Association?

5        A.    They're attached with a copy of the check.

6    All bills that are paid have an attachment of the check

7    that was paid, that paid the bill.

8        Q.    So you provide your accountant with a copy of

9    the statement and the check?

10       A.    If he needs it, yes.

11       Q.    And when would he need it?

12       A.    Only upon his request.

13       Q.    Okay.

14       A.    I'm sure he doesn't want to see every piece

15   of paper either.

16       Q.    So in a given year, for example, on behalf of

17   Savanna you would attach the payment checks or payment

18   receipts to the invoices, and then you said you

19   categorize them by business, is that correct?

20       A.    It's put into the computer depending on where

21   the purchases are at.  If it's equipment, then it would

22   be listed under equipment.  If it's materials, plant

23   material and things, it would be under plant material.

24   If it's office supplies, it would be under office

Case: 13-8004   Document: 1-2   Filed: 03/05/2013   Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 36 of 75 PageID #:9046

Page 35

TIMOTHY WAYNE CALDWELL
THE SAVANNA GROUP, INC v. TRYNEX, INC

1   supplies.

2        Q.   And when you say put into the computer,

3   you're referencing QuickBooks?

4        A.   QuickBooks.

5        Q.   What happens to the hard copies of the

6   invoice and attached checks?

7        A.   They are archived and stored.

8        Q.   And are they stored at the Niles address or

9   at a different location?

10       A.   They're stored at 202 April Lane up to the

11  time frame where the accountant says, okay, you don't

12  need these anymore, you can dispose of those. And then

13  they're put in a giant shredder and destroyed.

14       Q.   Do you put them in the shredder and destroy

15  them?

16       A.   Yes.  I take them to a service where you

17  throw it in the back of a semi and they chew it all up.

18       Q.   So, for example, what is the furthest date

19  back that you can remember that documents are still in

20  storage?

21       A.   Currently I don't know off the top of my

22  head, that's something I would have to look up.  But

23  that's again pursuant to what the accountant tells me

24  to do.  If he says, keep them for life, we keep them

Case: 13-8004    Document: 1-2    Filed: 03/05/2013    Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 37 of 75 PageID #:9047

Page 36

TIMOTHY WAYNE   CALDWELL
THE SAVANNA GROUP, INC v. TRYNEX, INC

1   for life.  If he says, keep them for five years, you

2   keep them for five years.

3       Q.   Is there a different protocol with respect to

4   retaining, for example, documents that come to you by

5   fax or you print off of an e-mail?

6       A.   No, we don't have any kind of a procedure or

7   anything like that.  I'm the only one -- the fax

8   machine sits right on my desk, I'm the one that --

9   everything comes through me.  Again I do all the office

10  stuff.

11      Q.   Let's talk about the fax machine for a

12  minute.  You said it sits right on your desk?

13      A.   Uh-huh.

14      Q.   Is it a stand alone machine?

15      A.   Yes.

16      Q.   Meaning is there anything else connected to

17  it?

18      A.   No.

19      Q.   Does it have its own dedicated phone line?

20      A.   Yes.

21      Q.   Do you know what that number is?

22      A.   Area code 630-264-1864.

23      Q.   Do you know what type of fax machine it is?

24      A.   I believe it's a Brothers.

AMICUS COURT REPORTERS, INC.
888.641.3550

e973f225-05d6-40fb-a92a-b4147b4897d7

Case: 13-8004    Document: 1-2    Filed: 03/05/2013    Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 38 of 75 PageID #:9048

Page 37

# TIMOTHY WAYNE CALDWELL
## THE SAVANNA GROUP, INC v. TRYNEX, INC

1   Q.   So that would be the make?

2   A.   Yes.  I don't know the model number off the

3   top of my head.

4   Q.   If I told you it was U61588K6F268814, would

5   you have any reason to doubt that?

6   A.   Not to my knowledge, no.

7   Q.   How long have you had the particular fax

8   machine that sits on the corner of your desk?

9   A.   Five or six years I would say.  Until they

10  wear out.

