**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

THE SAVANNA GROUP, INC.,     )
individually and as the representative     )
of a class of similarly-situated persons,     )
     )
     Plaintiff,     )
     v.     )     Case No. 10 C 7995
     )
     )
TRYNEX, INC. and JAMES TRUAN,     )
     )
     Defendants.     )
     )
     )
     )

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Savanna Group on behalf of a class of similarly situated individuals brings a class action against Defendants Trynex, Inc. and James Truan for alleged violations of the Telephone Consumer Protection Act pursuant to 47 U.S.C. § 227. Before the Court are the parties' cross-motions for summary judgment. For the following reasons, the Court denies Plaintiff's Motion and grants in part and denies in part Defendants' Motion.

## BACKGROUND

Plaintiff, the Savanna Group, Inc. ("Savanna"), is an Illinois corporation. (Defs. 56.1 ¶ 1.) Defendant Trynex, Inc. is a Michigan corporation with its principal place of business in Warren, Michigan. (Defs. 56.1 ¶ 2.) Trynex sells salt-spreaders and other snow and ice removal equipment to distributors and dealers. (Defs. 56.1 ¶ 13.) Defendant James Truan is the vice president of Trynex and the head of marketing. (Defs. 56.1 ¶¶ 3, 29; Pls. Resp. to Defs. 56.1 ¶¶

3,29.) Trynex markets its equipment through industry publications and trade shows. Trynex also uses "SnowEx Alerts." (Defs. 56.1 ¶ 12.) Prior to December of 2006, Trynex sent out SnowEx Alerts using its in-house fax machine. (Defs. 56.1 ¶ 16; Pls. Resp. to Defs. 56.1 ¶ 16.)

In December of 2006, Barry Truan—a Trynex customer service representative and James Truan's then 21-year old son—hired Business to Business Solutions ("B2B") to send out a "SnowEx Alert" fax promoting Trynex's extended warranty program. (Defs. 56.1 ¶¶ 17, 19; Pls. Resp. to Defs. 56.1 ¶¶ 17,19.) B2B was a fax advertising business operated by Caroline Abraham in conjunction with a Romanian company, Macaw. (Pls. 56.1 ¶ 9;).[1] B2B acted as Macaw's agent in the United States and "quarterbacked" its faxing operation from Brooklyn, New York. (Pls. 56.1 ¶ 10.) Generally, B2B would assist a customer in drafting a fax advertisement and then send it after receiving the customer's approval. (Pls. 56.1 ¶ 12; Defs. Resp. ¶ 12.) B2B obtained its list of fax recipients by culling a list of targets from a database purchased by InfoUSA. (Pls. 56.1 ¶ 13; Defs. Resp. ¶ 13.) B2B did not contact any of the companies in the database to request express permission or invitation to receive the faxes prior to sending them. (Id. ¶ 13.) In coordinating the faxing, Caroline Abraham never spoke with Barry Truan or anyone from Trynex. (Pls. 56.1 ¶ 92.)[2]

---

[1] In their Response to Plaintiff's Rule 56.1 statement, Defendants deny several asserted facts on the grounds that Plaintiff failed to attach an Ex. A to its Rule 56.1 statement. Within its discretion to enforce the Local Rules, the Court understands "Ex. A" to refer to Caroline Abraham's deposition, which Plaintiff attached as Ex. 2. (R. 202-1, Ex. 2.)

[2] The facts surrounding Barry Truan's interaction with B2B or the "Marketing Research Center," an alias for B2B, remain unclear. In his May 2, 2011 deposition Barry Truan testified that after receiving information from a friend about the Marketing Research Center, he contacted Kevin Wilson and "Philip." (R. 199-7, Ex. G., Dep. Tr. 8:11-12.) The Marketing Research Center then "deferred [him] to a local rep" for the area, which was one of those two individuals. (Id. at 9:12-15; 11-13-16.) Mr. Truan could not recall how many conversations he had with the Marketing Research Center prior to the deferral. (Id. at 11:21.) It is clear from Ms. Abraham's deposition that she communicated with Kevin Wilson, a sales agent for Macaw, regarding the faxing at issue. (R. 199, 10, Ex. J., Dep. Tr. 92:12-17; 78:22-25.)

Barry Truan paid B2B $508 by check from Trynex's petty cash account for the faxing services. As an individual who routinely signs petty cash checks at Trynex, James Truan signed the check. (Defs. 56.1 ¶ 39.) The "Memo" section of the carbon back of the check contained the hand-written notes "Blast Fax" and "Client # T120701." (Pls. 56.1 ¶ 18; Defs. Resp. to Pls. 56.1 ¶ 18.) Barry Truan then faxed a copy of the check to B2B.