11  Q.   Do you remember approximately when you

12  purchased it?

13  A.   Approximately, no.  I can't tell you exactly

14  when I purchased it.

15  Q.   2004, 2005?

16  A.   Again, I don't know.  I really -- I would

17  have to look in the accounting to find out.

18  Q.   By look in accounting, do you mean with your

19  accountant in terms of having a record?

20  A.   No.

21  Q.   What do you mean by "accounting"?

22  A.   In my accounting software, QuickBooks.

23  Q.   Would you look for the record of payment for

24  the fax machine?

Case: 13-8004    Document: 1-2    Filed: 03/05/2013    Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 39 of 75 PageID #:9049

Page 38

### TIMOTHY WAYNE CALDWELL
### THE SAVANNA GROUP, INC v. TRYNEX, INC

1      A.   Yes.

2      MS. MILNICHUK: Just on the record there is a

3 couple things that he's referencing he might have so I

4 am going to probably followup afterwards and give you

5 an official request.

6      MR. KELLY: Okay.  Just send me an e-mail and

7 we'll take a look at that.

8      MS. MILNICHUK: Okay.  Sounds good.

9 BY MS. MILNICHUK:

10      Q.   Do you remember who you purchased it from?

11      A.   Office Max.

12      Q.   Do you remember how you purchased it, meaning

13 via credit card, check?

14      A.   It would be either credit card or debit card.

15      Q.   And were the credit card and/or debit card in

16 the name of Savanna?

17      A.   Yes.

18      Q.   Do you remember what type of credit card or

19 debit card?

20      A.   I believe it would be a Visa.

21      Q.   Is the 630-264-1864 the same fax number that

22 existed in 2006?

23      A.   Yes.  It's been the same since -- for 13

24 years, since we started the corporation.

APP00082

### TIMOTHY WAYNE   CALDWELL
### THE SAVANNA GROUP, INC v. TRYNEX, INC

1     Q.  Who is the service provider of the telephone

2    line going into the fax machine?

3     A.  It's out of Cedar Rapids, Iowa.  I'm trying

4    to remember the name of it.  I know I write the check

5    every month and I can't remember the name of it off the

6    top of my head.  I know they're out of Cedar Rapids,

7    Iowa.

8     Q.  The telephone service provider is out of

9    Cedar Rapids, Iowa?

10    A.  Yes.  That's who the bill goes to.  I don't

11   know if they're out of there but that's where I send

12   the bill to.

13    Q.  Does Savanna have a telephone line that

14   also --

15    A.  We used to.  It was the same server, same

16   service provider provided the phone number also.  We

17   have since discontinued that and we do everything by

18   cell phone.

19    Q.  When did you discontinue that?

20    A.  Probably a year ago.

21    Q.  Was this service out of Cedar Rapids, Iowa,

22   the same provider in 2006?

23    A.  Yes.

24    Q.  In December of 2006?

### AMICUS COURT REPORTERS, INC.
### 888.641.3550

e973f225-05d6-40fb-a92a-b4147b4897d7

TIMOTHY WAYNE CALDWELL
THE SAVANNA GROUP, INC v. TRYNEX, INC

1     A.   Uh-huh.

2     MR. KELLY: Is that a yes?

3     THE WITNESS: Yes.

4  BY MS. MILNICHUK:

5     Q.   Do you know what kind of telephone circuitry

6  is associated with the machine?

7     A.   No, I do not.

8     Q.   Do you retain copies of the monthly invoices

9  from the service provider in Cedar Rapids, Iowa?

10    A.   Yes, up to the time frame when we needed to

11  get rid of them.

12    Q.   Do you know if you have invoices from 2006

13  from the Cedar Rapids, Iowa service provider?

14    A.   I don't know if those have been destroyed.  I

15  don't know off the top of my head.

16    MS. MILNICHUK: I'd ask you to look if you can.

17    MR. KELLY: Just put everything in an e-mail.

18    MS. MILNICHUK: Will do.

19  BY MS. MILNICHUK:

20    Q.   Did this particular fax machine we have been

21  discussing receive faxes in December of 2006?