The fax Trynex hired B2B to send ("Trynex fax") stated the following:

"BEST BUILT . . . BEST BACKED! YEAR-END OFFER! 50% OFF ON EXTENDED WARRANTY FOR ALL OF OUR SPREADERS PURCHASED IN DECEMBER, 2006, AND JANUARY, 2007! For a limited time we are offering 50% OFF on our extended warranty – a total of 5 years of coverage for HALF THE PRICE!!! Call 1-800-SALTERS for more information."

(Defs. 56.1 ¶ 22, Decl. A, #B2B000021.)

In the actual fax transmission, B2B attached its own 2-page fax advertisement to the SnowEx Alert without Trynex's knowledge or authorization. (Defs. 56.1 ¶¶ 50-51; Pls. 56.1 ¶¶ 50-51.) Based upon information recovered from the hard-drive of a B2B computer, B2B sent the Trynex fax to a total of 12,163 fax numbers, of which 8,199 were "successful error-free received fax transmissions." (Pls. 56.1 ¶ 38.) Records indicate that B2B successfully sent the fax to Savanna Group's fax number. (Pls. 56.1 ¶ 39.) The B2B hard-drive contained a file named "T120701_SnowexTheirsCombo061219a-barry.tif." (Pls. 56.1 ¶ 40.)

Plaintiff brought a class action on behalf of itself and other entities sent the fax against Trynex and James Truan (among others) in Illinois Circuit Court alleging violations of the Telephone Consumer Protection Act. *See* 47 U.S.C. § 227. On December 16, 2010, Defendants removed the case to federal court on the basis of federal question jurisdiction under 28 U.S.C. § 1331. (R. 1.) Plaintiff seeks $500 in statutory damages per violation, as well treble damages. (R. 161; R. 201.)

On February 20, 2013, the Court certified a class action pursuant to Federal Rule of Civil

Procedure Rule 23 composed of the following class of individuals:

> All persons who were successfully sent a facsimile on December 19, 2006 or December 20, 2006, from "SnowEx . . . Leaders in Ice Control" promoting the "best built . . . best backed" salt spreaders, offering "50% off on extended warranty for all of our spreaders purchased in December, 2006 and January, 2007," and instructing interested recipients to "Call 1-800-Salters for more information."

(R. 176, R. 156.)

Both parties have moved for summary judgment.

## LEGAL STANDARD

### I.     Northern District Illinois – Local Rule 56.1

Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the

advantage of the parties' familiarity with the record and often cannot afford to spend the time

combing the record to locate the relevant information,' in determining whether a trial is

necessary." *Delapaz v. Richardson,* 634 F.3d 895, 899 (7th Cir. 2011) (citation omitted).  Local

Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which

the moving party contends there is no genuine issue." *Cracco v. Vitran Exp., Inc*., 559 F.3d 625,

632 (7th Cir. 2009).  "The opposing party is required to file 'a response to each numbered

paragraph in the moving party's statement, including, in the case of any disagreement, specific

references to the affidavits, parts of the record, and other supporting materials relied upon." *Id.*

(citing N.D. Ill. R. 56.1(b)(3)(B)).  Local Rule 56. 1(b)(3)(C) further requires the nonmoving

party to present a separate statement of additional facts that requires the denial of summary

judgment because the Court will not consider any additional facts proposed in the nonmoving

party's Local Rule 56. 1(b)(3)(B) Response. *See Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635,

643–44 (7th Cir. 2008); *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809 (7th Cir. 2005).

As the Seventh Circuit has explained, "[f]or litigants appearing in the Northern District of Illinois, the Rule 56.1 statement is a critical, and required, component of a litigant's response to a motion for summary judgment. The purpose of the local rule is to make the summary judgment process less burdensome on district courts, by requiring the parties to nail down the relevant facts and the way they propose to support them." *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 398 (7th Cir. 2012). As such, Local Rule 56.1 statements should identify the relevant admissible evidence supporting the material facts, but should not make factual or legal arguments. *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) ("statement of material facts did [ ] not comply with Rule 56.1 as it failed to adequately cite the record and was filled with irrelevant information, legal arguments, and conjecture"). Moreover, the requirements for responses under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000). The Court may also disregard statements and responses that do not properly cite to the record. *See Cady*, 467 F.3d at 1060; *Cichon,* 401 F.3d at 809–10. Finally, the Court has broad discretion to enforce Local Rule 56.1. *See Benuzzi v. Bd. of Educ. of City of Chicago,* 647 F.3d 652, 655 (7th Cir. 2011).