22    A.   Yes.

23    Q.   Did you keep copies of the faxes that were

24  received in December of 2006?

Case: 13-8004     Document: 1-2     Filed: 03/05/2013     Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 42 of 75 PageID #:9052

TIMOTHY  WAYNE   CALDWELL
THE SAVANNA GROUP, INC v. TRYNEX, INC

1          A.    No, I did not.

2          Q.    Have you ever kept any faxes that The Savanna

3     Group received for that fax machine?

4          A.    Just recently, yes.

5          Q.    By "recently" what month or year?

6          A.    I'd say probably started in September of

7     2010.

8          Q.    When was the first time you heard about the

9     Telephone Consumer Protection Act?

10         A.    Well, I knew when the National Registry came

11    out for the non- -- so you can't call.  That was the

12    big thing there.  I believe that's when I first heard

13    of it.  I don't remember what year that was, but I

14    remember I went through and every number I had I called

15    and put them on the do not call list; cell phones, home

16    numbers, fax numbers, everything.

17         Q.    And that's when you remember reading about

18    the Telephone Consumer Protection Act?

19         A.    Yes.

20         Q.    Where would you have read about that?

21         A.    Where?

22         Q.    Yes.

23         A.    Every news media resource in America.

24         Q.    Do you remember approximately when that was?

AMICUS  COURT  REPORTERS,  INC.
888.641.3550

e973f225-05d6-40fb-a92a-b4147b4897d7

APP00085

TIMOTHY WAYNE CALDWELL
THE SAVANNA GROUP, INC v. TRYNEX, INC

1   A.   No.

2   Q.   Three years ago, five years ago?

3   A.   I'd assume more than five years 'cause I know

4   the renewal -- 'cause they only last five years -- came

5   up a couple years ago, so probably seven, eight years

6   ago.

7   Q.   Now did your -- strike that.

8        Were you contacted about filing a lawsuit

9   with respect to an action under the TCPA, and by "TCPA"

10  I mean the Telephone Consumer Protection Act?

11  A.   No.  I received the marketing information.

12  Q.   Who did you receive the marketing information

13  from?

14  A.   From the law offices here.

15  MS. MILNICHUK: Mark this as Exhibit 2.

16                      (Deposition Exhibit No. 2 was

17                      marked for identification.)

18  BY MS. MILNICHUK:

19  Q.   I'm showing you what's been marked as

20  Exhibit 2.  Please take a minute to look at that.  Is

21  this the letter you received from the firm Anderson &

22  Wanca?

23  A.   Yes.

24  Q.   Is this what you just were referring to as

AMICUS COURT REPORTERS, INC.
888.641.3550

e973f225-05d6-40fb-a92a-b4147b4897d7

Case: 13-8004    Document: 1-2        Filed: 03/05/2013    Pages: 185
Case: 1:10-cv-07995 Document #: 145-3 Filed: 10/09/12 Page 44 of 75 PageID #:9054

Page 43

## TIMOTHY WAYNE   CALDWELL
## THE SAVANNA GROUP, INC v. TRYNEX, INC

1   marketing information?

2       A.   Yes, it was, that's why I remember it was

3   September of 2010.

4       Q.   Directing your attention to the second

5   paragraph -- well strike that.

6           How do you understand your role to be in the

7   lawsuit that's currently been filed?

8       A.   My understanding is to do today, the

9   deposition, and help out in any way possible through

10  the investigation.

11      Q.   Do you know in terms of if you're the class

12  representative for the class action?

13      A.   Yes, I believe so.

14      Q.   So directing your attention to that second

15  paragraph there is the sentence begins, "During our

16  investigation, we have determined that you are likely

17  to be a class member in one or more of the cases we are

18  pursuing."

19          How is it that you became a class

20  representative and not a class member in a different

21  lawsuit?

22      A.   Well, I contacted the office here and said, I

23  believe I did receive some junk faxes, and I wanted

24  them to pursue to see if I was.