## II.     Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In deciding a summary judgment

5

motion, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson,* 477 U.S. at 255 (quotation omitted). "[D]istrict courts presiding over summary judgment proceedings may not weigh conflicting evidence or make credibility determinations, both of which are the province of the jury." *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704–05 (7th Cir. 2011) (internal citations omitted); *see also Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . .").

## ANALYSIS

In their Motions, the parties mainly contest the issue of Trynex and James Truan's vicarious liability for the actions of B2B. The Court will address this issue in the posture of the arguments raised in Defendants' Motion. In determining whether genuine issues of fact exist, however, the Court will consider the evidence in the light most favorable to the relevant non-moving party.

### I. Trynex

Defendants argue that Trynex is entitled to summary judgment on two grounds: (1) B2B did not send the fax "on behalf" of Trynex; (2) Trynex is not vicariously liable for the actions of B2B under the agency principles recently set forth in *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 F.C.C.R. 6574, 6587 (2013) ("*Dish Network*"). Before considering

whether issues of fact preclude summary judgment, the Court must clarify the applicable standard governing this issue.

## A. TCPA and Vicarious Liability

Section 227(b)(1)(C) of the TCPA provides that "[i]t shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States . . . to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement, unless," among other conditions, "the unsolicited advertisement is from a sender with an established business relationship with the recipient." 47 U.S.C. § 227(b)(1)(C). Section 227(b)(3) provides a private right of action for violations of 47 U.S.C. § 227(b). *See id.* § 227(b)(3).

The Federal Communications Commission (FCC) has authority to promulgate regulations implementing the TCPA. *See* 47 U.S.C. § 227(b)(2); *Addison Auto., Inc. v. RTC Grp., Inc.*, No. 12 C 9869, 2013 WL 3771423, at *4 (N.D. Ill. July 16, 2013). An FCC regulation defines a "sender" for purposes of the ban on the transmission of unsolicited faxes in the regulations as "the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement." 47 C.F.R. § 64.1200(f)(10). The FCC has clarified that—as between the entity on whose behalf a message is sent and "service providers" or "fax broadcasters" that disseminate messages for that entity—the "entity or entities on whose behalf facsimiles are transmitted are ultimately liable for compliance with the rule banning unsolicited facsimile advertisements." *See In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12407–08, ¶¶ 34–35 (July 26, 1995); *see also In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 21 FCC Rcd. 3787, 3808, ¶ 39 (April 5, 2006) ("We take this

opportunity to emphasize that under the Commission's interpretation of the facsimile advertising rules, the sender is the person or entity on whose behalf the advertisement is sent.") (with respect to rules addressing responsibility for compliance with opt-out notice requirements).

As a threshold issue, the parties debate which standard of liability applies to violations for sending unsolicited faxes through the use of third parties. Plaintiff argues primarily that the "sender" standard set forth in 47 C.F.R. § 64.1200(f)(10) governs the issue. Under this standard, Plaintiff apparently suggests that Trynex would be liable as the "sender" of the fax as the "person or entity . . . whose goods or services are advertised or promoted in the unsolicited advertisement." *See* 47 C.F.R. § 64.1200(f)(10). Defendants contend that the general agency vicarious liability principles set forth in the FCC's May 19, 2013 *Dish Network* declaratory ruling determine Trynex's liability. Under the agency standard, Defendants argue that Trynex is entitled to summary judgment because Trynex lacked an agency relationship with B2B. Plaintiff further contends that even if agency principles apply, there is no genuine factual dispute that B2B acted with sufficient apparent authority from Trynex to give rise to liability.

Prior to the *Dish Network* ruling, the relationship between agency principles and the "sender" definition in 47 C.F.R. § 64.1200(f)(10) was uncertain. Defendants cite several cases that have applied vicarious liability agency principles to violations of different provisions of the TCPA. *See, e.g.*, *Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079 (C.D. Cal. 2012.); *Mey v. Pinnacle Sec., LLC*, No. 5:11 CV 47, 2012 WL 4009718, *4-5 (N.D.W.Va. Sept. 13, 2012). Nonetheless, as at least one district court in this District has recognized, the application of the heightened standard of agency liability to the fax context does not square entirely with 47 C.F.R. § 64.1200(f)(10). *See Addison Automatics*, 2013 WL 3771423, at *4 ("The cases relied on by the Defendants that hold that Plaintiff must establish the existence of an agency relationship in

order to hold the Defendants vicariously liable are unpersuasive. None of these cases appears to have considered the rule promulgated by the FCC that defines 'senders' as the person or entity whose goods or services are advertised or promoted in the unsolicited advertisement.").

In *Dish Network*, the FCC addressed the questions of whether a "seller"—who does not generally "initiate" calls within the meaning of the TCPA—may nevertheless be vicariously liable under federal common law agency principles for violations of either § 227(b) or § 227(c) committed by third-party telemarketers. The FCC concluded that "[w]hile section 227(b) does not contain a provision that specifically mandates or prohibits vicarious liability . . . the prohibitions contained in section 227(b) incorporate the federal common law of agency and . . . such vicarious liability principles reasonably advance the goals of the TCPA." 28 F.C.C.R. at 6587.

Both parties implicitly acknowledge that *Dish Network* applies to this case. Nonetheless, further explanation is required on this point. Under the Hobbs Act, the Court must apply a final FCC order if it governs the matter at issue. *See* 28 U.S.C. § 2342(1); *CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 446 (7th Cir. 2010) ("[T]he Hobbs Act prevents the district court from reviewing the validity of FCC regulations.") Although *Dish Network* spoke of the availability of vicarious liability agency principles for violations of the "prohibitions" of § 227(b) —which include the prohibition on sending unsolicited faxes—it specifically addressed the status of "sellers" within the telemarketing context, not "senders" within the faxing context. The FCC regulations define these terms separately. *Compare* 47 C.F.R. § 64.1200 (f)(9) ("The term seller means the person or entity on whose behalf a telephone call or message is initiated for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person."), *with* 47 C.F.R. § 64.1200 (f)(10) ("The term

sender for purposes of paragraph (a)(4) of this section means the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement.").  Given the substantial similarity between the definitions of "seller" and "sender" and the broad language of the ruling concerning violations of § 227(b), the ruling is controlling in this case.

### B.    Issues of Material Fact

Applying the *Dish Network* agency standard, Trynex is not entitled to summary judgment.  The federal common law of agency as described in *Dish Network* is in accord with the Restatement.  *See Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000).  The Restatement (Third) of Agency defines agency as a "fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."  Restatement (Third) Agency § 1.01.  The agent's authority to act may be either actual or apparent.  *See* Restatement (Third) Agency § 2.01; *See Dish Network*, 28 F.C.C.R. at 6586.  "An essential element of agency is the principal's right to control the agent's actions."  Restatement (Third) of Agency § 1.01, cmt. f(1) (2006).  In particular, "[t]he power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents."  *See id*.

In addition, "[a]pparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal."[102]  *Dish Network*, 28 F.C.C.R. at 6586.  In *Dish Network*, the FCC noted that broader theories of agency liability such as ratification may be available in particular cases.  *See* 28 F.C.C.R. at 6586-87 ("For example, a seller may be liable

for the acts of another under traditional agency principles if it ratifies those acts by knowingly accepting their benefits."). Ratification occurs "through conduct justifiable only on the assumption that the person consents to be bound by the act's legal consequences." *Id.*

The existence and scope of an agency relationship between Trynex[3] and B2B turns on numerous disputed issues of fact inappropriate for resolution at summary judgment. Specifically, issues of fact remain as to whether Trynex manifested assent for B2B to act as its agent with respect to the allegedly unsolicited faxes. Barry Truan testified that to his knowledge Trynex provided a list of numbers to B2B for its registered dealers and users. (Dep. Tr. 37: 5-11.) Plaintiff, however, presents evidence of a document from B2B stating that B2B would send the ad to "all the fax numbers we have for snow removal and landscaping companies" and that "[y]our price is $508 for us transmitting approximately 12,000 ads to all the fax numbers we have for snow removal and landscaping companies." (Pls.' 56.1 ¶ 16.) Defendants have not demonstrated in the record the number of fax numbers allegedly contained in the list provided by Trynex to B2B. Viewing this evidence in the light most favorable to Plaintiff, a factual question remains as to the scope of the agency relationship.

Defendants further contend that the fact that Trynex only paid $508 demonstrates that Trynex did not pay for "number rental," because number rental is listed as a separate charge on the pricing sheet sent to Barry Truan. (*See* R. 199-11, Ex. K.) But whether or not Trynex paid for "number rental" is not dispositive of whether or not it manifested assent for B2B to act as its agent, or whether the third-party recipients' belief that B2B acted as an agent of Trynex was reasonable. Rather, this determination turns in part on the factors identified in the *Dish Network*

---

[3] Defendants further assert that Trynex cannot be held liable for the acts of Barry Truan in connection with hiring B2B because Barry Truan was not authorized to act on behalf of Trynex in this capacity. This is a distinct issue from the other vicarious liability issues that the parties have not briefed. Regardless, the record presents factual disputes on this question.

ruling as indicative of apparent authority, such as the "ability by the outside sales entity to enter consumer information into the seller's sales or customer systems," "[its] authority to use the seller's trade name, trademark and service mark," and whether "the seller approved, wrote or reviewed the outside entity's . . . [materials]."[4] *See* 28 F.C.C.R. at 6592. Caroline Abraham further averred in her March 28, 2010 declaration that B2B would draft an advertisement and then receive customer approval for it prior to transmission. (Pls.' 56.1 ¶ 12, Ex. E., ¶ 6.) Here, there is evidence of the notation of "blast fax" on the carbon back of the check sent to B2B. This is sufficient to create a genuine issue of fact as to whether B2B acted with the apparent authority of Trynex.

Viewing this evidence in the light most favorable to Plaintiff, —coupled with the addition of B2B's own advertisement to the Trynex fax—there is a factual question that precludes summary judgment for Plaintiff as to whether B2B acted within the scope of its authority under any agency relationship. *See Bridgeview Health Care Ctr. Ltd. v. Clark*, 09 C 5601, 2013 WL 1154206 (N.D. Ill. Mar. 19, 2013) (material factual dispute on whether B2B exceeded authority by sending faxes outside certain authorized geographical range); *Creative Montessori v. Ashford Gear LLC*, No. 09 C 3963, Doc. # 157 ("In the instant case, the key fact on which defendant bases its motion, that it instructed B2B to send facsimiles only to a list of customers provided by defendant, remains in dispute.).

---

[4] The inquiry is more difficult in this respect because one of the only individuals who apparently interacted with, B2B—Barry Truan—testified that "he could not recall" in response to numerous questions on this subject including with regard to the alleged list of fax numbers of registered users and dealers provided to B2B, and whether he approved the fax in question.

## II.     James Truan

The parties dispute James Truan's liability under the same theories as they applied to Trynex.  Because James Truan is an officer of a corporation, however, he presents a different case with respect to vicarious liability.  Absent an expression of contrary intent, "when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules." *Meyer v. Holley*, 537 U.S. 280, 285, 123 S. Ct. 824, 828-29, 154 L. Ed. 2d 753 (2003).  Under the general background principles of vicarious liability, "in the absence of special circumstances it is the corporation, not its owner or officer, who is the principal or employer, and thus subject to vicarious liability for torts committed by its employees or agents." *See id.*  "A corporate employee typically acts on behalf of the corporation, not its owner or officer." *Id.* at 829.

Viewing the evidence in the light most favorable to Plaintiff, there is no genuine issue of fact as to whether James Truan may be vicariously liable as either the "sender" of the faxes within the meaning of 47 C.F.R. 64.1200(f)(10) or under agency principles.  It is undisputed that the check that James Truan signed was from "Trynex International."  (Pls. 56.1 ¶ 17, Ex. A, Ex. C.)  Moreover, Plaintiff has failed to present any evidence disputing that Barry Truan "never explained who Business to Business was nor the reason for the check to James Truan" and that Barry Truan "placed the notation 'Blast Fax' on the carbon back after James Truan signed the check drafted to Business To Business." (R. 199-8, Decl. Barry Truan ¶¶ 4,6.)  Although Plaintiff asserts that because James Truan was the head of marketing for Trynex, "it makes perfect sense that [he] would approve a fax marketing campaign," this speculation is not sufficient to survive summary judgment.  Similarly, while Plaintiff argues there is a genuine issue of material fact as to whether James Truan saw the notations on the carbon back of the

check, Plaintiff presents no evidence for this assertion, other than that he was the head of marketing. *See* Pls. Resp. to Defs. 56.1 ¶ 28. Indeed, premising Truan's liability solely on his status as the head of marketing would run afoul of the principle that a corporate officer may not be liable for corporate acts based purely on his or her status in the corporation. *See Texas v. Am. Blastfax, Inc.*, 164 F. Supp. 2d 892, 897 (W.D. Tex. 2001).

Taking all inferences in favor of Plaintiff, the same goes for any agency relationship between James Truan and B2B. Specifically, Plaintiffs have failed to put forth sufficient evidence that either James Truan manifested assent to B2B to act on his personal behalf and subject to his control or that B2B manifested assent or otherwise consented to act in this manner. The signing of the check alone is insufficient in this respect, particularly when Plaintiff provides no evidence to contradict James Truan's statements that he did not review the carbon back of the check at issue, and "routinely signs checks from Trynex's petty cash account without investigating the reason for the check." (R. 199-9, Truan Decl. ¶¶ 3-7 (Nov. 22, 2011).) Nor does Plaintiff dispute that James Truan never communicated with Caroline Abraham or B2B. (Def.'s 56.1 Resp. ¶ 42.).[5] As such, Plaintiff has failed to present more than the "scintilla" of evidence necessary to survive summary judgment.

Accordingly, the Court grants Defendants' Motion with respect to James Truan.[6]

---

[5] This outcome is consistent with cases considering personal liability of corporate officers for acts undertaken on behalf of a corporation under the TCPA. These cases require a far more significant level of involvement of the corporate officer than any conduct alleged here. *See Am. Blastfax, Inc.*, 164 F. Supp. 2d at 898 (noting the corporate officers were "the two persons who controlled all of Blastfax's day-to-day operations" and had "direct, personal involvement in and ultimate control over every aspect of Blastfax's wrongful conduct"); *Mais v. Gulf Coast Collection Bureau, Inc.*, 11-61936-CIV-SCOLA, No. 11-cv-61936, 2013 WL 1283885, at *1 (S.D. Fla. Mar. 27, 2013) (holding no personal liability for officer who attempted to implement policies conforming with the TCPA but was not actively or personally involved in the collection of the debt).

[6] Plaintiff contends that Defendants' Motion for Summary Judgment is no more than an attempt to take a "third bite at the apple," given the Court's denial of both Defendants' motion for partial

### III.    Damages

Under Section 227(b), "[a] person or entity" may bring an action to recover the greater of either the "actual monetary loss" from a violation of § 227(b) or "to receive $500 in damages for each such violation." 47 U.S.C. § 227(b)(3)(B). Plaintiff on behalf of the class seeks $4,098,000 in statutory damages for 8,196 violations of the TCPA, and a total award upon trebling the damages of $12,294,000.00. (R. 224, Pl.'s Reply 13.) Defendants argue that the proposed $4,098,000 award violates the Due Process Clause of the Fifth Amendment and that the Court should not treble the damages. Both issues are premature for resolution at this time. The Court will not address these issues if and until Plaintiff and the class prevail at trial.

---

summary judgment on similar grounds and motion for reconsideration of that order. Previously, in denying Defendants' motion for partial summary judgment as to James Truan, the Court held that the fact that James Truan signed the check with the notation "Blast Fax" created a genuine dispute as to Mr. Truan's liability. (R. 65, Order 2.) Subsequently, in their motion to reconsider this ruling, Defendants submitted a declaration from Mr. Truan, in which he stated that the notation "Blastfax" on the back of the check was "not [his] handwriting" and that he "never saw the carbon back of the check drafted to Business to Business" until May 2, 2011, as well as a declaration from Barry Truan stating he "placed the notation 'Blast Fax' on the carbon back [of the check] after James Truan signed the check." (R. 74-1, ¶¶ 6-7.; R. 74-2, ¶ 6.) At the time, the Court properly refused to consider this evidence as grounds for reconsideration because it was available to Defendants when they filed the original Motion. (*See* R. 97, at 3) (noting "motions for reconsideration cannot be used to introduce evidence that could have been presented earlier." (citing *Egonmwan v. Cook Cty. Sheriff's Dep't*, 602 F.3d 845, 852 (7th Cir. 2010).) Although Defendants have submitted the same evidence in support of their present Motion, the record as a whole and the arguments for which such evidence is relevant are more fully developed. In addition, Plaintiff has neither put forth evidence contesting Mr. Truan's statements nor demonstrated that it will be prejudiced by the Court's consideration of the evidence. Accordingly, Plaintiff's argument fails.

## CONCLUSION

For the foregoing reasons, the Court denies Plaintiff's Motion for Summary Judgment and grants Defendants' Motion for Summary Judgment as to James Truan and denies it as to Trynex, Inc.

**Date: September 3, 2013**

**ENTERED**

_____
AMY J. ST. EVE
United States District Court Judge